## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **HELEN D. MARTIN,** *Pro se* | § | |
| Plaintiff | § | |
| | § | |
| | § | |
| v. | § | **C.A. No.: 06-303 (GMS)** |
| | § | |
| **PACHULSKI, STANG, ZIEHL,** | § | |
| **YOUNG & JONES, P.C.,** | § | |
| | § | |
| Defendant | § | |
| | § | |

## DEFENDANT'S, PACHULSKI, STANG, ZIEHL, YOUNG & JONES, P.C., OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGEMENT

Respectfully submitted,

Dated: August 30, 2007

   /s/ *Richard R. Wier, Jr.*
Richard R. Wier, Jr. ( #716)
Michele D. Allen (#4359)
Two Mill Road, Suite 200
Wilmington, DE 19806
Rwier@wierlaw.com
302.888.3222
Attorney for Defendant

# TABLE OF CONTENTS

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

NATURE AND STAGE OF THE PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.    Summary Judgment Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.    Defendant Is Entitled to Judgement As A Matter Of Law On Plaintiff's Claim For a Violation of 42 U.S.C Section 1983 Because All Material Facts Have Been Presented And There Is Nothing In The Record To Support Defendant Was Acting Under Color of State Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    C.    Defendant Is Entitled To Judgment As A Matter Of Law On Plaintiff's Presumed Claim Under Title VII of the Civil Rights Act of (1964) Because All Material Facts Have Been Presented And There Is No Genuine Issue As To Any Material Fact And Therefore Plaintiff Has Failed To Make Out A *Prima Facie* Case Of Racial Discrimination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    D.    Defendant Is Entitled To Judgment As A Matter Of Law On Plaintiff's Presumed Claim Under 42 U.S.C § 1981 Because All Material Facts Have Been Presented And There Is No Genuine Issue As To Any Material Fact And Therefore Plaintiff Has Failed To Make Out A *Prima Facie* Case Of Racial Discrimination In Violation of 42 U.S.C § 1981. . . . . . . . . . . . . . . . . . . . . . . 10

    E.    Defendant Is Entitled To Judgment As A Matter Of Law On Plaintiff's Claim For A Racially Hostile Work Environment Because All Material Facts Have Been Presented And There Is No Genuine Issue As To Any Material Fact And Therefore Plaintiff Has Failed To Make Out A *Prima Facie* Case Of A Racially Hostile Work Environment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    F.    Defendant Is Entitled To Judgment As A Matter Of Law On Plaintiff's Complaint For Violation of The State Discrimination Statute Because At That Time Plaintiff Did Not Have A Private Right Of Action Against Defendant. . . . . . . . . . . . . . 13

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## TABLE OF CITATIONS

**Cases**

Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) . 5

Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

County Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061

    (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Blickling v. Kent General Hosp., Inc., 872 F. Supp. 1299 (D.Del. 1994) . . . . . . . . . . . . . . . . . 5

 Anderson v. Liberty Lobby, 477 U.S. 242, 248, 249 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

Parratt v. Taylor, 451 U. S. 527, 535 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fleming v. Polodora Italian Grill and Holleger, 2005 U.S. Dist. LEXIS 7363 (D. Del.) . . . . . . . 6

McDonnell Douglass Corp. v. Green, 411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Johnson v. Keebler-Sunshine Biscuits, Inc., 2007 U.S. App. LEXIS 1914 . . . . . . . . . . . . . . . . . 7

Tx. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981) . . . . . . . . . . . . . . . . . . . . . 7

Burlington Industries, Inc. Ellerth, 524 U.S. 742 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . 8, 9

Brown v. Phillip Morris, Inc. 250 F.3d 789, 797 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 10

 Allen, et. al. v. national Railroad Passenger Corporation (AMTRAK), 2007 U.S. App.

    LEXIS 2216 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Weston v. Pennsylvania*, 251 F.3d 420, 427 (3d cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Schuster v. Valentino*, 775 A.2d 1029 (Del. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Statutes**

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 7

42 U.S.C. § 1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10, 11

451 US 527, 535 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Delaware State Discrimination Act, 19 <u>Del</u>, <u>C</u>. § 701 *et. seq*. Complaint ¶ 9  . . . . . . . . . . . . . 13

74 <u>Del</u>. <u>Laws</u> <u>C</u>. 356 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Pursuant to Fed. R. Civ. P. 56©), Defendant, Pachulski, Stang, Ziehl, Young & Jones, P.C. (hereinafter Defendant), submits the following in support of its Motion for Summary Judgment.

## I.    NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff specifically alleges this case arises under 42 U.S.C § 1983 and under the State Discrimination Act of the State of Delaware. *App.* 2.[1]  Plaintiff filed her Complaint on May 8, 2006 alleging that Defendant created a racially hostile work environment and discriminated against her because of her race. *Complaint in general.*  Plaintiff has failed to establish a genuine issue of material fact that she was discriminated against or that there was a racially hostile work environment.  Therefore, Defendant moves this Court to enter Summary Judgment in its favor and against Plaintiff on all counts of the Complaint.

## II.    SUMMARY OF ARGUMENT

1.    There is no genuine issue as to any material fact and, therefore, Defendant is entitled to Summary Judgment.

2.    Defendant is entitled to Judgment as a matter of law on Plaintiff's claims under 42 U.S.C. § 1983 because Defendant is a private entity and was at no time acting under color of state law.

3.    Defendant is entitled to Judgment as a matter of law on Plaintiff's claim under Title VII of the Civil Rights Act of (1964), because all material facts have been presented and there is no genuine issue for trial since Plaintiff has failed to make out a *prima facie* case of racial

---

[1]Materials are included in the Appendix and reference will be to App.

discrimination.

4.      Defendant is entitled to Judgment as a matter of law on Plaintiff's

claim under 42 U.S.C. § 1981 because all material facts have been presented and there is no

genuine issue for trial since Plaintiff has failed to make out a *prima facie* case of intentional

racial discrimination.

5.      Defendant is entitled to Judgment as a matter of law on Plaintiff's claim of a

racially hostile work environment because all material facts have been presented and there is no

genuine issue of fact for trial since the facts do not establish a cause of action.

6.      Defendant is entitled to Judgment as a matter of law on Plaintiff's claim under the

State Discrimination Act because at the time Plaintiff voluntarily resigned there was no private

cause of action for discrimination and Plaintiff failed to exhaust her administrative remedies.


## III.    STATEMENT OF FACTS

Helen Martin, (Plaintiff) was employed by Pachulski, Stang, Ziehl, Young & Jones

(Defendant), a bankruptcy law firm, from January 2000 until January 2003. *App.* A1. Plaintiff

was the supervisor for the company's file room, until she voluntarily resigned on or about January

13, 2003. *App.* A1.

Plaintiff alleges she was discriminated against by Defendant, but has failed to cite to any

facts in either the Complaint or her deposition which support her allegation.  During Plaintiff's

deposition it became abundantly clear that throughout her employment with Defendant she was

upset and frustrated with upper management's lack of attention to personnel issues such as

employee's misuse of break times, personal hygiene issues, misuse of internet access and their

2

inappropriate dress *App.* A87-93.    Plaintiff interpreted the lack of attention as disrespectful and now is attempting to mask her personal dissatisfaction with Defendant as a claim for racial discrimination.  *App.* A38.

Plaintiff terminated her employment with Defendant on two other occasions prior to her final voluntary resignation on January 13, 2003.   On September 11, 2001, when the United States was under attack, Plaintiff quit because a senior partner, at the Defendant's firm, told her that he was in charge and he wanted the office closed.  *App.* A14-17.   Plaintiff returned to work on or about September 13, 2001, after meeting with Laura Davis Jones, the managing partner in Delaware. *App.* A26.   Again, in the early part of 2002 Plaintiff quit over personal hygiene issues with other employees.  *App.* A27-28.   Plaintiff at some point again returned to work with Defendant.  However, on January 13, 2003, Plaintiff could no longer deal with what she perceived as Defendant's lack of attention to personnel issues, specifically, personal hygiene issues and she voluntarily resigned without giving Defendant any advance notice.  *App.* A107.  Defendant did take several steps to try and resolve the personnel issues, but they were never to Plaintiff's satisfaction.  For example, there were meetings held throughout 2001 and 2002 with Plaintiff and the file room employees to  address the personnel issues regarding break times, internet access, documents and printers.  *App.* A100-103.

Moreover, Plaintiff was given numerous opportunities throughout her deposition to provide a basis for her discrimination claim and throughout Plaintiff recited several reasons that were devoid of any facts related to race.  Initially when Plaintiff was questioned about how she was discriminated against she only referenced the incident on September 11, 2001, when the senior partner told her he was in charge and that he wanted the office closed.  *App.* A13-16

Plaintiff at no time during her response raised the issue of race. Plaintiff was again questioned as to whether there were any other acts of discrimination and she responded in the affirmative and stated, that there were personal hygiene issues, with other employees failing to bathe. *App.* A30-33. Again, Plaintiff failed to make any reference to race. When questioned again regarding other wrongs that occurred which caused her to quit or feel discriminated against, Plaintiff responded that she was disrespected by management because they did not address the fact that her coworkers were disrespecting her by not doing their work. *App.* A44-48, A51-52, A68. Furthermore, when Plaintiff was asked if there was a precipitating factor that caused her to quit, she stated that what threw her over the edge was when the personnel manager commented that she know now what Plaintiff was complaining about because she had smelled the lack personal hygiene of some of the other employees. *App.* A107. Plaintiff became totally frustrated and packed her stuff up and left and never returned. Plaintiff was asked in her deposition about what was racially offensive about the work environment and she responded that her character was attacked when her supervisor referred to her as "straightforward and blunt", which again failed to reference her race. *App.* A159. Plaintiff, did state there was also name calling, but she was not aware of it and did not hear any of the name-calling. *Id.* Additionally, Plaintiff testified during an Unemployment Insurance Appeals Hearing in the matter of Martin and Pachulski Stang on May 14, 2003 and never raised the issue of race as to why she quit her job with Defendant. *App.* A252-299. It is evident, based on Plaintiff's deposition that her reason for voluntarily resigning was because of personnel difficulties that she had with Defendant which had nothing to do with Plaintiff's race or any discrimination or racially hostile work environment. Plaintiff alleges in her complaint that she was discriminated against because of her race, however, she has failed to show that there is

4

any material fact in dispute which raises a genuine issue for trial and, therefore, Defendant is entitled to judgment as a matter of law.

## IV.    ARGUMENT

### A.    Summary Judgment Standard

Summary Judgment should be entered for Defendant because all material facts have been presented, there is no genuine issue as to any material fact, and, Defendant is therefore entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (c).  *See Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986).

On a motion for Summary Judgment, "the moving party bears the initial burden of showing – that is, point out to the court that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  "The moving party is not required to negate the non-movant's claim, but instead must only point out the lack of evidence supporting the non-movant's claim." *County Floors, Inc. v. Partnership Composed of Gepner and Ford,* 930 F.2d 1056, 1061 (3d Cir. 1991); *Blickling v. Kent General Hosp., Inc.,* 872 F. Supp. 1299 (D.Del. 1994).

Once the moving party meets their burden, the non-moving party "may not rest upon the mere allegations or denials of his pleading." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).  The non-moving party instead "must set forth specific facts showing that there is a genuine issue for trial." *Matsushita,* 475 U.S. at 587.  Factual disputes that are irrelevant or unnecessary will not be counted. *Anderson,* 477 U.S. at 248.  The mere existence of a scintilla of evidence in support of the non-moving party will not prevent the grant of a motion for Summary j

Judgment; there must be enough evidence to enable a jury to reasonably find for the non-moving party on that issue. *Id.* at 249. Mere speculation or conjecture by the non-moving party clearly cannot preclude the granting of Summary Judgment.

For the reasons set forth herein, the undisputed facts establish that Defendant is entitled to Summary Judgment.

      **B.**      **Defendant Is Entitled to Judgement As A Matter Of Law On Plaintiff's Claim For a Violation of 42 U.S.C Section 1983 Because All Material Facts Have Been Presented And There Is Nothing In The Record To Support Defendant Was Acting Under Color of State Law.**

Plaintiff alleges in ¶ 8 of her Complaint that Defendant discriminated against her in violation of Plaintiff's rights under the Constitution and in violation of 42 U.S.C. Section 1983. Plaintiff does not support her claim, that Defendant was acting under color of state law, with any facts in either her Complaint or developed through her deposition.

A cause of action under 42 U.S.C § 1983, has two elements which Plaintiff must prove. *Parratt v. Taylor*, 451 U. S. 527, 535 (1981). Plaintiff must show that defendant deprived plaintiff of a right under the Constitution or the laws of the United States and Plaintiff must prove that the Defendant acted under color of sate law. *Id.* Defendant in the instant case is purely a private entity and Plaintiff, therefore, can not maintain a claim under 42 U.S.C § 1983. *Fleming v. Polodora Italian Grill and Holleger,* 2005 U.S. Dist. LEXIS 7363 (D. Del.) (*Pro Se* plaintiff filed a lawsuit alleging a violation of 42 U.S.C § 1983 against defendants and the Court dismissed the Complaint as frivolous because the Complaint only stated a claim against private individuals and entities). Plaintiff's claim for violation of 42 U.S.C § 1983, does not apply to Defendant since Defendant is a private entity and was not acting under color of state law. Therefore,

Defendant is entitled to Judgment as a matter of law on Plaintiff's claim for violation 42 U.S.C §
1983.

    **C.    Defendant Is Entitled To Judgment As A Matter Of Law On Plaintiff's Presumed Claim Under Title VII of the Civil Rights Act of (1964) Because All Material Facts Have Been Presented And There Is No Genuine Issue As To Any Material Fact And Therefore Plaintiff Has Failed To Make Out A *Prima Facie* Case Of Racial Discrimination.**

Although Plaintiff does not specifically cite a violation of 42 U.S.C. § 2000(e), Title VII of
the Civil Rights Act of (1964) [Title VII], Plaintiff in ¶ 11 of her Complaint references a "right to
sue" letter from the EEOC. Due to the fact that Plaintiff is *pro se*, Defendant interprets the
Complaint with wide latitude and presumes Plaintiff is alleging a claim under 42 U.S.C. §
2000(e), [Title VII]. Plaintiff has failed to assert a viable claim under 42 U.S.C. § 2000(e), [Title
VII], and therefore Defendant is entitled to judgment as a matter of law.

In order for Plaintiff to establish a *prima facie* case of racial discrimination, under [Title
VII], she must show that: (1) she is a member of a protected class; (2) she was qualified for the
position; (3) there was some adverse employment action taken against her and (4) other members,
not in the protected class, were treated more favorably. *McDonnell Douglass Corp. v. Green*, 411
U.S. 792 (1973). If Plaintiff can establish the four elements then the employer must articulate a
legitimate non-discriminatory reason for the adverse employment decision. *Johnson v. Keebler-
Sunshine Biscuits, Inc.*, 2007 U.S. App. LEXIS 1914 (citing *Goosby v. Johnson & Johnson Med.,
Inc.*, 228 F.3d 313, 318-19 (3d Cir. 2000))(citing *Tx. Dep't of Cmty. Affairs v. Burdine*, 450 U.S.
248, 254-56 (1981)). Once Defendant has met its burden then Plaintiff must by a preponderance
of the evidence prove that the legitimate reasons offered by Defendant were a mere pretext for the
discrimination. *Tx. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). Plaintiff has

presented no facts to establish that there was an adverse employment action taken against her and therefore the remaining prongs need not be addressed.

Plaintiff in the instant case has failed to set forth any facts in either her Complaint or during her deposition to establish even a *prima facie* case of racial discrimination and, therefore, Defendant is entitled to Judgment as a matter of law. Plaintiff has produced no facts to show white employees similarly situated were treated more favorably. In addition, all material facts have been presented and there is no genuine issue as to any material fact and the facts do not support an adverse employment action taken against Plaintiff. The United States Supreme Court has defined an adverse employment action as:

> A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. . . A tangible employment action in most cases inflicts direct economic harm.

*Burlington Industries, Inc. Ellerth,* 524 U.S. 742 (1998). Further the Third Circuit has defined an "adverse employment action" under [Title VII] as "an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" *Storey v. Burns Int'l Sec. Servs.,* 390 F.3d 760, 764 (3d Cir. 2004). (quoting *Cardenas v. Massey,* 269 F.3d 251, 263 (3d Cir. 2001).

During Plaintiff's deposition she stated the reason she believed she was discriminated against was because Defendant failed to address her complaints regarding personnel issues with other employees such as: personal hygiene issues, misuse of breaks, failure to do their work, not showing up for work and name calling. *App.* A68-70. Plaintiff in her deposition speculated that if she were white than management would have taken care of the personnel issues. *App.* A69.

8

Plaintiff failed to provide any situation in which, any other employees outside of her protected

class, reported personnel issues that were immediately addressed. Therefore, Plaintiff has failed

to show Defendant treated employees outside of Plaintiff's protected class more favorably. A lack

of attention by Defendants in dealing with Plaintiff's complaints regarding other employee's

personnel issues, relating personal hygiene issues, misuse of breaks, failure to do their work, not

showing up for work and name calling is not an adverse employment action against Plaintiff.

Plaintiff did not receive any change of status in her employment, she was not terminated, she was

not reassigned and she did not receive any change in her benefits.[2] Furthermore, there has been no

alteration in Plaintiff's terms, conditions, or privileges of employment. *Storey v. Burns Int'l Sec.*

*Servs.*, 390 F.3d 760, 764 (3d Cir. 2004).

Additionally, Plaintiff, claims she did not receive a pay raise when it was promised to her and other file room employees in August 2001. *App.* A163-164. Plaintiff admits that the file room employees consisted of both black and white employees. *Id.* Plaintiff further admitted in her deposition that the file room employees, including herself, did eventually receive the promised raises at the end of 2001 and 2002. *Id.* Plaintiff also claims she asked for a pay raise and did not get it even though her fellow white coworkers did receive raises. *App.* A169. However, Plaintiff admitted that the white employees that she was referring to were either paralegals or secretaries. *Id.* Those positions were not similarity situated to Plaintiff and therefore their alleged raises have no relevance as to whether or not Plaintiff suffered an adverse employment action. Defendant explained to Plaintiff and the other file room employees that based on a survey they did of file rooms throughout the City of Wilmington they found that the salaries their employees were receiving was comparable. *App.* A178. Therefore, Plaintiff has clearly failed to establish any material facts supporting a *prima facie* case for racial discrimination claim under 42 U.S.C. § 2000(e), Title VII of the Civil Rights Act of (1964) and Judgment as a matter of law should be entered in favor of Defendant.

---

[2] Plaintiff never states in her charge to the DDOL, *App* A300. , the Complaint or her deposition that she was denied a promotion, however, in her resignation letter, *App.* A301 she does reference that she was passed over for promotions, but failed to establish any facts to support her statement. Most specifically she has failed to identify what position she allegedly applied for, when and who received the promotion. Therefore, Plaintiff can not show that she was not promoted.

**D.**     **Defendant Is Entitled To Judgment As A Matter Of Law On Plaintiff's Presumed Claim Under 42 U.S.C § 1981 Because All Material Facts Have Been Presented And There Is No Genuine Issue As To Any Material Fact And Therefore Plaintiff Has Failed To Make Out A *Prima Facie* Case Of Racial Discrimination In Violation of 42 U.S.C § 1981.**

Plaintiff does not specifically allege a violation of 42 U.S.C. § 1981 in her Complaint. However, to the extent the Court interprets her Complaint as encompassing an allegation of a violation of 42 U.S.C. § 1981, Judgment as a matter of law must be entered in favor of Defendant because Plaintiff has failed to establish any material facts to support a *prima facie* case of racial discrimination under 42 U.S.C. § 1981.

To state a claim under 42 U.S.C. § 1981, Plaintiff must allege facts to support: (1) she is a member of a racial minority; (2) Defendants intended to discriminate against her on the basis of her race; and (3) the discrimination concerned one or more of the activities enumerated in the statute. *Brown v. Phillip Morris, Inc.* 250 F.3d 789, 797 (3d Cir. 2001).

Throughout Plaintiff's deposition she made broad generalizations without any supporting facts that she was discriminated against by Defendant because she felt as though Defendant would have more effectively dealt with the personnel and equipment issues if she was white. *App.* A69, A116. However, throughout her entire deposition Plaintiff failed to support her overly broad and general allegation that she was treated differently because of her race. In a presumed attempt to support her claim that she was intentionally discriminated against, Plaintiff stated in her deposition that her supervisor attacked her character by describing her as "blunt and outspoken". *App.* A127. Although, the description may be misplaced, it did not reference race and fails to show any intentional discrimination. Since Plaintiff has failed to establish any facts to support any intentional racial discrimination there is no need to determine whether or not the

discrimination covered one or more of the activities enumerated in the statute. Therefore, since Plaintiff has failed to establish any material facts supporting a *prima facie* case for racial discrimination under 42 U.S.C. § 1981, Judgment as a matter of law must be granted to Defendant.

**E.      Defendant Is Entitled To Judgment As A Matter Of Law On Plaintiff's Claim For A Racially Hostile Work Environment Because All Material Facts Have Been Presented And There Is No Genuine Issue As To Any Material Fact And Therefore Plaintiff Has Failed To Make Out A *Prima Facie* Case Of A Racially Hostile Work Environment.**

In order for Plaintiff to establish a racially hostile work environment she is required to show that: (1) she suffered intentional discrimination due to her race, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected her, (4) the discrimination would have detrimentally affected a reasonable person of the same race in that position, and (5) the existence of *respondent superior* liability. *Allen, et. al. v. national Railroad Passenger Corporation (AMTRAK)*, 2007 U.S. App. LEXIS 2216 (*Citing Jensen v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir. 2006)). Plaintiff in ¶ 6 of her Complaint makes an overly broad general allegation that "Throughout the duration of Plaintiff's employment, . . . Defendant created a racially hostile work environment and discriminated against Plaintiff because of her race." Plaintiff has failed to establish any material facts supporting any specific incidents that created a racially hostile work environment and therefore Defendant is entitled to Judgment as a matter of law.

During Plaintiff's deposition she discussed some incidents in which racial terms were used. However, Plaintiff did not specifically hear any of these comments directly. *App.* A49, A73 On one occasion Plaintiff became aware that Cheryl Pitman told Wayne Cross that "she has lived

around niggers all her life". *Id.* Defendant took immediate action regarding the comment and held a meeting addressing the issue. *App.* A50. Additionally, Plaintiff states that racial names were called against her, and although she could not recall the specifics, she did recall that they did not bother her. *App.* A73. Plaintiff also recalled a situation in which an employee said something verbal about her, but she did not know what was said. *App.* A75-76. Mary Ritchie Johnson, Plaintiff's supervisor, was made aware of the situation by other employees and took immediate steps in terminating the employee. *App.* A76-77. Plaintiff did hear a conversation between two employees, in which one of them said, "only three black people in the file room." *App.* A79. These incidents, however, fail to satisfy the burden required of Plaintiff in establishing a racially hostile environment. As stated, *supra*, Plaintiff has failed to support her allegation that she suffered intentional discrimination. The incidents that Plaintiff alleged in her deposition were not severe and pervasive. Moreover, there is nothing in the record to support that Plaintiff was detrimentally affected by the incidents. In fact, Plaintiff stated in her deposition that she was not bothered by the comments and she did not care what people said about her. *App.* A73. Since Plaintiff was not detrimentally affected there is no need to address whether a reasonable person of her race would be affected. Lastly, there is no existence of *respondent superior* liability because Defendant took immediate action to resolve all incidents regarding racial comments which were brought to their attention. *See Allen, et. al. v. national Railroad Passenger Corporation (AMTRAK),* 2007 U.S. App. LEXIS 2216 (employees claimed a hostile work environment because of a racially offensive remark made on the telephone by another worker and because of a racially derogatory flyer that was posted. In that case the Court held the employees failed to establish a *prima facie* case because the employer took prompt disciplinary action and had a

12

policy in place that prohibited racial harassment). An employer can only be held liable under Title VII, for an employee's action in creating a hostile work environment when the Plaintiff can prove that "the employer failed to provide a reasonable avenue for complaint, or, if the employer was aware of the alleged harassment, that it failed to take appropriate remedial action." *Weston v. Pennsylvania*, 251 F.3d 420, 427 (3d cir. 2001). Plaintiff has failed to establish any facts to show that Defendant did not provide a reasonable means to complain and that Defendant did not respond to any complaints they were aware of. Moreover, the incidents alleged by Plaintiff, to which Plaintiff admits she was not offended, do not rise to the level of "pervasive" discrimination. The record is not even clear on what was said, by whom, when, nor where. The ambiguity of the statements makes it impossible to say that they were "pervasive". Moreover, as stated, *supra*, the incidents were not so severe as to alter the conditions of Plaintiff's employment because she stated in her deposition that she was not bothered by the comments. Plaintiff has failed to establish any material facts that raises a genuine issue for trial as to a racially hostile work environment and therefore Judgment must be entered in favor of Defendant.

**F.     Defendant Is Entitled To Judgment As A Matter Of Law On Plaintiff's Complaint For Violation of The State Discrimination Statute Because At That Time Plaintiff Did Not Have A Private Right Of Action Against Defendant.**

Plaintiff has alleged in her Complaint that Defendant's actions were in violation of the Delaware State Discrimination Act, 19 *Del C.* § 701 et. seq. Complaint ¶ 9. As stated, *supra*, Plaintiff has failed to support or make out a *prima facie* case for any racial discrimination. Plaintiff had no cause of action within that statute. At the time of her alleged discrimination, prior to her resignation in January 2003, she did not have a private right of action against Defendant

was amended, by 74 *Del Laws C*. 356, to provide a process before the Delaware Department of Labor ending in the issuance of a right to sue and setting a ninety day limitation period to file a suit upon receipt of the right to sue.) (*Citing Wright v. ICI Americans Inc.*, 813 F. Supp. 1083, 1091 (D. Del. 1993)).  Plaintiff did not have a private right of action and no right to sue was issued.  Therefore, on August 31, 2004, the Delaware Department of Labor dismissed Plaintiff's claim.  *App.*  A302-303.  Plaintiff's only remedy was a review by the Court of Chancery.  She was advised of the limited remedy and received the dismissal which stated, "Since this decision ends the administrative process, you may have a right of judicial review under default principles of law in the Court of the Chancery." Plaintiff admitted that she did not pursue such a review with the Court of Chancery and, therefore, did not exhaust her administrative remedies.  *App.*  A60. Therefore, it is clear that Defendant is entitled to Judgment as a matter of law on Plaintiff's State Law Claim of racial discrimination because she did not have a private right of action and did not exhaust her administrative remedies.

## V.  CONCLUSION

For the aforementioned reasons, the Defendant, respectfully request that Judgment as a matter of law be entered in its favor and against Plaintiff on all claims.


Respectfully submitted,


/s/ *Richard R. Wier, Jr.*
Richard R. Wier, Jr. ( #716)
Michele D. Allen (#4359)
Two Mill Road, Suite 200
Wilmington, DE 19806
Rwier@wierlaw.com
302.888.3222
Attorney for Defendant

Dated August 30, 2007

14

**IN THE UNITED STATES DISTRICT COURT**
**IN AND FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **HELEN D. MARTIN,** *Pro se* | § | |
| Plaintiff | § | |
| | § | |
| | § | |
| v. | § | **C.A. No.: 06-303 (GMS)** |
| | § | |
| **PACHULSKI, STANG, ZIEHL,** | § | |
| **YOUNG & JONES, P.C.,** | § | |
| | § | |
| Defendant | § | |

## <u>ORDER</u>

AND NOW this _____ day of _____, 2007 it is hereby ORDERED AND

DECREED that Defendant's Pachulski, Stang, Ziehl, Young & Jones, P.C., Motion for Summary

Judgment is GRANTED.

_____
J.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HELEN D. MARTIN, *Pro se* | § | |
| Plaintiff | § | |
| | § | |
| | § | |
| v. | § | C.A. No.: 06-303 (GMS) |
| | § | |
| PACHULSKI, STANG, ZIEHL, | § | |
| YOUNG & JONES, P.C., | § | |
| Defendant | § | |
| | § | |

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of August 2007,   that  I served Plaintiff, Helen D.

Martin with Defendant's, Opening Brief In Support Of Its Motion for Summary Judgment. by

U.S. MAIL on:


Helen D. Martin, *pro se*
3 East 24th Street
Wilmington, Delaware 19802


RICHARD R. WIER, JR., P.A.


 /s/ Richard R. Wier
Richard R. Wier, Jr. (#716)
Michele D. Allen (#4359)
Two Mill Road, Suite 200
Wilmington, DE 19806
(302)888-3222

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 7363

Case 1:06-cv-00303-GMS   Document 26-2   Filed 08/30/2007   Page 1 of 18

Page 1 of 4

Service: **Get by LEXSEE®**
Citation: **2005 us dist lexis 7363**

*2005 U.S. Dist. LEXIS 7363, \**

SEBRON E. FLEMING III, Plaintiff, v. POLODORA ITALIAN GRILL and AARON S. HOLLEGER, Defendants.

Civ. No. 04-1480-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2005 U.S. Dist. LEXIS 7363

April 27, 2005, Decided

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff claimant filed a pro se action pursuant to 42 U.S.C.S. § 1983 seeking compensatory damages against defendants, a restaurant and its assistant manager, alleging that the manager tackled the claimant and struck him with an aluminum pole. The claimant requested leave to proceed in forma pauperis pursuant to 28 U.S.C.S. § 1915.

**OVERVIEW:** Although the court granted the claimant leave to proceed in forma pauperis, the claimant had to establish a claim upon which relief could be granted. Pursuant to § 1915(e)(2)(B), the court dismissed the complaint as frivolous under the standards of Fed. R. Civ. P. 12(b)(6). The claimant's action had no arguable basis in law or fact because the claims were against a private individual and a restaurant. The claimant failed to allege that either party acted under color of state law and deprived the claimant of his constitutional rights. Thus, the claimant failed to state a cause of action under 42 U.S.C.S. § 1983.

**OUTCOME:** The court dismissed the complaint.

**CORE TERMS:** frivolous, forma pauperis, pro se, leave to proceed, standard of review, fails to state, monetary relief, malicious, arguable, lawsuit, pauper, immune, entities

## LEXISNEXIS® HEADNOTES

**– Hide**

Civil Procedure > Sanctions > Baseless Filings > General Overview ⌐ₐₗₗ
Civil Rights Law > Prisoner Rights > Prison Litigation Reform Act > Claim Dismissals ⌐ₐₗₗ
Criminal Law & Procedure > Accusatory Instruments > General Overview ⌐ₐₗₗ

*HN1* ⤷Reviewing complaints filed pursuant to 28 U.S.C.S. § 1915 is a two step process. First, the court must determine whether a plaintiff is eligible for pauper status. Once the pauper determination is made, the court must then determine whether the action is frivolous, malicious, fails to state a claim upon which relief may be granted or seeks monetary relief from a defendant immune from such relief pursuant to 28 U.S.C.S. §§ 1915(e)(2)(B), 1915A(b)(1). If the court finds plaintiff's complaint falls under any one of the exclusions listed in the statutes, then the court must dismiss the complaint. More Like This Headnote

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 7363

Case 1:06-cv-00303-GMS    Document 26-2    Filed 08/30/2007    Page 2 of 18

Page 2 of 4

Civil Procedure > Sanctions > Baseless Filings > General Overview ⬆ᴬᴸᴸ
   Civil Rights Law > Prisoner Rights > Prison Litigation Reform Act > Claim Dismissals ⬆ᴬᴸᴸ
   Civil Rights Law > Prisoner Rights > Prison Litigation Reform Act > Judicial Screening ⬆ᴬᴸᴸ

*HN2*⬇ 28 U.S.C.S. § 1915(e)(2)(B) authorizes the court to dismiss an in forma pauperis complaint at any time, if the court finds the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted or seeks monetary relief from a defendant immune from such relief. 28 U.S.C.S. § 1915A(a) requires the court to screen prisoner in forma pauperis complaints seeking redress from governmental entities, officers or employees before docketing, if feasible and to dismiss those complaints falling under the categories listed in § 1915A(b) (1). More Like This Headnote

Civil Procedure > Pleading & Practice > Pleadings > Proceedings in Forma Pauperis > General Overview ⬆ᴬᴸᴸ
Civil Procedure > Parties > Self-Representation > Pleading Standards ⬆ᴬᴸᴸ
   Civil Rights Law > Prisoner Rights > Prison Litigation Reform Act > Claim Dismissals ⬆ᴬᴸᴸ

*HN3*⬇ When reviewing complaints pursuant to 28 U.S.C.S. §§ 1915(e)(2)(B), 1915A(b) (1), a court must apply the Fed. R. Civ. P. 12(b)(6) standard of review. Accordingly, the court must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom. Pro se complaints are held to less stringent standards than formal pleadings drafted by lawyers and can only be dismissed for failure to state a claim if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. More Like This Headnote

Civil Procedure > Dismissals > Involuntary Dismissals > General Overview ⬆ᴬᴸᴸ
Civil Procedure > Sanctions > Baseless Filings > General Overview ⬆ᴬᴸᴸ

*HN4*⬇ The standard for determining whether an action is frivolous is well established. The United States Supreme Court has explained that a complaint is frivolous where it lacks an arguable basis either in law or fact. More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims ⬆ᴬᴸᴸ
Civil Rights Law > Section 1983 Actions > Private Facilities ⬆ᴬᴸᴸ
Civil Rights Law > Section 1983 Actions > Scope ⬆ᴬᴸᴸ

*HN5*⬇ In order to bring suit under 42 U.S.C.S. § 1983, a plaintiff must allege that a person acting under color of state law deprived the plaintiff of his constitutional rights. More Like This Headnote

**COUNSEL:** **[\*1]** For Sebron E. Fleming, III, Plaintiff, Pro se, Smyrna, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION**

**MEMORANDUM ORDER**

**I. INTRODUCTION**

Plaintiff Sebron Fleming is a pro se litigant who filed this action pursuant to 42 U.S.C. § 1983 and requested leave to proceed in forma pauperis pursuant to 28 U.S.C. § 1915. (D.I. 1, 2)

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 7363

Case 1:06-cv-00303-GMS    Document 26-2    Filed 08/30/2007    Page 3 of 18

Page 3 of 4

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## II. STANDARD OF REVIEW

**HN1** Reviewing complaints filed pursuant to 28 U.S.C. § 1915 is a two step process. First, the court must determine whether plaintiff is eligible for pauper status. On January 18, 2005, the court granted plaintiff leave to proceed in forma pauperis. (D.I. 8)

Once the pauper determination is made, the court must then determine whether the action is frivolous, malicious, fails to state a claim upon which relief may be granted or seeks monetary relief from a defendant immune from such relief pursuant to 28 U.S.C. §§ 1915(e)(2)(B)-1915A(b) (1). ¹ If the court finds plaintiff's complaint falls under **[*2]** any one of the exclusions listed in the statutes, then the court must dismiss the complaint.

**FOOTNOTES**

1 These two statutes work in conjunction. **HN2** Section 1915(e)(2)(B) authorizes the court to dismiss an in forma pauperis complaint at any time, if the court finds the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted or seeks monetary relief from a defendant immune from such relief. Section 1915A(a) requires the court to screen prisoner in forma pauperis complaints seeking redress from governmental entities, officers or employees before docketing, if feasible and to dismiss those complaints falling under the categories listed in § 1915A(b)(1).

**HN3** When reviewing complaints pursuant to 28 U.S.C. §§ 1915(e)(2)(B)-1915A(b)(1), the court must apply the Fed. R. Civ. P. 12(b)(6) standard of review. *See Neal v. Pennsylvania Bd. of Prob. & Parole*, 1997 U.S. Dist. LEXIS 8696, No. 96-7923, 1997 WL 338838, *1 (E.D. Pa. June 19, 1997) **[*3]** (applying Rule 12(b)(6) standard as appropriate standard for dismissing claim under § 1915A). Accordingly, the court must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996). Pro se complaints are held to "less stringent standards than formal pleadings drafted by lawyers and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Estelle v. Gamble*, 429 U.S. 97, 106, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).

**HN4** The standard for determining whether an action is frivolous is well established. The Supreme Court has explained that a complaint is frivolous "where it lacks an arguable basis either in law or fact." *Neitzke v. Williams*, 490 U.S. 319, 325, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1989). ² As discussed below, plaintiff's claims have no arguable basis in law or fact. Therefore, his complaint shall be dismissed as frivolous pursuant to 28 U.S.C. §§ 1915(e)(2)(B)-1915A(b) **[*4]** (1).

**FOOTNOTES**

2 *Neitzke* applied § 1915(d) prior to the enactment of the Prisoner Litigation Reform Act of 1995 ("PLRA"). Section 1915(e)(2)(B) is the re-designation of the former § 1915(d) under the PLRA. Therefore, cases addressing the meaning of frivolousness under the prior section remain applicable. *See* Prisoner Litigation Reform Act of 1995, Pub. L. No. 14-134, § 804, 110 Stat. 1321 (April 26, 1996).

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 7363
Case 1:06-cv-00303-GMS    Document 26-2    Filed 08/30/2007    Page 4 of 18
Page 4 of 4

## III. DISCUSSION

Plaintiff filed this pro se lawsuit under 42 U.S.C. § 1983 against defendant Holleger in his capacity as assistant manager of defendant Polodoro Italian Grill. (D.I. 2) According to plaintiff's complaint, defendant Holleger tackled plaintiff and struck plaintiff twice with a six-foot aluminum pole. (*Id.*) Plaintiff requests compensatory damages. (*Id.*)

Dismissal of this lawsuit pursuant to 28 U.S.C. §§ 1915(e)(2)(B)-1915A(b)(1) is appropriate because plaintiff has failed to state a claim under 42 U.S.C. § 1983. **[*5]** *HN5* In order to bring suit under § 1983, plaintiff must allege that a person acting under color of state law deprived plaintiff of his constitutional rights. *West v. Atkins*, 487 U.S. 42, 48, 101 L. Ed. 2d 40, 108 S. Ct. 2250 (1988). Plaintiff's complaint only states claims against private individuals and entities (i.e., defendants Holleger and Polodoro Italian Grill), against whom he cannot maintain a § 1983 claim. Therefore, plaintiff's complaint is dismissed as frivolous pursuant to 28 U.S.C. §§ 1915(e)(2)(B)-1915A(b)(1).

## IV. CONCLUSION

At Wilmington this 27th day of April, 2005, for the reasons set forth above;

IT IS ORDERED that plaintiff's complaint (D.I. 2) is dismissed as frivolous pursuant to 28 U.S.C. §§ 1915(e)(2)(B)-1915A(b)(1).

United States District Judge

Sue L. Robinson

Service: **Get by LEXSEE®**
Citation: **2005 us dist lexis 7363**
View: Full
Date/Time: Thursday, August 30, 2007 - 12:58 PM EDT

LexisNexis

About LexisNexis  | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Case 1:06-cv-00303-GMS    Document 26-2    Filed 08/30/2007    Page 5 of 18
Get a Document - by Citation - 214 Fed. Appx. 239
Page 1 of 6

Service: **Get by LEXSEE®**
Citation: **2007 U.S. App. LEXIS 1914**

*214 Fed. Appx. 239, \*; 2007 U.S. App. LEXIS 1914, \*\**

DAVID M. JOHNSON, Appellant v. KEEBLER-SUNSHINE BISCUITS, INC., a/k/a THE KEEBLER COMPANY

NO. 06-3219

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

214 Fed. Appx. 239; 2007 U.S. App. LEXIS 1914

January 3, 2007, Submitted Under Third Circuit LAR 34.1(a)
January 29, 2007, Filed

**NOTICE: [\*\*1]** NOT PRECEDENTIAL OPINION UNDER THIRD CIRCUIT INTERNAL OPERATING PROCEDURE RULE 5.7. SUCH OPINIONS ARE NOT REGARDED AS PRECEDENTS WHICH BIND THE COURT.

PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** On Appeal From the United States District Court For the District of New Jersey. (D.C. Civil No. 00-cv-02055). District Judge: Honorable Jose L. Linares.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Appellant former employee filed an employment discrimination suit against appellee former employer alleging that he was transferred from his position in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e et seq. The employee filed a pro se appeal after the United States District Court for the District of New Jersey granted summary judgment to the employer as to his Title VII race and sex discrimination claims.

**OVERVIEW:** The employee, an African-American male, was bumped from his pesticide control position by a Caucasian, female co-worker who had greater seniority. The employee worked as a machine cleaner and held other positions until the plant where he worked was closed. In his suit, the employee alleged that the employer acted with a discriminatory motive when it transferred him from the pesticide control position. The district court granted summary judgment to the employer, finding that the employee failed to establish a prima facie case because he did not present evidence that would support an inference of discrimination. The court agreed that the employer was entitled to summary judgment, but on different grounds. It held that the employee had established a prima facie case. The fact the employee was replaced by someone outside of his protected class was sufficient to establish an inference of discrimination. The employee failed, however, to raise a disputed issue of material fact as to whether the legitimate, nondiscriminatory reason proffered by the employer, namely that seniority-based bumping was allowed under the terms of a collective bargaining agreement, was pretextual.

**OUTCOME:** The court affirmed the district court's grant of summary judgment to the employer, but on different grounds than those relied upon by the district court.

**CORE TERMS:** plant, pesticide, prima facie case, non-discriminatory, replaced, protected

Get a Document - by Citation - 214 Fed. Appx. 239
Case 1:06-cv-00303-GMS    Document 26-2    Filed 08/30/2007    Page 6 of 18
Page 2 of 6

class, seniority, summary judgment, factfinder, pretextual, different reasons, legitimate reasons, came forward, ability to perform, transferred, proffered, biscuits, pretext, layoff, bumped, color, woman, infer, sex, issue of fact, reopened, sanitor, machine, cleaner

## LEXISNEXIS® HEADNOTES                                                    – Hide

Civil Procedure > Appeals > Appellate Jurisdiction > General Overview 🔦
*HN1* ⬆ An appellate court can affirm an order of a district court based upon different reasons if the record supports the judgment.  More Like This Headnote

Civil Procedure > Summary Judgment > Appellate Review > Standards of Review 🔦
Civil Procedure > Appeals > Standards of Review > De Novo Review 🔦
*HN2* ⬆ The United States Court of Appeals for the Third Circuit reviews the grant of summary judgment de novo.  More Like This Headnote

Civil Procedure > Summary Judgment > Standards > Appropriateness 🔦
*HN3* ⬆ Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c).  More Like This Headnote

Evidence > Procedural Considerations > Burdens of Proof > Burden Shifting 🔦
Evidence > Procedural Considerations > Burdens of Proof > Preponderance of Evidence 🔦
Labor & Employment Law > Discrimination > Racial Discrimination > Proof > Burdens of Proof > Burden Shifting 🔦
Labor & Employment Law > Discrimination > Racial Discrimination > Proof > Burdens of Proof > Employee Burdens 🔦
*HN4* ⬆ Claims of discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., are analyzed under the burden-shifting framework announced in McDonnell Douglas. In order to show a prima facie case of racial discrimination, a plaintiff must illustrate that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination. If a plaintiff establishes a prima facie case, the employer must come forward with a legitimate, nondiscriminatory reason for the adverse employment decision. If the defendant meets this burden, the plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Evidence > Inferences & Presumptions > Inferences 🔦
Labor & Employment Law > Discrimination > Racial Discrimination > Proof > Burdens of Proof > Burden Shifting 🔦
Labor & Employment Law > Discrimination > Racial Discrimination > Proof > Burdens of Proof > Employee Burdens 🔦
*HN5* ⬆ In order to show pretext, a Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., racial discrimination plaintiff must submit evidence which: (1) casts doubt on the legitimate reason proffered by the employer such that a factfinder could reasonably conclude that the reason was a fabrication; or (2) allow the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the employee's termination. The non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reasons for its action that a reasonable

Get a Document - by Citation - 214 Fed. Appx. 239
Case 1:06-cv-00303-GMS    Document 26-2    Filed 08/30/2007    Page 7 of 18
Page 3 of 6

factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted nondiscriminatory reasons. More Like This Headnote | *Shepardize:* Restrict By Headnote

Evidence > Inferences & Presumptions > Inferences 🔍
Labor & Employment Law > Discrimination > Racial Discrimination > Proof > Burdens of Proof > Employee Burdens 🔍

HN6 ⚡While the United States Court of Appeals for the Third Circuit no longer requires a Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e et seq., plaintiff to show that he was replaced by someone outside of the protected class, to establish an inference of racial discrimination, such evidence establishes the fourth and final element of a prima facie case. A plaintiff establishes the fourth element of a prima facie case if he is replaced by someone outside of the protected class or is treated differently than similarly-situated, nonprotected employees. The mere fact that a plaintiff is replaced by someone outside of the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII analysis. More Like This Headnote |
*Shepardize:* Restrict By Headnote

Civil Procedure > Appeals > Briefs 🔍
Civil Procedure > Appeals > Reviewability > Preservation for Review 🔍
Labor & Employment Law > Discrimination > Disparate Treatment > Employment Practices > Adverse Employment Actions > General Overview 🔍

HN7 ⚡Where a Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., defendant does not contest a district court's adverse employment action finding, the defendant's argument, that no adverse action occurred, is deemed waived. The failure to identify or argue an issue in an opening brief constitutes a waiver of the argument on appeal. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > Defenses & Exceptions > General Overview 🔍
Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting 🔍
Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burdens of Proof 🔍

HN8 ⚡The defendant's burden at the second stage of the McDonnell Douglas burden-shifting framework is relatively light, and it is satisfied if the defendant articulates a legitimate reason for the adverse employment action. More Like This Headnote

**COUNSEL:** DAVID M. JOHNSON, Appellant, Pro se, Iselin, NJ.

For KEEBLER-SUNSHINE BISCUITS, INC., /aka Keebler Co, Appellee: Francis X. Dee ✓, McElroy, Deutsch, Mulvaney & Carpenter, Three Gateway Center, Newark, NJ.

**JUDGES:** Before: RENDELL, COWEN and VANANTWERPEN, Circuit Judges.

**OPINION**

[*240] OPINION OF THE COURT

PER CURIAM

This is an appeal from the District Court's grant of summary judgment in favor of Keebler-Sunshine Biscuits, Inc. ▾ ("Keebler-Sunshine") on David Johnson's claim that Keebler-

Sunshine transferred him to a different position in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Johnson is an African-American male. Johnson asserted that Keebler-Sunshine discriminated against him on the basis of his color, race and sex. We will affirm, albeit for different reasons than held by the District **[\*\*2]** Court. *See Guthrie v. Lady Jane Collieries, Inc.*, 722 F.2d 1141, 1145 n.1 (3d Cir. 1983) (stating *HN1* an appellate court can affirm an order of the District **[\*241]** Court based upon different reasons if the record supports the judgment).

I.

Keebler-Sunshine operated a plant which produced cookies, biscuits and crackers in Sayreville, New Jersey. Johnson started his employment with Keebler-Sunshine in 1989 in the baking and mixing department. Virginia Ramer, a Caucasian woman, began her employment with Keebler-Sunshine in 1981. From approximately 1987 to 1992, Ramer held the pesticide control position. In 1992, Ramer began a different position and Keebler-Sunshine offered the pesticide control position to Johnson. Johnson accepted and began training with Ramer. Johnson held the pesticide control position until 1997. In December 1996, the plant temporarily closed for maintenance. During this time, many employees (including Johnson) were placed on layoff status. On or about January 6, 1997, Keebler-Sunshine reopened the plant. After the plant was reopened, approximately 160 employees were not retained. Additionally, Johnson was one of about seven employees "bumped" from his position **[\*\*3]** by co-workers who had greater plant seniority. Ramer replaced Johnson in the pesticide control position. Keebler-Sunshine transferred Johnson to a "sanitor/machine cleaner" position. Johnson worked in various positions within the plant until the plant was closed down permanently in 1999.

In April 2000, Johnson filed his complaint in the District Court. Specifically, Johnson asserted that his transfer from the pesticide control position to the "sanitor/machine cleaner" position was based on his race, color and sex. After the close of discovery, Keebler-Sunshine successfully moved for summary judgment. Specifically, the District Court determined that Johnson failed to show a prima facie case because he did not establish an inference of discrimination. Johnson timely filed a notice of appeal.

II.

*HN2* We review the grant of summary judgment de novo. *See McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). *HN3* Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Saldana v. KMart Corp.*, 43 V.I. 361, 260 F.3d 228, 232 (3d Cir. 2001); **[\*\*4]** Fed. R. Civ. P. 56(c).

III.

*HN4* Claims of discrimination under Title VII are analyzed under the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). In order to show a prima facie case of racial discrimination, a plaintiff must illustrate that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999). If a plaintiff establishes a prima facie case, the employer must come forward with a legitimate, non-discriminatory reason for the adverse employment decision. *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318-19 (3d Cir. 2000)(citing *Tx. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-56, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). If the defendant meets this burden, the plaintiff must then prove by a preponderance of the evidence that the

legitimate reasons offered by [**5] the defendant are merely a pretext for discrimination. *See Jones*, 198 F.3d at 410 (citing [*242] *Burdine*, 450 U.S. at 252-53). *HN5* In order to show pretext, a plaintiff must submit evidence which: (1) casts doubt on the legitimate reason proffered by the employer such that a factfinder could reasonably conclude that the reason was a fabrication; or (2) allow the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the employee's termination. *See Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994). "The non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* (internal quotation marks and citations omitted).

We agree with the District Court that Johnson satisfied the first three elements of establishing a prima facie case. [1] However, we disagree with the District Court's conclusion that Johnson failed [**6] to show an inference of discrimination. The parties agree that Johnson was replaced by Ramer, a Caucasian woman. *HN6* While this Court no longer requires a plaintiff to show that he was replaced by someone outside of the protected class to establish an inference of discrimination, *see Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 347 (3d Cir. 1999), we find that this evidence establishes the fourth and final element of a prima facie case in this case. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006)(stating that a plaintiff establishes the fourth element of a prima facie case if he was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees); *Maynard v. Bd. of Regents of Div. of Univs. of Fl. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003)(same); *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001)(stating that "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII analysis"). [**7] Therefore, Johnson established a prima facie case.

## FOOTNOTES

[1] Keebler-Sunshine contested whether Johnson's transfer constituted an adverse employment action in the District Court. However, in its appellate brief, Keebler-Sunshine *HN7* does not contest the District Court's finding that the transfer constituted an adverse employment action. Therefore, this argument is deemed waived. *See In re Surrick*, 338 F.3d 224, 237 (3d Cir. 2003)(stating that failure to identify or argue an issue in an opening brief constitutes waiver of the argument on appeal).

Next, Keebler-Sunshine came forward with a legitimate non-discriminatory reason for transferring Johnson from the pesticide control position. *See e.g., Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997)(noting that *HN8* the defendant's burden at this stage is relatively light and that it is satisfied if the defendant articulates a legitimate reason for the adverse employment action). Keebler-Sunshine stated that Johnson was "bumped" from [**8] the pesticide control position by Ramer because she had more plant seniority and could perform the job. Indeed, the Collective Bargaining Agreement between Johnson's union and Keebler-Sunshine provides that in the event of a layoff, an employee may "bump" another employee out of a position as long as she has greater seniority and has the ability to perform the work.

Because Keebler-Sunshine came forward with a legitimate non-discriminatory reason for the transfer, Johnson must [*243] show that this reason was pretextual. Johnson fails to establish a material issue of fact that Keebler-Sunshine's legitimate non-discriminatory reason for the transfer was pretextual. Specifically, Ramer had more plant seniority than

Johnson. Additionally, Keebler-Sunshine previously employed Ramer in the pesticide control position and she had the ability to perform the work of the position.

IV.

We have considered all the arguments and find that Johnson failed to create a material issue of fact regarding whether Keebler-Sunshine's legitimate non-discriminatory reason for the transfer was pretextual. Accordingly, we will affirm the grant of summary judgment in favor of Keebler-Sunshine.

Service:    **Get by LEXSEE®**
Citation:  **2007 U.S. App. LEXIS 1914**
View:  Full
Date/Time:  Thursday, August 30, 2007 - 12:59 PM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
Q - Questioned: Validity questioned by citing refs
⋮ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
A - Citing Refs. With Analysis Available
I - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.



About LexisNexis  ¡ Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Case 1:06-cv-00303-GMS    Document 26-2    Filed 08/30/2007    Page 11 of 18

Service: **Get by LEXSEE®**
Citation: **2007 us app lexis 2216**

*2007 U.S. App. LEXIS 2216, \**

DEBRA ALLEN, ET AL; BEVERLY GREEN RONALD JONES; JOILYNN SCOTT; BILLY SHAW; YVONNE UPSHUR, Appellants v. NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK)

No. 05-4551

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

2007 U.S. App. LEXIS 2216

January 16, 2007, Submitted Under Third Circuit LAR 34.1(a)
January 31, 2007, Opinion Filed

**NOTICE: [\*1]** NOT PRECEDENTIAL OPINION UNDER THIRD CIRCUIT INTERNAL OPERATING PROCEDURE RULE 5.7. SUCH OPINIONS ARE NOT REGARDED AS PRECEDENTS WHICH BIND THE COURT.

PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** Appeal from the United States District Court for the Eastern District of Pennsylvania. (D.C. Civil Action No. 03-cv-03497). District Judge: Honorable Legrome D. Davis.
Allen v. AMTRAK, 2005 U.S. Dist. LEXIS 19624 (E.D. Pa., Sept. 6, 2005)

**DISPOSITION:** The district court's grant of summary judgment for the employer was affirmed.

Case in Brief  **($)**
Time-saving, comprehensive research tool. Includes expanded summary, extensive research and analysis, and links to LexisNexis® content and available court documents.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff employees sued defendant employer in the United States District Court for the Eastern District of Pennsylvania, alleging a racially hostile work environment, retaliation, and failure to promote based on race in violation of Title VII of the Civil Rights Act of 1964. The district court granted summary judgment in favor of the employer, and the employees appealed.

**OVERVIEW:** The employees based their hostile work environment claims on a racially offensive remark made via telephone by a worker in another of the employer's locations and on the posting of a racially derogatory flyer. The court of appeals found that the employees did not establish a prima facie case because the employer took prompt disciplinary action, had a policy in place that prohibited racial harassment, and had a functioning dispute resolution process. The employees failed to show unlawful retaliation based on their discrimination complaints; the allegedly retaliatory actions, which included criticism, disciplinary action, and a schedule change, were not materially adverse and/or were not shown to have been related to the discrimination complaints. The failure-to-promote claims brought by two employees failed because the employer offered legitimate reasons for not promoting the employees--including that they were less qualified than the applicants who were hired for the positions--and the employees failed to offer evidence of

pretext.

**OUTCOME:** The district court's grant of summary judgment for the employer was affirmed.

**CORE TERMS:** summary judgment, flyer, prima facie case, retaliation, manager, deposition, protected activity, harassment, telephone, hostile, reprimand, work environment, dispute resolution, protected class, citation omitted, adverse action, undisputed, responded, repeated, racial discrimination, failed to produce, legitimate reason, attendance, hired, crew, discrimination case, burden shifts, evidence linking, reasonable person, causal link

## LEXISNEXIS® HEADNOTES                                            - **Hide**

Civil Procedure > Summary Judgment > Appellate Review > Standards of Review 🖙
Civil Procedure > Summary Judgment > Standards > General Overview 🖙

*HN1* ⚡A court of appeals reviews grants of summary judgment de novo, applying the same standard that the district court should have applied. The court of appeals affirms grants of summary judgment when, construing all record evidence in the moving party's favor, there are no genuinely disputed issues of material fact, and the non-moving party must prevail as a matter of law. More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof >
Absence of Essential Element of Claim 🖙
Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants 🖙

*HN2* ⚡When a civil defendant moves for summary judgment, the plaintiffs must show that they have satisfied their burden of production--that they have produced evidence supporting each element of their claims. If they have not, then the defendant is entitled to summary judgment. More Like This Headnote

Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Burdens of Proof >
Employee Burdens 🖙
Labor & Employment Law > Discrimination > Harassment > Racial Harassment >
Hostile Work Environment 🖙

*HN3* ⚡For a racially hostile work environment claim, a prima facie case has five elements: (1) the employee suffered intentional discrimination because of her/his race, (2) the discrimination was severe and pervasive, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same race in that position, and (5) the existence of respondeat superior liability. Plaintiffs bear the burden of proof on each of these elements. More Like This Headnote | *Shepardize:* Restrict By Headnote

Labor & Employment Law > Discrimination > Harassment > General Overview 🖙

*HN4* ⚡The elements of a prima facie hostile work environment case are the same no matter the protected class at issue. More Like This Headnote

Labor & Employment Law > Discrimination > Harassment > General Overview 🖙
Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Defenses 🖙
Labor & Employment Law > Discrimination > Harassment > Racial Harassment >
Hostile Work Environment 🖙

*HN5* ⚡Under Title VII of the Civil Rights Act of 1964, an employer can only be held liable for the actions of other employees in creating a hostile work environment when

Case 1:06-cv-00303-GMS    Document 26-2    Filed 08/30/2007    Page 13 of 18

the plaintiff-employee can prove that the employer failed to provide a reasonable avenue for complaint, or, if the employer was aware of the alleged harassment, that it failed to take appropriate remedial action. More Like This Headnote |
*Shepardize: Restrict By Headnote*

Civil Procedure > Summary Judgment > Evidence 🔍
HN6 ⚓ At the summary judgment stage, a court looks beyond the pleadings to whether there is actual evidence on both sides of the relevant factual questions. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation > Elements > General Overview 🔍
HN7 ⚓ A prima facie case for unlawful retaliation has three elements: (1) that the employee engaged in protected activity, (2) that the employer took adverse action against her, and (3) that a causal link exists between the protected activity and the employer's adverse action. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation > Elements > Adverse Employment Actions 🔍
HN8 ⚓ An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. Rather, to show retaliation, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > Employment Practices > Adverse Employment Actions > Demotions & Promotions 🔍
Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting 🔍
Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burdens of Proof 🔍
HN9 ⚓ A prima facie employment discrimination case based on failure to promote has three elements: the plaintiff must establish that (a) she was a member of a protected class, (b) she was qualified for the job to which she applied, and (c) another, not in the protected class, was treated more favorably. If the plaintiff succeeds in establishing a prima facie case, then the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for the failure to promote. If it does, then the burden shifts back to the plaintiff to show that the proffered reason is pretextual. More Like This Headnote

**COUNSEL:** For DEBRA ALLEN; BEVERLY GREEN; RONALD JONES; JOILYNN SCOTT; BILLY SHAW; YVONNE UPSHUR, Appellants: H. Francis deLone, Jr. ⌄✓, Wayne, PA.

For NATL RR PASSENGER, (AMTRAK), Appellee: Charles L. Becker ⌄, Reed Smith, Philadelphia, PA.

**JUDGES:** Before: McKEE, AMBRO and STAPLETON, Circuit Judges.

**OPINION BY:** AMBRO

**OPINION**


AMBRO, Circuit Judge

Case 1:06-cv-00303-GMS     Document 26-2     Filed 08/30/2007     Page 14 of 18

This is an appeal from an order granting summary judgment in favor of the National Railroad Passenger Corporation ("Amtrak") in a Title VII race discrimination case. Because the District Court properly found that the Plaintiffs have not met their burden of production on any of their claims, we affirm the grant of summary judgment.

## I. Facts and Procedural History

Plaintiffs Debra Allen, Beverly Green, Ronald Jones, Joilynn Scott, Billy Shaw, and Yvonne Upshur all work at Amtrak 's Wilmington, Delaware **[*2]** administrative facility. They allege that Amtrak has violated their civil rights by (1) subjecting them to a hostile work environment, (2) retaliating against them when they complained about racial discrimination, and (3) failing to promote them on the basis of race.

In support of their claims, they cite the following two incidents. In January 2001, some of the Plaintiffs overheard an Amtrak employee in Kansas City, Missouri make a racially offensive remark in a telephone conversation with an Amtrak employee in Wilmington. Specifically, the Kansas City employee stated that "a bunch of n  s are running the operation" in Wilmington. The incident was reported to Amtrak, and Amtrak submitted evidence that it responded by suspending the offending employee for ten days without pay and demoting him.

In May 2001, someone posted a racially derogatory flyer at the Wilmington facility. The flyer contained a picture of the face of an African American male with a slash mark through it. When the flyer was discovered, Amtrak managers gathered up all of the copies and sent one to the company's Dispute Resolution Officer ("DRO"). They also notified the police and held an all-employee meeting **[*3]** some 90 minutes after the flyer was discovered. At the meeting, Amtrak managers stated that the flyer violated company policy, the incident would be investigated rigorously, and misconduct of this sort would not be tolerated. Amtrak was not able to discover the person who posted the flyer. Plaintiff Green testified that later that day she saw Amtrak manager Michael Kates hold up the flyer among two other white colleagues and laugh at it. On learning of this allegation (though an anonymous e-mail), the Amtrak DRO scheduled a meeting among Green, Kates, and a DRO representative. Green refused to attend.

In their individual depositions, each of the Plaintiffs alleged other, individual events of discrimination. We address those allegations below as they relate to the Plaintiffs' legal claims on appeal. [1]

**FOOTNOTES**

[1] We have jurisdiction under 28 U.S.C. § 1291.

## II . Summary Judgment

*HN1* We review grants of summary judgment *de novo*, applying the same standard that the District Court should **[*4]** have applied. *Cetel v. Kirwan Fin. Group*, 460 F.3d 494, 506 (3d Cir. 2006). We affirm grants of summary judgment when, construing all record evidence in the moving party's favor, there are no genuinely disputed issues of material fact, and the non-moving party must prevail as a matter of law. *Id.*

*HN2* When, as here, a civil defendant moves for summary judgment, the plaintiffs must show that they have satisfied their burden of production-that they have produced evidence supporting each element of their claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If they have not, then the defendant is entitled to

summary judgment. *Id.*

## III . Hostile Work Environment

*HN3* For Plaintiffs' hostile work environment claim, a *prima facie* case has five elements: (1) the employee suffered intentional discrimination because of [her/his race], (2) the discrimination was severe and pervasive, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same [race] in that position, and (5) the existence of *respondeat superior* liability. *Jensen v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir. 2006). **[*5]** [2] The Plaintiffs bear the burden of proof on each of these elements. *See id.*

### FOOTNOTES

[2] We recognize that *Jensen* was a sex discrimination case, but we have held that *HN4* the elements of the *prima facie* case are the same no matter the protected class at issue. *See Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005).

Here, the Plaintiffs' evidence is insufficient to bear their burden. The only specific incidents they cite are the telephone conversation and the flyer posting detailed above. In addition, they allege in interrogatory responses that:

> [i]n several other incidents of racial discrimination and harassment white managerial/supervisory personnel made false accusations about plaintiffs and other African Americans and yelled at them in a derogatory manner. When plaintiffs and others advised appropriate supervisory/management personnel of the racial discrimination and harassment to which plaintiffs were being subjected, defendant failed to conduct any real investigation **[*6]** of the problem and failed to take any effective corrective action.

J.A. at 149. Moreover, when Amtrak ⌄deposed the six plaintiffs, not one of them could describe these "other incidents" with any specificity.

*HN5* Under Title VII, an employer can only be held liable for the actions of other employees in creating a hostile work environment when the plaintiff-employee can prove that "the employer failed to provide a reasonable avenue for complaint, or, if the employer was aware of the alleged harassment, that it failed to take appropriate remedial action." *Weston v. Pennsylvania*, 251 F.3d 420, 427 (3d Cir. 2001) (citation omitted). Here, the following facts are undisputed [3]: (1) Amtrak ⌄disciplined the offending employee after becoming aware of the telephone incident; (2) upon being apprised of the flyer incident, Amtrak ⌄swiftly removed the flyers, filed an incident report with the police, and held an all-employee meeting to explain that the incident was unacceptable and under investigation; (3) upon being apprised of the allegation against Kates, Amtrak ⌄'s DRO asked Green and Kates to a meeting to discuss the incident, which Green refused to attend; and (4) **[*7]** none of these incidents was repeated. Moreover, it is undisputed that any racial harassment violates Amtrak ⌄'s written policies and that Amtrak ⌄has a functioning dispute resolution process with a dedicated dispute resolution officer and staff. On this record, all of the evidence supports Amtrak ⌄'s argument that it both provides a reasonable means of complaint and that it appropriately responded to all alleged incidents of discrimination. [4]

### FOOTNOTES

[3] By "undisputed" we mean that we find no contrary evidence in the record. We recognize

Case 1:06-cv-00303-GMS    Document 26-2    Filed 08/30/2007    Page 16 of 18

that the Plaintiffs "deny" many of these facts in their pleadings and in their briefing, but **HN6***at the summary judgment stage, we look beyond the pleadings to whether there is actual evidence on both sides of the relevant factual questions. Here, there is not.

4 Alternatively, we note that the incidents alleged fail to rise to the level of "pervasive" discrimination, as they are few in number, were separated by four months, and appear wholly unrelated to one another. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 760-61 (6th Cir. 2000). Furthermore, these incidents were not so severe as to alter the conditions of the Plaintiffs' employment and create an abusive working environment.

## [*8] IV . Unlawful Retaliation

**HN7***A *prima facie* case for unlawful retaliation has three elements: "(1) that [the employee] engaged in protected activity, (2) that the employer took adverse action against her, and (3) that a causal link exists between the protected activity and the employer's adverse action." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (citations omitted). Because each plaintiff alleges different retaliatory events, we deal with each separately.

### A. Allen

In her deposition, Allen recounted two incidents that she alleged constituted unlawful retaliation. She testified that sometime after she spoke with Kates's manager about his demeaning behavior, he (1) began undercutting her authority by changing assignments that she gave to her clerks on days that she was absent and (2) once called her out of a meeting to criticize the way that she changed a schedule.

As the Supreme Court held last year, **HN8***"An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington Northern & Santa Fe Ry. v. White*, U.S. , 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006) **[*9]** (citations omitted). Rather, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (citations and internal quotation marks omitted). The actions that Allen alleges-reassignment of work while absent and one incident of criticism-simply do not rise to the level of material adversity. Moreover, she offers no evidence linking the incidents to her complaints against Kates, aside from the bare fact that they occurred in the following months. On this record, Allen has not produced evidence substantiating a *prima facie* case of retaliation.

### B. Green

In her deposition, Green was asked: "Can you tell me how Amtrak or anyone at Amtrak retaliated against you?" J.A. at 602. She responded: "I don't remember." *Id.* Thus, she is unable to substantiate any allegation of retaliation.

### C. Jones

In his deposition, Jones testified that one of his managers issued a written reprimand to him for excessive telephone usage. Another manager initiated an investigation against him related to his performance, **[*10]** but nothing came of the investigation. He further testified that he believed that both of these incidents were motivated by personal dislike. He cited neither racial animus nor retaliation for his Equal Employment Opportunity Commission ("EEOC") complaint as the motivation. Thus, he cannot link the incidents-which also were not sufficiently adverse-to any protected activity.

## D. Scott

In her deposition, Scott testified that the only incident of retaliation that she could recall was her October 2003 disqualification from working as a crew management representative. She admitted, however, that Amtrak ⌄cited two reasons for issuing the punishment: (1) repeated violations of the attendance policy, and (2) repeated embellishment of her ticket count. Scott further testified that she voluntarily waived her right to contest the allegations against her, and that she voluntarily signed a waiver admitting the violations. She offered no explanation why she thought that the disqualification-which occurred months after her EEOC complaint was resolved and two years after it was filed-was related to any protected activity. On this record, she has failed to produce any evidence of a causal link **[*11]** between the incidents.

## E . Shaw

Shaw testified to three incidents he interpreted as retaliation: (1) failure to train him and other members of his work group as promised, (2) changes in shift schedules, and (3) Kates's failure to welcome him back in a timely manner when he returned to work following a suspension. The training and shift-change incidents affected not just Shaw but all members of his workgroup. He admitted in his deposition that neither policy change singled him out. Moreover, he has presented no evidence that would lead a reasonable person to infer that the incidents had anything to do with his EEOC complaint, which was filed two and a half years before the changes and resolved months beforehand. In addition, the failure to welcome does not constitute adverse action.

## F . Upshur

Upshur testified to two incidents that she believed were retaliatory: her manager (1) wrongly accused her of violating Amtrak ⌄'s attendance policy, and (2) issued a written reprimand for improperly communicating with a coworker during a designated rest period. For the attendance policy violation, Upshur testified that, when her manager approached her about the issue, she told him **[*12]** that he was mistaken, and he reviewed the policy and admitted his error. He took no formal action against her. As to the reprimand, Upshur has not denied its allegations, nor does it appear that the reprimand affected Upshur's employment in any material way. Moreover, she produced no evidence linking it to her EEOC complaint, which was filed a year before the incident. Thus, she cannot make out a *prima facie* case of retaliation.

## V. Failure to Promote

Only Jones and Scott press failure to promote claims. [HN9]⌄A *prima facie* case here has three elements: the plaintiff must establish that "(a) she was a member of a protected class, (b) she was qualified for the . . . job to which she applied, and (c) another, not in the protected class, was treated more favorably." *Scheidemantle v. Slippery Rock Univ. State Sys. of Educ.*, 470 F.3d 535, 539 (3d Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). If the plaintiff succeeds in establishing a *prima facie* case, then the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for the failure to promote. *Id.* If it **[*13]** does, then the burden shifts back to the plaintiff to show that the proffered reason is pretextual. *Id.*

## A. Jones

Jones alleges that he was denied promotions to a Lead Crew Dispatcher position, and to a Customer Service Agent position, in 2001. We need not address the *prima facie* case because in both instances Amtrak ⌄offered a legitimate reason for not promoting Jones that he has failed to rebut. Specifically, it argues that Jones was less qualified than the applicants hired

because he has a poor disciplinary record-a record that included two suspensions in the year prior to his applications. Amtrak ⌄further notes-and Jones does not contest-that many of the people hired for both positions are African American. He offers no evidence to suggest that Amtrak ⌄'s reason was pretexual in either situation. Thus, his claims cannot succeed.

## B . Scott

Scott also complains of Amtrak ⌄'s failure to promote her to the position of Lead Crew Dispatcher. Again, we need not address the *prima facie* case because Amtrak ⌄proffered two legitimate reasons, and Scott failed to produce evidence of pretext. Specifically, Amtrak ⌄ stated that Scott was less qualified than the applicants hired **[*14]** and that she performed poorly in her interview by displaying a lack of understanding of the job and of the department. Scott has failed to produce any evidence that would undercut these legitimate reasons. Her claim, therefore, fails.

## VI . Concluding Remarks

In closing, we cannot help but note that the Plaintiffs' brief does not meet the rather basic requirements of Federal Rule of Appellate Procedure 28(a)(9). It makes no attempt to set out the elements of the various Title VII claims; indeed, it fails to cite a single case for a proposition relevant to Title VII. For all its rhetoric about summary judgment, it makes no attempt to connect the summary judgment standard to the substantive law applicable to this case, and it fails to cite the plaintiffs' depositions, which are clearly relevant to whether they can provide evidentiary support for their claims. We note that counsel's performance in front of the District Court was also underwhelming, as the Court sanctioned him for "numerous discovery violations." In any future appearances before our Court, we strongly advise Plaintiffs' counsel to take notice that we expect more from members **[*15]** of our bar.

Because the Plaintiffs have not met their burden of production, the District Court's grant of summary judgment in Amtrak ⌄'s favor is affirmed.

Service: **Get by LEXSEE®**
Citation: **2007 us app lexis 2216**
View: Full
Date/Time: Thursday, August 30, 2007 - 1:00 PM EDT

\* Signal Legend:
● - Warning: Negative treatment is indicated
🅠 - Questioned: Validity questioned by citing refs
⋮ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
🅐 - Citing Refs. With Analysis Available
🅘 - Citation information available
\* Click on any *Shepard's* signal to *Shepardize®* that case.

   About LexisNexis | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE**

**HELEN D. MARTIN**, *Pro se*  §
      Plaintiff  §
§
§
      v.  §     **C.A. No.: 06-303 (GMS)**
§
**PACHULSKI, STANG, ZIEHL,**  §
**YOUNG & JONES, P.C.,**  §
§
      Defendant  §


**APPENDIX IN SUPPORT OF DEFENDANT'S OPENING BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

# APPENDIX

| | |
|---|---|
| **Complaint** | **A 1-8** |
| **Deposition of Helen Martin** | **A 9-251** |
| **Unemployment Insurance Appeals Hearing**<br>**In The matter Of Martin and Pachulski Stang** | **A 252-299** |
| **Charge of Discrimination with**<br>**Delaware Department of Labor** | **A 300** |
| **Helen Martin's Resignation Letter** | **A 301** |
| **Notice of Dismissal from**<br>**Delaware Department of Labor** | **A 302-303** |

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE STATE OF DELAWARE

HELEN D. MARTIN,

    Plaintiff

        v.

CIVIL ACTION NO. 0 6 - 3 0 3

P.ACHULSKI, STANG, ZEIHL,
YOUNG & JONES, P.C.

    Defendant.

## **COMPLAINT**

1.    Plaintiff is an adult individual residing at 616 West 8th Street, Wilmington, Delaware.

2.    Defendant is a professional corporation maintaining offices in the City of Wilmington, Delaware.

3.    Jurisdiction of this court is premised upon 28 U.S.C. Section 1343, as this case involves a federal question and a claim of deprivation of civil rights.

4.    Venue of this action is proper in the District of Delaware pursuant to 28 U.S.C. Section 1391, as the cause of action arose in Delaware.

5.    On or about January 10, 2000, Plaintiff became employed as a Managing Supervisor for the DE office file room.

6.    Throughout the duration of Plaintiff's employment, until January 27, 2003, Defendant created a racially hostile work environment and discriminated against Plaintiff because of her race.

**A1**

7       As a result of Defendant's conduct, Plaintiff was forced to quit her employment on January 27, 2003, under circumstances amounting to a constructive discharge.

8       The act of Defendant in discriminating against Plaintiff is in violation of Plaintiff's rights under the Constitution and in violation of 42 U.S.C. Section 1983.

9.      The conduct of Defendant was also in violation Plaintiff's rights under the State Discrimination Act of the State of Delaware.

10.     Plaintiff submitted her charge of discrimination of the Equal Employment Opportunity Commission and the corresponding state agency.

11.     Plaintiff has received a "right to sue letter" from the EEOC and this compliant is being filed within ninety (90) days of Plaintiff's receipt of that letter.   A copy of the letter is attached hereto.

WHEREFORE, Plaintiff, Helen D. Martin, Respectfully requests this Honorable Court enter judgment in her favor, and against Defendant, together with reinstatement, full back pay and retroactive benefits, together with such further relief as deemed appropriate by the Court.

HELEN D. MARTIN
Pro se

**A2**

EEOC Form 161 (2-98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To: Helen D. Martin<br>616 West 8th Street<br>Wilmington, DE 19801 | From: Philadelphia District Office - 530<br>21 South 5th Street<br>Suite 400<br>Philadelphia, PA 19106 |

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR § 1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 17C-2003-00191 | Charles Brown, III,<br>State & Local Coordinator | (215) 440-2842 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this Notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_Marie M. Tomasso_

**Marie M. Tomasso,**
**District Director**

February 6, 2006

(Date Mailed)

Enclosure(s)

cc: PACHULSKI, STANG, ZIEHL, YOUNG &
Jones
919 Market Street
Wilmington, DE 19801

**A3**

Enclosure with EEOC
Form 161 (3-98)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

PRIVATE SUIT RIGHTS  --  **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
**or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

PRIVATE SUIT RIGHTS -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit *before 7/1/02 – not 12/1/02* -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

ATTORNEY REPRESENTATION -- **Title VII and the ADA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do **not** relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months** of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**A4**



Equal Employment Opportunity Commission
PHILADELPHIA DISTRICT OFFICE
21 SOUTH 5TH STREET, SUITE 400
Philadelphia, PA 19106-2515

AO 240 (Rev. 10/03)
DELAWARE (Rev. 4/05)

# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

_Helen D. Martin_
**Plaintiff**

V.

_Rockdale Glen Point Apt Inc_
**Defendant(s)**

## APPLICATION TO PROCEED WITHOUT PREPAYMENT OF FEES AND AFFIDAVIT

CASE NUMBER:    C 6 - 3 0 3

I, _Helen D Martin_ declare that I am the (check appropriate box)

☒ Petitioner/Plaintiff/Movant      ☐ Other

in the above-entitled proceeding; that in support of my request to proceed without prepayment of fees or costs under 28 USC §1915, I declare that I am unable to pay the costs of these proceedings and that I am entitled to the relief sought in the complaint/petition/motion.

In support of this application, I answer the following questions under penalty of perjury:

1.  Are you currently incarcerated?   ☐ Yes   ☒ No   (If "No" go to Question 2)

    If "YES" state the place of your incarceration _____

    **Inmate Identification Number (Required):** _____

    Are you employed at the institution? _____ Do you receive any payment from the institution? _____

    _Attach a ledger sheet from the institution of your incarceration showing at least the past six months' transactions_

2.  Are you currently employed?   ☐ Yes   ☒ No

    a.    If the answer is "YES" state the amount of your take-home salary or wages and pay period a
          and give the name and address of your employer.

    b.    If the answer is "NO" state the date of your last employment, the amount of your take-home
          salary or wages and pay period and the name and address of your last employer.
          _02/12/06  Personnel Personnel_

3.  In the past 12 twelve months have you received any money from any of the following sources?

    | | | | |
    |---|---|---|---|
    | a. | Business, profession or other self-employment | ☐ Yes | ☒ No |
    | b. | Rent payments, interest or dividends | ☐ Yes | ☒ No |
    | c. | Pensions, annuities or life insurance payments | ☐ Yes | ☒ No |
    | d. | Disability or workers compensation payments | ☐ Yes | ☒ No |
    | e. | Gifts or inheritances | ☐ Yes | ☒ No |
    | f. | Any other sources | ☐ Yes | ☒ No |

    If the answer to any of the above is "YES" describe each source of money and state the amount
    received _AND_ what you expect you will continue to receive.

**A6**

AO 240 Reverse (Rev 10'03)
DELAWARE (Rev 4-05)

4. Do you have any cash or checking or savings accounts?          ☑ Yes          ☐ No

   If "Yes" state the total amount  $ _____

5. Do you own any real estate, stocks, bonds, securities, other financial instruments, automobiles or other valuable property?

                                                                   ☑ Yes          ☐ No

   If "Yes" describe the property and state its value.

   Have currently where i reside

6. List the persons who are dependent on you for support, state your relationship to each person and indicate how much you contribute to their support, *OR* state *NONE* if applicable.

   N/A

   I declare under penalty of perjury that the above information is true and correct.

   _____                    _____
   DATE                                 SIGNATURE OF APPLICANT

**NOTE TO PRISONER:  A Prisoner seeking to proceed without prepayment of fees shall submit an affidavit stating all assets.  In addition, a prisoner must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts. If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.**

**A7**

JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

06 - 303

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

*Helen O. Martin*

**DEFENDANTS**

*Purchase, Stang Leasing, Inc.*

**(b)** County of Residence of First Listed Plaintiff    *New Castle*
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

2006 MAY

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                    and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☒ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
*28 U.S.C. Section 1343*

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____    DOCKET NUMBER _____

DATE   *05/05/06*

SIGNATURE OF ATTORNEY OF RECORD   *Helen S. Martin*

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**A8**

Helen Martin

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

—    —    —

HELEN D. MARTIN, Pro Se,          :
                                  : Civil Action
        Plaintiff,                : No. 06-303 (GMS)
                                  :
        vs.                       :
                                  : TRIAL BY JURY OF 12
PACHULSKI, STANG, ZIEHL,          :
YOUNG and JONES, P.C.,            :
                                  :
        Defendant.                :

—    —    —

        Deposition of HELEN MARTIN, taken
pursuant to notice before Gail Inghram Verbano, CLR,
CSR, RMR, in the offices of Richard R. Wier, Jr.,
P.A., Two Mill Road, Suite 200, Wilmington, Delaware
19806, on Monday, June 11, 2007, beginning at
approximately 9:10 a.m., there being present:

APPEARANCES:

        HELEN D. MARTIN, PRO SE
        3 East 24th Street
        Wilmington, Delaware

        RICHARD R. WIER, JR., ESQ.
        RICHARD R. WIER, JR., P.A.
        Two Mill Road, Suite 200
        Wilmington, Delaware 19806
          Attorney for Defendants

CORBETT & WILCOX
230 N. Market Street - Wilmington, Delaware 19801
(302) 571-0510

Corbett & Wilcox is not affiliated with
Wilcox & Fetzer, Court Reporters

Helen Martin

Page 2

1                    HELEN MARTIN, having first been

2     duly sworn according to law, was examined and

3     testified as follows:

4                         -   -   -

5                    EXAMINATION

6     BY MR. WIER:

7          Q    Good morning, Ms. Martin.  I'm Richard

8     Wier, and I represent Pachulski, Stang, Ziehl, Young

9     and Jones in connection with a lawsuit that you

10    brought against them.

11                   When you came in, you looked

12    familiar.  You and I talked, and you indicated that

13    you had worked as an aide for my father maybe 30-some

14    years ago, and I did recall that.  I didn't recall

15    you until I saw you.

16                   But I don't believe that creates

17    any conflict of interest.  Do you?

18         A    No.

19                   MR. WIER:  Okay.  You filed a

20    complaint, and initially you filed a charge of

21    discrimination.  And let me have that marked as

22    Exhibit Martin No. 1.

23                   (Martin Exhibit 1 was marked for

24                   identification.)

Helen Martin

1    BY MR. WIER:

2         Q    What I'm going to do is explain the

3    process a little bit to you to make sure you

4    understand the questions that I ask.

5                    First of all, if you don't

6    understand the question, please feel free to have me

7    repeat it.  If you do answer the question, I'd ask

8    you to do it with language as opposed to nodding your

9    head or shrugging your shoulders like you're doing

10   now.  So say yes or no.  Okay?

11        A    Yes.

12        Q    Because your answers, if they're not

13   verbal, can't be taken down; and the purpose of this

14   is to create a transcript.

15        A    Okay.

16        Q    If you answer a question, I'll assume

17   that you have understood it, that you're answering it

18   fully and truthfully.  All right?

19        A    Yes.

20        Q    Okay.  Part of the process, in a

21   deposition, is to just simply find out what the facts

22   are.  So I'll be asking you about the allegations;

23   and in the course of that, I may be marking what are

24   called exhibits or documents.

A11

Helen Martin

Page 4

```
 1        A     Okay.

 2        Q     And the exhibits will be marked, and then

 3   I'll provide them to you and ask you questions about

 4   the documents.

 5              And the first document that I have

 6   marked is Martin Exhibit 1, and ask you if you can

 7   identify that document.

 8        A     Yes, I do.

 9        Q     What is it?

10        A     The charge of discrimination that I filed

11   with the EEOC.

12        Q     Well, you also filed with the Delaware

13   Department of Labor, did you not?

14        A     Yes.

15        Q     And you initially filed it with both the

16   Delaware Department of Labor and the EEOC on what

17   date?

18        A     On January the 15th, '03.

19        Q     Of '03?

20        A     Yes.

21        Q     And up at the top it says, States

22   discrimination took place, and then the kind of

23   discrimination.  And then you're claiming what kind

24   of discrimination?
```

Helen Martin

1          A     The type of discrimination that I am

2    claiming is in violation of Title 7 of the Civil

3    Rights Act of 1946.

4          Q     Well, take a look at the little box in

5    the charge here.  You're claiming racial

6    discrimination?

7          A     Yes.

8          Q     That is your claim?

9          A     Yes, it is.

10         Q     You were discriminated against by your

11   employer.  And it says, Date description took place,

12   September 11th, 2001 --

13         A     Correct.

14         Q     -- through January 13th, 2003.

15         A     Correct.

16         Q     Can you tell me how you were

17   discriminated against on the basis of your race.

18         A     Due to the fact that I was in my office

19   where I was preparing company business, and the

20   senior partner came in, and he and another attorney

21   was with him.  They came into my office where I was

22   preparing company business, and he just calmly walked

23   up to me and told me who he was, as if I didn't know.

24                    And he starts to tell me about the

Helen Martin

Page 6

1   onset of 9/11 that day.  And I'm like, Okay.  He was

2   just letting me know that he was the senior partner,

3   he was in charge.

4                    And he told me that I needed to let

5   my employees go.  And he made sure that I understood

6   that he was in charge and told me to stop what I was

7   doing and look at him.

8        Q    All right.  So this occurred in 2001; is

9   that right?

10       A    Yes.  On 9/11, yes.

11       Q    And that's when you say the

12  discrimination -- that that meeting was with a senior

13  partner and another attorney?

14       A    That wasn't a meeting.  I was doing my

15  work.

16       Q    Okay.  You were in your office and a

17  senior attorney came in.

18                    Who was the senior attorney?

19       A    Jim Stang.  And he came along with Bruce

20  Grohsgal.

21       Q    And tell me what was said in that meeting

22  that was racial.

23       A    It wasn't a meeting.  He came --

24       Q    Well, that confrontation.  Tell me what

Helen Martin

1    was racial.

2         A    He came into my office, and he said -- he

3    told me who he was and everything, like I said

4    previously.

5         Q    Tell me, as best you can, what he said

6    and what you said and what transpired in that

7    meeting.

8         A    He said to me stop what I was doing and

9    to look at him.

10              And I continued on doing my work,

11   and I was verbally listening to what he was saying.

12        Q    But you were not looking at him?

13        A    No, I was not physically looking at him.

14   No, I did not.

15              At that particular time, he said to

16   me, Stop doing my work and pay attention, young lady.

17              And I turned around and I looked at

18   him.  And I told him what I had to say, which was,

19   I'm doing my work.  And he went on to tell me that he

20   was the senior partner there and he was in charge.

21              Where in the interim of all this,

22   while he's talking to me, Bruce Grohsgal is standing

23   there.

24        Q    How do you spell that, Grohsgal?

Page 8

1              A     I think you spell it G-R-O-S-G --

2     G-R-O-S-H-G-A-L (sic).

3                    And he was explaining at that

4     particular time who Mr. Stang was again, as if I

5     didn't know.  I mean, I worked there for over a year.

6                    But anyway, he said to me that --

7              Q     "He" being whom?

8              A     Mr. Stang -- sorry -- said to me that he

9     was in charge, and if he could tell the employees to

10    go home, that they should go home, and he had stopped

11    our work.

12                   At that particular stage of the

13    game, I was going on to proceed to tell him that I

14    had already talked with the employees and we had all

15    decided that we would leave together.

16                   And again, he didn't want to hear

17    any more of it, he was in charge; and he left my

18    door.  And I packed my belongings and I left.

19             Q     And did you quit?

20             A     Yes, I did.

21             Q     Okay.  All right.  And what is -- is that

22    the sum and substance of that meeting?

23             A     It wasn't a meeting.

24             Q     Or the --

Helen Martin

Page 9

1       A     Yes.

2       Q     How would you characterize it?

3       A     Terrible.

4       Q     No, I'm sorry.  You said it wasn't a

5    meeting.  What was it?

6       A     I guess it was basically him coming to

7    tell me who he was and he was in charge and that the

8    employees could leave.

9       Q     Okay.  And have you accurately described

10   the event as best you can, the sum and substance of

11   what occurred in that --

12      A     Yes.

13      Q     -- confrontation?

14      A     Yes.

15      Q     Thank you.

16      A     Yes.

17      Q     And have you accurately described what he

18   said and what Bruce said?

19      A     Yes.

20      Q     All right.  You submitted your

21   resignation to whom?

22      A     To Laura Davis Jones, this partner.

23      Q     And when was that?  That same day?

24      A     No.  I quit that day.  I quit.  I

Helen Martin

Page 10

1   literally left the office.  I quit.

2        Q    Right.  And my question is, did you

3   submit your resignation to someone?

4        A    No, I did not.  Not at that particular

5   instance, no, I didn't.

6        Q    Well, when you quit, you just packed your

7   bags and left?

8        A    Yes.

9        Q    And went home?

10       A    Yes, I went home.

11       Q    And then were you subsequently hired, or

12   did you come back to work?

13       A    I came back to work.  The Delaware senior

14   partner, Laura Davis Jones, and I, we sit down and we

15   had talked about what had taken place.  And she

16   explained to me that she had spoken with Mr. Stang,

17   and I started back to work.

18       Q    When did you meet with Ms. Jones?

19       A    I think I met with Ms. Jones -- let's

20   see.  That happened on 9/11.  Probably on the 13th

21   of September.

22       Q    Okay.  September 11th -- do you recall

23   what day of the week that was?

24       A    I think it was a Wednesday.

Helen Martin

Page 11

1        Q       All right.  What did you do on September

2    the 12th?

3        A       September the 12th, people called me

4    from work, and I talked to them about things that

5    they needed to handle there.

6                And I believe I spoke with Laura

7    Davis Jones that day and set up the meeting for me to

8    come in and speak with her on the 13th.

9        Q       Were you paid for September the 12th?

10       A       I would say, yes.

11       Q       Okay.  And on the 11th, did you have

12   any further contact with anyone at Pachulski, Stang

13   prior to leaving?

14       A       Just the people that I had supervised in

15   the file room, they had called asking me questions.

16       Q       On the 11th or the 12th?

17       A       On the 11th.

18       Q       The day of 9/11 --

19       A       Yes.

20       Q       -- you --

21       A       Packed my stuff up and left.

22       Q       And went home?

23       A       Yes.

24       Q       Didn't talk with your employees?

Helen Martin

Page 12

1        A     Yes, I did.

2        Q     Okay.   What did you say to them?

3        A     They didn't understand what had taken

4   place.   And I had explained to them that -- we had

5   all had a meeting prior to Mr. Stang even arriving to

6   the Delaware office.   And I had explained to them

7   that we have received an email from San Francisco

8   saying something terrible had happened in New York.

9                At that particular stage of the

10  game, we didn't know what had taken place.   And I had

11  pulled all my people together that I supervised and

12  explained to them that we would all pitch in and help

13  get the work done faster; just in case we all got to

14  go home, we all could leave at one time.   We had all

15  verbally agreed to that.

16                And we -- we were doing our work.

17                And then Mr. Stang and Mr. Grohsgal

18  came to my office, and it was like, you know, he

19  didn't even stop to think that I had even talked to

20  my employees to find why they were still working,

21  because we had already discussed that instance.

22        Q     Well, what did Mr. Stang say, if

23  anything, that you recall?

24        A     He told me that he was in charge, and

Helen Martin

Page 13

1   that if he said for people to go home, people could

2   go home.

3       Q    Well, did he say that he had heard that

4   you were not permitting individuals to go home?

5       A    He never told me what took place or

6   anything.

7            He never even gave me the

8   opportunity to say, Well, Mr. Stang, I've met with my

9   employees, we all discussed what's going on and -- he

10  never gave me the opportunity to basically say

11  anything.

12           He just told me to stop what I was

13  doing and look at him.  And he told me that he was in

14  charge and why was people still working?

15           And he never gave me the chance to

16  say anything at all in my defense saying, Well, I

17  talked to my people, and we're going to do

18  such-and-such a thing.  And --

19      Q    When you say you talked to your people,

20  what was your position?

21      A    Managing supervisor of the file room.

22      Q    So you were in charge of the file clerks?

23      A    Yes, sir.

24      Q    And how many file clerks were you in

Helen Martin

Page 14

1    charge of on September of 2001?

2        A    I probably say a total of probably 13

3    people.

4        Q    And they worked in the file room in

5    Wilmington; is that right?

6        A    Yes.

7        Q    In the Wilmington office?

8        A    Yes.

9        Q    Now, were there other offices of

10   Pachulski, Stang other than the Wilmington office?

11       A    You have New York, San Francisco,

12   Los Angeles.

13       Q    At that time, they were --

14       A    I don't think New York was open there.  I

15   think it was just Wilmington, San Francisco and

16   Los Angeles.

17       Q    Okay.  Is that the first time that you

18   quit, September 2001, or had you quit before?

19       A    I may have quit before.

20       Q    Do you recall when you quit before?

21       A    I don't think I quit before.  I don't

22   think I quit -- I quit a couple times, yes, but I

23   don't think I had quit before then.

24       Q    All right.  So your best recollection is

Helen Martin

Page 15

1    that this is the first time you quit, but not the

2    only time?

3         A    Right, exactly.

4         Q    Okay.  When did you begin at Pachulski,

5    Stang?

6         A    January the 10th of 2000.

7         Q    And did you come from another law firm?

8         A    Yes, I did.

9         Q    And what firm did you come from and how

10   did you come to Pachulski, Stang?

11        A    I worked at Young, Conaway.

12        Q    And did you work with Laura Davis Jones

13   at Young, Conaway?

14        A    I didn't work directly with her, but she

15   was a manager -- I mean managing partner for the

16   bankruptcy department; which is where I worked, for

17   the bankruptcy department.

18        Q    And then she left to join Pachulski?

19        A    Yes.

20        Q    And she brought you with her?  She asked

21   you to come with her?

22        A    Yes.

23        Q    And you did that; is that right?

24        A    Yes, uh-huh.

Helen Martin

Page 16

1       Q     And were there other employees in the

2   bankruptcy section at Young, Conaway that came over

3   with you and Laura?

4       A     Yes, but not when I came.  But they

5   sporadically came, yes.

6       Q     All right.  When you came, was it just

7   you and Laura?

8       A     Basically, yes.

9       Q     On September 11th of 2001, you say you

10  spoke with Laura Davis Jones.  She had continued in

11  the Wilmington office since leaving Young, Conaway?

12      A     Yes.

13      Q     And she became a named partner in the

14  firm; is that right?

15      A     Yes.  She was a named partner in the

16  firm.

17      Q     And before you quit, did you go and talk

18  to her about your quitting?

19      A     No.  She knew that I had quit, and she

20  had called me and she and I talked, and that's when

21  we had set up a meeting for me to go in on the 13th

22  and talk to her.

23      Q     So Laura called you on the 11th?

24      A     I believe it was the 11th or the

Helen Martin

Page 17

1    12th.

2        Q    And what did she say?

3        A    We talked about what had happened.  And

4    she had explained to me that Mr. Stang wasn't there

5    when I had talked to the employees, and I explained

6    to her that I know that he wasn't there when I had

7    talked to the employees, and that I had tried to

8    explain that to him but he didn't want to listen to

9    what I had to say; he just kept telling me that he

10   was in charge there.  And had he listened to me, he

11   would have known -- or he could have asked anybody,

12   except Bruce Grohsgal, that I had taken care of my

13   people to make sure that we were secure, like we

14   normally would.

15              But he never asked -- or he just

16   told me, you know, he wanted me to make sure that I

17   understood who he was and that he was in charge

18   there, which I already knew that.

19       Q    All right.  Was he a partner in the

20   California office?

21       A    Yes, sir.

22       Q    And do you know what he was doing in

23   Wilmington on that day?

24       A    I have no clue.

Helen Martin

Page 18

1       Q     Okay.  So Laura called and wanted to set
2    up a meeting to discuss why you quit?

3       A     Uh-huh.  She wanted to know why I quit,
4    and I told her over the phone what had happened.

5       Q     And did you tell her what you've just
6    told us?

7       A     Every single thing that I just told you,
8    I told her the same thing.

9       Q     Did you tell her anything different than
10   what you've said today?

11      A     No, I did not.

12      Q     Okay.  All right.  And she suggested that
13   you come in and talk with her?

14      A     Yes; I came in and talked with her --

15      Q     Did you do that?

16      A     Yes, I did.

17      Q     And that was when?

18      A     I believe it was on September the 13th
19   that I came in, and I spoke with her that morning;
20   and I worked there until I physically resigned.

21      Q     Okay.

22      A     I went back to work that day, when she
23   and I had the talk in the morning and, you know, she
24   offered me to go back to my job, which I did.  I went

Helen Martin

Page 19

1    back to my job.

2                And she told me that she had spoke

3    with Mr. Stang, and she let him know that I was one

4    of her valued employees there and that, you know, she

5    was apologizing for him.

6        Q    All right.  Now, you made a comment, you

7    worked there until you resigned.

8                Did you resign again?

9        A    I resigned on January of '03.

10       Q    Between September of '01 and January of

11   '03, did you quit on any other occasion?

12       A    I do think that I did, but I don't recall

13   what it was.  It was something that pushed me over

14   the edge for me to quit, but I don't recall what it

15   was.  But I'm sure that I walked out prior to that,

16   to my actually physically giving something in writing

17   saying that I resigned.

18       Q    Well, do you recall whether you

19   resigned -- quit again in 2001?

20       A    No, it wasn't 2001.  I think it was the

21   early part of 2002.

22       Q    But you don't have a specific

23   recollection of why you quit?

24       A    Yes, it was because of personal hygiene

Helen Martin

Page 20

1    issues with employees.

2            Q    So this is in 2002?

3            A    Yes.

4            Q    Now, am I correct that you had no

5    problems at work from January 10th, 2000, to this

6    meeting on September 13th of '01?

7            A    No, there was problems.  Minimal things

8    that eventually took a long time to get worked out.

9    But there were problems.

10           Q    Were these racial problems?

11           A    Yes, on a couple instances from

12   employees, coworkers, people that I supervised.

13           Q    Well, let's just stop.

14                Between January 10th of 2000 and

15   September 13th, 2001 --

16           A    Right.

17           Q    Do you allege that you were treated

18   differently or that you suffered any kind of

19   environment because of your race?

20           A    Oh, yes, most definitely.

21           Q    Then when you filed your charge, why did

22   you say the earliest incident of discrimination was

23   September of 2001?

24           A    September of 2001 to January of 2002 was

Helen Martin

Page 21

1    all in the same era.

2         Q    I'm talking January 2000, when you first

3    came over from Young, Conaway --

4         A    I'm sorry.

5         Q    -- to September of 2001?

6         A    Oh, I'm sorry.  No, pardon me.  Back that

7    up, please.  I'm sorry.

8                   Okay.  There were things

9    occurring -- so there were things that were taking

10   place that I had not paid attention to.

11        Q    I don't understand what you're saying.

12   I'm asking you a direct question.

13                   My question is --

14        A    Yes.  Yes.

15        Q    Yes what?

16        A    There were occurrences that had taken

17   place.

18        Q    I'm not asking you occurrences,

19   Ms. Martin.  Let's try to be specific.

20                   Let's start first with the

21   allegation that you made under oath with the Delaware

22   Department of Labor.

23        A    Okay.

24        Q    And that allegation is that the earliest

Helen Martin

Page 22

1    act of discrimination was September 11th, 2001.

2           A    Okay.

3           Q    I asked you what that racial

4    discrimination was, as you alleged, and you said that

5    there was this meeting on September 11th.

6           A    Okay.

7           Q    Is that right?

8           A    Yes --

9           Q    So far?

10          A    -- yes.

11          Q    Okay.  Let's just stick with

12   September 11th, 2001, to January 13th of 2003.

13          A    Oh, okay.  I'm sorry.

14          Q    That period of time there.

15          A    Okay.  Yes, I understand.

16          Q    Were there any other acts of

17   discrimination that you allege?

18          A    Yes.

19          Q    What were they and when?

20          A    Personal hygiene issues.

21          Q    Well, explain that.

22          A    People coming to work that hadn't bathed.

23          Q    So you had employees --

24          A    Yes.

Helen Martin

1      Q      -- that smelled?

2      A      Yes.  Also --

3      Q      So these were employees that worked at

4    Pachulski, Stang in the file room; is that right?

5      A      Yes.

6      Q      And was there more than one?

7      A      Yes.

8      Q      Was there more than two?

9      A      Yes.

10      Q      How many were there?

11      A      Three.

12      Q      All right.  Three people that did not --

13      A      They had personal hygiene problems.

14      Q      Personal hygiene.  And those personal

15    hygiene problems were what?  Odor?

16      A      Yes.  Odor, clothes were filthy.

17      Q      Okay.  Odor, clothes filthy.

18              What other hygiene issues were

19    there?

20      A      They did not bathe.  They just did not

21    bathe.

22              And his personal hygiene problem

23    was alcohol.

24      Q      Him who?  Another employee?

Helen Martin

Page 24

```
1        A    Yes.

2        Q    What was the employee's name?

3        A    His name was Wayne Cross.

4        Q    C-R-O-S-S?

5        A    Yes.

6        Q    And Wayne Cross?

7        A    His problem was alcohol.

8        Q    You mean he smelled of alcohol?

9        A    Yes.  He smelled and looked of alcohol.

10       Q    Okay.  And was he white or black?

11       A    He's a Caucasian male.

12       Q    Okay.  And who was the next employee?

13       A    Arthur Seidler.

14       Q    Arthur -- how do you spell that?

15       A    His name is Andrew, I'm sorry.  Andrew

16   Seidler, S-E-I-D-L-E-R.

17       Q    So Andrew Seidler was another employee?

18       A    Yes.

19       Q    And what was his problem?

20       A    He did not bathe.  He had very severe,

21   huge personal hygiene problems.

22       Q    And what's the next person that had the

23   hygiene problem?

24       A    Oh, what's his name?
```

Helen Martin

Page 25

1                    I can't recall his name.

2        Q     And Andrew is a white male?

3        A     Yes.

4        Q     And you don't remember the other

5   employee?

6        A     I can't recall his name.

7        Q     Is that a male?

8        A     Charles.  Charles.  Yes, it's a male.

9   He's a Caucasian male as well.  His name is Charles.

10       Q     Okay.  And those three individuals had a

11  hygiene problem?

12       A     Yes, they did.

13       Q     Okay.  And what about those hygiene

14  problems was racially motivated, if any?

15       A     The first personnel manager, she was

16  verbally offensive.  And when I'm saying verbally

17  offensive, I mean -- I should mind my own business,

18  she does not believe that it's happening, I should

19  worry about my own people, is a statement that she

20  said to me numerous occasions.

21                    The second personnel manager -- we

22  had two personnel managers --

23       Q     Well, let's just try to keep it

24  chronological.

Helen Martin

Page 26

1        A    Okay.

2        Q    September of '01 was this meeting with

3    Mr. --

4        A    Stang.

5        Q    -- Stang?

6        A    Right.

7        Q    And then I asked you what other acts of

8    discrimination, and you mentioned personal hygiene

9    issues.

10       A    Okay.

11       Q    When did these personal hygiene issues

12   surface?

13       A    They were around for a while.

14       Q    Well, was it in 2001?

15       A    2001, slightly -- we had an employee

16   prior to them, but they canned them.  They got rid of

17   them.  It took them a minute.  It was a temp.  It was

18   a lady.  I don't recall her name, but they got rid of

19   her.

20            Then I think it was probably like

21   starting with Arthur around the early part of 2002.

22            As well as verbal abuse and

23   disrespect.  All this ties into the same line:

24   Verbal abuse, personal hygiene, verbal abuse and

Helen Martin

Page 27

1    disrespect.

2         Q    All right.  I'm a little confused.

3                   There were three employees who had

4    personal hygiene issues.

5         A    Exactly.

6         Q    Okay.  Explain to me why that was an

7    issue for you and what happened.

8         A    I had to work with these young men.  And

9    we tried numerous ways to like physically not have

10   any disrespect as far as them and their issue.

11                  I talked to the personnel manager

12   on numerous occasions --

13        Q    And who was that?

14        A    Mary Richie Johnson -- on numerous

15   occasions referencing this matter.

16                  I used to give my people that I

17   supervised, 101s, I mentioned it to them month after

18   month, not trying to single any individual out.

19                  And in turn, the second manager,

20   she said --

21        Q    All right.  Well, let's just --

22        A    Okay.

23        Q    MaryRitchie Johnson was a personnel

24   manager that you discussed the personal hygiene

**A35**

Helen Martin

Page 28

1    issues with; is that right?

2         A    Yes, for the Delaware office.

3         Q    Okay.  Now, you talked about -- did she

4    say or do anything that you considered improper or --

5         A    Yes.

6         Q    -- discriminatory?

7         A    Yes.

8         Q    And what is it that you allege she did or

9    said?

10        A    She used verbal incentatives.

11        Q    What do you mean, "incentatives"?

12        A    Stating the fact that -- how can I put

13   this?

14             She became very angry.

15        Q    Well, just tell me what she said and what

16   happened.

17        A    That I shouldn't worry about it, that it

18   wasn't issues for me, I had no need to be concerned

19   with them, I should worry about my own people, which

20   they were my people.

21        Q    You mean in the file room?

22        A    I'm assuming that.  But, you know, worry

23   about my own people.

24             Are not they my people?  I

Helen Martin

Page 29

1    supervise them as well.

2         Q    Okay.

3         A    Also.  That became very -- that became a

4    very nasty issue, because it went to the next level,

5    to the -- they have all these little titles, these

6    people that were over the Delaware office and the

7    California office.

8              So I spoke with the managing person

9    who handles personnel issues in the California office

10   referencing the same -- her name is Donna Carr -- and

11   she was a little bit more pleasant.

12        Q    Well, I'm just trying to understand what

13   this issue is.

14             You're telling me -- and I don't

15   want to put words in your mouth.  But you're telling

16   me that after the September 11th meeting, and you

17   quit and came back and spoke with Laura Davis Jones,

18   you then returned to work.

19        A    Exactly.

20        Q    And the next event or events that you

21   cite as problems at work is this personal hygiene

22   problem?

23        A    Yes, along with the disrespect.

24        Q    Disrespect by whom?

Helen Martin

Page 30

1    A    From coworkers and management.

2    Q    Well, identify the disrespect from the

3    management and the disrespect from coworkers.

4    A    Okay.

5    Q    Let's deal with the management.

6    A    Okay.  Management.

7         Given authority for people to

8    respect and do their work.  There was -- I mean --

9    how can I explain it?

10   Q    What disrespect did management show you

11   that you were citing to?

12   A    Not telling people to bathe, take care of

13   their personal hygiene.

14   Q    What is the disrespect that management --

15   that -- to you?  How did they disrespect you?

16   A    By not informing our employees properly

17   on respecting people, taking baths.

18   Q    Any other disrespect by management to

19   you?

20   A    Oh, yes.  Management not doing their job

21   as far as I was concerned.

22   Q    All right.  So the disrespect, not doing

23   their job in terms of getting these employees to

24   bathe?

A38

Helen Martin

Page 31

1       A     Bathe, as far as -- not only bathe, now.

2    Like I said, disrespect.  I mean, there was people

3    that I was supervising had no respect, none at all.

4       Q     Let's deal with the management

5    disrespect.

6       A     Okay.  We're still there.

7       Q     Well, I'm trying to get there.

8             Disrespect of you was that they did

9    not deal with the personal hygiene issue as you

10   expected them to?

11      A     Any issue.  Not only the personal hygiene

12   issue, the disrespect issue, people not doing their

13   work issue.

14      Q     Well, Ms. Martin, we're going to be here

15   for two months unless you answer these questions.

16             Okay.  You filed a complaint.  I'm

17   trying to figure out the basis for that complaint --

18      A     Okay.

19      Q     -- and I'm asking you questions.

20      A     Okay.

21      Q     And you've got to be as specific as you

22   can so we can get through this.

23      A     Okay.

24      Q     How did management disrespect you?

Helen Martin

Page 32

1       A    Management violated me by not doing their

2    job.

3       Q    All right.  That's the -- is that the sum

4    and substance of how they disrespected you?

5       A    Yes.  They violated me by not doing their

6    job as me, as a black female being a supervisor for

7    their company.  There was no participation of

8    management to handle any of these issues.  None of

9    the issues were handled.  None.

10      Q    And you're claiming that was because of

11   your race?

12      A    If I were white, they would have taken

13   care of it.  I wouldn't have went through any of that

14   that I went through.

15               These were long-gone problems that

16   just didn't start and someone came in and we talked

17   to them.

18               Even as far as the personal hygiene

19   issue --

20      Q    Well, let's just deal with this.

21      A    Okay.

22      Q    What is the disrespect that the

23   management showed to you?  And I think you've said

24   that they didn't deal with the personal hygiene

Helen Martin

Page 33

1    issue, as one issue.

2        A    They dealt with none of the issues.

3        Q    Well, I'm talking about the personal

4    hygiene issue, which is the first time you've

5    identified that.

6        A    No, they did not deal with it.

7        Q    All right.  And tell me what it is that

8    you asked management to do and whether that issue was

9    subsequently addressed.

10        A    I asked management to talk to the

11   employees.  Management came back and told me that

12   they did not want me to talk to the employees, to

13   find a coworker to do that.  Which we did, we found

14   someone to address them, and they talked to them

15   about that.

16                In turn, nothing still didn't help.

17   We had another coworker do the same.  Nothing got

18   resolved.  Nothing.

19        Q    All right.  So the suggestion by

20   management -- and by "management," you're talking

21   about MaryRitchie Johnson?

22        A    Laura Davis Jones, the senior partner,

23   actually asked me to find an employee, because she

24   did not want myself or MaryRitchie Johnson to say

Helen Martin

Page 34

1    anything to the employee.  And we found someone to do

2    that, and they --

3            Q    And who was that?

4            A    The person that did it?

5            Q    Yeah.

6            A    Wayne Cross.

7            Q    I thought he was the one that had the

8    odor problem.

9            A    Yes, he did.  He had the alcoholic odor

10   problem.

11           Q    Okay.

12           A    And he did.  He talked to them, and he

13   did what he needed to do.  And as far as himself too.

14   But it still -- it grew progressively worse.  Worse,

15   worse.

16           Q    The odor problem?

17           A    Yes.  Yes.

18                Also, I had given different links

19   that you can go on without approaching the employee

20   personally to the personnel manager, and she had

21   given them to MaryRitchie Johnson.  And MaryRitchie

22   Johnson, the personnel manager in the Delaware

23   office, she became furious.  And she called me in her

24   office, and she verbally reamed me up one side and

Helen Martin

Page 35

1    down the other, because it was not my place to give

2    those links to the other personnel manager.  And --

3    I'm like, that's a violation of my rights.

4                I had to work with these people.

5    These people are smelling terrible.  And not only

6    did -- like I say, it grew progressively worse.  It

7    became to the point where I physically had to go to

8    that room and stop other people from spraying Lysol

9    on these people.

10                Okay?  That's how furious it

11   became.  We had a pregnant lady there, and management

12   knew this lady was pregnant, and they knew this was

13   going on.  And they did nothing about it at that

14   particular stage of the game.  It even got worse.

15                It got worse to the point where we

16   physically had to set with these people or either

17   cross-train and have other people sitting with them,

18   where other people started to complain as if I wasn't

19   doing my job because these people stank and they

20   didn't want to sit down with them.  Nothing got done

21   there.

22                It went on and on and on and on and

23   on, and nothing still got resolved.  As far as I know

24   about, nothing got resolved.

Helen Martin

Page 36

1                    When I left there in January of

2     '03, I don't think any of the problems were resolved.

3     And if they were, no one came to my attention and

4     told me.

5          Q    All right.  So if I understand, you

6     complained to MaryRitchie Johnson?

7          A    Yes.

8          Q    She said, Don't worry about it, worry

9     about the other people that you're supervising; is

10    that right?

11         A    Exactly.

12         Q    And then you called Donna Carr in

13    California?

14         A    Yes.

15         Q    And what happened in that approach?

16         A    Donna Carr was more liberal.  She

17    understood.  And she said that she had heard about

18    complaints, and she asked me was anything taking

19    place?  And I told her no.  And she asked me who was

20    the people involved, and I explained to her who the

21    people was involved.  And there was no more that I

22    knew of referencing about it, because when I talked

23    to her the next time about the personal hygiene

24    issue, it was still going on.

Helen Martin

Page 37

1      Q      And when was the next time you spoke with

2   her?

3      A      The next time that I spoke with her I

4   think was like September of '02, when she came to

5   visit, I had spoke with her about the same.  But she

6   had asked me had anything gotten cleared up, and I

7   told her no.

8      Q      So this personal hygiene issue, as I

9   understand it, Andrew Seidler -- he continued there;

10   is that right?

11      A      Yes.

12      Q      And he was there when you quit?

13      A      Yes.

14      Q      In '03?

15      A      Yes.

16      Q      And he still smelled?

17      A      Yes.

18      Q      And Charles whatever his -- was he still

19   there when you quit?

20      A      Yes.

21      Q      And then Wayne Cross, was he still there?

22      A      Everybody was still there when I quit.

23      Q      So the three people that had odor

24   problems still continued?

Helen Martin

Page 38

1          A     Yes.

2          Q     And your claim was that you felt

3   management did not take care of that problem?

4          A     Right.  That was one of the issues they

5   did not take care of.

6          Q     What other wrongs occurred that caused

7   you to quit or feel that you were discriminated

8   against?

9          A     Disrespect.

10          Q     Well, let's deal with that.  Disrespect

11   by whom?

12          A     Coworkers, people that I supervised.

13          Q     Have you explained all the disrespect

14   from the management?

15          A     Yes.

16          Q     Yes?

17          A     Yes.

18          Q     Okay.  And the disrespect from management

19   was that they just didn't deal with this problem?

20          A     Right.  They dealt with no issues.

21          Q     Well, the personal hygiene issue was one

22   issue.

23          A     Right.

24          Q     Were there other issues they did not deal

Helen Martin

Page 39

1    with?

2         A    Correct.

3         Q    What other issues?

4         A    Disrespect.

5         Q    Let's deal with the disrespect.  What

6    disrespect?

7         A    Okay.

8         Q    Disrespect by coworkers?

9         A    Yes.

10        Q    So you're saying that management

11   disrespected you by not dealing with the disrespect

12   of coworkers?

13        A    Exactly.

14        Q    Okay.  What coworkers?

15        A    Okay.

16        Q    What was the disrespect with the

17   coworkers?

18        A    Asking them to do jobs that they should

19   have done, which they did not do.

20        Q    Try to be as specific as you can.

21        A    Not doing their work.  Misuse of breaks.

22        Q    What else?

23        A    Removing sensible documentation -- hiding

24   work.  Hiding work.

Helen Martin

Page 40

```
1        Q    Removing sensible documentation?  What's
2   that mean?  You mean sensitive documentation?
3        A    Yes.  Yes.  Taking legal documents and
4   hiding them.
5        Q    What else?
6        A    People not showing up for work.
7        Q    What else?
8        A    Name-calling.
9        Q    What were the name -- what name-calling?
10       A    Let's see.  Racially motivated slurs.
11       Q    I'm sorry?
12       A    Racially motivated slurs.
13       Q    So coworkers made --
14       A    Yes.
15       Q    -- made names?
16       A    Yes.
17       Q    Of each other?
18       A    To each other.
19       Q    What names?
20       A    About each other.
21       Q    All right.  Well, what names did they
22   call each other?
23       A    We had a Caucasian call people black.  We
24   had a couple people call people a Negro.
```

Helen Martin

Page 41

1       Q    Well, I'm just trying to ask you

2    specifically --

3       A    Okay.  You want to write black.  You want

4    to write nigger down there.

5       Q    I'm asking you what people said, when

6    they said it and to whom they did said it.

7       A    Cheryl Pitman said it to --

8       Q    Cheryl?

9       A    Pitman.

10      Q    Pitman?

11      A    Uh-huh.

12      Q    She works in the file room?

13      A    Yes.

14      Q    And she said what to whom?

15      A    She spoke about niggers to Wayne Cross.

16      Q    What is it that she said, and did you

17   hear it?

18      A    No, I did not hear, but other people in

19   the file room did.

20      Q    Well, tell me what you understood Cheryl

21   Pitman said to Wayne.

22      A    Cheryl Pitman -- they were making usual

23   conversation.  And Cheryl Pitman stated to Wayne that

24   she has lived around niggers all her life.

Helen Martin

Page 42

1                        Wayne Cross, in turn, reported that

2       to MaryRitchie Johnson, and we had a big meeting

3       referencing using the name "nigger" and calling

4       people names.

5                        Okay.  Now we go to Pam Pollack --

6       P-O-L-L-A-C-K, I believe is how it's spelled.

7            Q    Now, the first -- you're talking about

8       disrespect of coworkers to each other.  Is that what

9       you're talking about?

10           A    Yes.

11           Q    So we have disrespect from management on

12      the personal hygiene issue, because they didn't deal

13      with it?

14           A    Yes.

15           Q    And then we have coworkers not doing

16      work?

17           A    Yes.

18           Q    Misuse of breaks.

19           A    Yes.

20           Q    Hiding documents.

21           A    Yes.

22           Q    Not showing up for work?

23           A    Yes.

24           Q    And name-calling?

Helen Martin

Page 43

1          A     Exactly.

2          Q     Okay.  I'm just trying to understand the

3    basis for your claim that this was discriminatory

4    towards you.

5          A     I had to supervise and manage these

6    people.  It was my job to keep them going.  They were

7    under my authority because I was their supervisor

8    because they were employees in the file room.

9                        This became a very hostile working

10   environment due to the fact that management, under no

11   circumstances, came forth to really take care of

12   these problems.

13                       These were ongoing occurrences that

14   continued to happen over and over.  You take other

15   employees out, get new employees in, the same thing

16   continued, because the bad employees continue to work

17   there, which they would not get rid of.  They just

18   wouldn't get rid of them.  It was just like a runoff.

19   You get rid of some employees; they already met these

20   bad employees, so it continued to go on.

21                       And management continued to allow

22   this stuff to happen on a daily basis.  And not every

23   day -- every day, all day.  Every day, different

24   story.  Every day it was a different story.

Helen Martin

Page 44

1              I have never in my life seen people

2    who allow people to just do what they want when they

3    get ready, say what they want, and just normal every

4    day business, go and come.  And management was aware

5    of all this, very aware.

6         Q    Well, you've identified that employees --

7    you're talking about employees in the file room or

8    employees in the firm?

9         A    In general.

10        Q    Or both?

11        A    Both.

12        Q    So there are other employees in the law

13   firm -- you're shaking your head yes but let's not

14   shake your head yes.

15        A    Yes.  Sorry.

16        Q    You're talking about other employees not

17   doing their work?

18        A    Yes.

19        Q    I'm a little at a loss to understand how

20   that is a claim that you have.

21        A    That's a claim that I have due to the

22   fact that other employees, nonfile room employees had

23   to prepare documents for the file room to prepare

24   hearing binders for the court, after electronic

Helen Martin

Page 45

1   E-filing.

2               When they went to the electric

3   E-filing, the file room prepared the hearing binders.

4   I know that's not normal, but that's the way

5   Pachulski worked.   The file clerks prepared the

6   hearing binders.

7               In order for us to prepare the

8   hearing binders, the secretaries, their attorneys or

9   paralegals must bring us documents to prepare these

10  hearing binders along with the agenda letters.

11              Things were not coming in a normal

12  fashion.   They would probably bring an agenda letter

13  with a couple documents, or they would bring stuff

14  without the correct information.   It was always

15  something going on every day.

16              And I'm the one in charge.   I'm the

17  one that had to go to management and say, look,

18  people are not doing what they're supposed to do; we

19  need to talk about this.   Which, in turn, we talked

20  but nothing still got done.

21              Things always continued to linger,

22  regardless to what it was.   It always continued to

23  linger because management allowed for it to linger.

24  They allowed for it to linger on numerous occasions.

Helen Martin

Page 46

```
1        Q    So they did not discipline these

2   employees; is that right?

3        A    Correct, yes.

4        Q    And how is that racially motivated?

5        A    That's racially motivated because had it

6   been me, I would have been fired.  I had --

7        Q    Well, why do you say that?

8        A    Early on we had --

9        Q    Well, did you not do your job?

10       A    Yes, I did my job 100 percent, plus.

11       Q    So you're not similarly situated to the

12  employees that didn't do their job?

13       A    Exactly.

14       Q    Did you misuse breaks?

15       A    No, never.

16       Q    Did you hide documents?

17       A    Of course not.

18       Q    Did you not show up for work?

19       A    I showed up for work.

20       Q    Other than quitting a numbers of times.

21       A    Yes, I showed up for work.  I was there

22  day, night.  I worked more hours than any attorney

23  there my first year there.

24                 So I mean, everything that I'm
```

Helen Martin

Page 47

1    saying to you is because management allowed it to

2    happen.  If management would have just took one step

3    to help with one situation, that would have been

4    fine.  But they helped with no situations, nothing at

5    all.  Even when it came to firing people.

6                    Out of all the people that I

7    supervised, one employee, April Tabor, we put up with

8    so much from her from the day she started to the day

9    she left -- she worked exactly a year -- that it was

10   totally unbearable.  Not only did I complain,

11   everybody complained.

12                    But yet and still, management still

13   allowed this young lady to come to work and do what

14   she wanted to do.

15                    And when they finally fired her, we

16   couldn't believe it.  We didn't believe that she had

17   gotten fired, because we had.

18                    Tish Wanda Coleman, which was a

19   black lady, she worked there, she got fired

20   immediately.  We had another young lady, Pam Pollack,

21   she worked, there she took and stole sensitive

22   information and hid it.  She never got terminated.

23                    Then we had another black lady that

24   worked there, Ashley Grasty, got terminated; I didn't

Helen Martin

Page 48

1    know when it took place.  Didn't even know she had

2    terminated.  I'm writing her up for never come back

3    from lunch, and here she got fired 11 o'clock in the

4    morning.  No one came and told me.

5           Q    So they did respond to her not showing

6    up?

7           A    They responded to her not showing up?

8           Q    Yeah, by firing her.

9           A    Well, she -- she -- finally, yes, they

10   did respond by firing her.

11          Q    And you were writing her up?

12          A    I was writing her up for not coming back

13   from lunch that day, but I didn't even know that she

14   had gotten fired that morning at 11 o'clock.

15   Personnel never came to me and said, We fired one of

16   your employees.

17                    That's totally disrespectful right

18   there.  And I'm writing up an employee that's been

19   fired at 1 o'clock because she's not back from lunch.

20                    So it's a lot of things.

21          Q    I want you to give me as best you can the

22   basis for your claim that you were -- that -- let's

23   back up for a minute.

24                    You claim that you were

Helen Martin

Page 49

1    discriminated against because you were black.

2          A      Exactly.

3          Q      And we're trying to find out why you make

4    that claim.

5          A      Had I been white --

6          Q      Let me just ask you this.

7          A      Okay.

8          Q      When you filed a claim for unemployment

9    compensation, you never mentioned racial

10   discrimination, did you?

11         A      Yes, I did.

12         Q      Did you testify before the appeal

13   referee?

14         A      Yes, I did.

15         Q      Was there a transcript of that?

16         A      Yes, there is.

17         Q      Have you reviewed it?

18         A      No, I haven't.

19         Q      Did you ever mention racial

20   discrimination as a reason for your quiting?

21         A      I mentioned a lot in there.

22         Q      Did you?  Yes or no.

23         A      Yes, I did.

24         Q      Okay.  There was an appeal referee

Helen Martin

Page 50

1    decision first; is that correct?  In your claim for

2    unemployment.

3         A    Yes, there was.

4         Q    And the appeal referee had a hearing with

5    you, did she not?

6         A    Yes, she did.

7         Q    And that was transcribed, and that was

8    testimony under oath; is that correct?

9         A    Yes.

10        Q    And then the appeal referee wrote a

11   decision denying you unemployment?

12        A    Yes, she did.

13        Q    And the basis of the unemployment claim

14   was to find out why you quit; is that right?  Whether

15   you quit for a good cause?

16        A    Yes, I quit for a good cause.

17        Q    The termination was whether you quit for

18   good cause under the unemployment statute.

19        A    Oh, okay.  All right.

20        Q    And the appeal referee found you did not

21   quit for a good cause.

22        A    Right; that's what she found.

23        Q    And denied you unemployment.

24        A    Yes, she did.

Helen Martin

Page 51

1        Q     And the Unemployment Insurance Appeal

2   Board denied your claim?

3        A     Okay, yes.

4              MR. WIER:  Okay.  Let's mark

5   Exhibit 2 as the appeal referee decision.

6              (Martin Exhibits 2 through 4 were

7              marked for identification.)

8   BY MR. WIER:

9        Q     Just so we can just mark some documents,

10  Ms. Martin, so we can try to get the record here,

11  exhibit 1 is your charge of discrimination.

12       A     Right.

13       Q     Exhibit 2 is the appeal referee decision

14  denying your claim.  You've seen that before;

15  correct?

16       A     Yes, I have that.

17       Q     And Exhibit 3 is the no cause finding by

18  the Delaware Department of Labor.  They found no

19  cause to your claim; correct?

20       A     Yes.

21       Q     So they did an investigation and found no

22  discrimination; is that correct?

23       A     To their writing, yes.

24       Q     And that's Exhibit 3.  We'll go through

A59

Helen Martin

Page 52

1    these in a minute.

2                    Exhibit 4 is the right to sue

3    letter you got from the EEOC; is that right?

4            A    Correct.

5            Q    Now, the Delaware Department of Labor

6    dismissed your claim on August 31st of '04; is that

7    correct?  If you look at Exhibit No. 3.

8            A    Where are you seeing that?

9            Q    Second page -- I'm talking about the

10   Department of Labor, Exhibit 3.

11           A    Okay.  That's -- okay.

12           Q    Do you have that?

13           A    Yes, I do.

14           Q    Okay.  Exhibit 3, they dismissed your

15   claim on August 31st of '04; is that right?

16           A    Yes.

17           Q    On the second page of that it says

18   that -- at the end of that, there's no statutory

19   right of appeal of the department's no-cause

20   dismissal.  "Since this decision ends the

21   administrative process, you may have a right of

22   judicial review under default principles of law in

23   the Court of the Chancery."

24           A    Yes.

Helen Martin

Page 53

1        Q      Did you take a review of that to the

2    Court of Chancery?

3        A      No, I did not.

4        Q      All right.  So that's No. 3,

5    Exhibit No. 3.

6        A      Okay.

7        Q      Then we have Exhibit No. 4, which is the

8    right to sue from the EEOC; is that right?

9        A      Yes.

10       Q      And that's dated February 6th of '06;

11   is that right?

12       A      Correct.

13       Q      Okay.  And you filed your Complaint in

14   this court, which will be Exhibit 5, on May 8th of

15   '6; is that right?

16       A      Sounds about right.

17              (Martin Exhibit 5 was marked for

18              identification.)

19              THE WITNESS:  Okay.

20   BY MR. WIER:

21       Q      When did you receive the right to sue

22   from the EEOC?  What date?

23       A      I'm not exactly sure what date I received

24   it.

Helen Martin

Page 54

1       Q    In your complaint you allege that your

2    complaint is being -- in Paragraph 11, this is

3    Exhibit 5.  Do you have that?

4       A    Yes, I do.

5       Q    That's the complaint that you filed in

6    this case?

7       A    Uh-huh.

8       Q    And it has May 8th, 2006, as the date

9    of filing.  Do you see that stamp on there?

10      A    Yes, I do.

11      Q    Okay.  You say, in Paragraph 11 your

12   complaint is being filed within 90 days of your

13   receipt of the right to sue.

14      A    Letter, yes.

15      Q    But you can't tell me when you received

16   the right to sue?

17      A    I don't recall exactly when I received it

18   in the mail.  No, I do not.

19      Q    Okay.  Then we have --

20           You then took an appeal to the

21   unemployment -- strike that.

22           The Unemployment Insurance Appeal

23   Board dismissed your appeal as untimely, and

24   dismissed your claim, and then you took an appeal to

Helen Martin

Page 55

1    the Superior Court; is that right?

2         A    Yes.

3         Q    And Judge Cooch denied your appeal; is

4    that correct?

5         A    Yes.  Of unemployment, yes.

6              MR. WIER:  Let's have that as the

7    next exhibit.

8              (Martin Exhibit 6 was marked for

9              identification.)

10   BY MR. WIER:

11        Q    Just trying to create the record,

12   Ms. Martin.

13             This is Judge Cooch denied your

14   appeal from the decision of the Unemployment

15   Insurance Appeal Board; is that right?

16        A    Yes.

17        Q    And that's the decision that he wrote

18   denying your appeal?

19        A    Okay.  Yes.

20        Q    You filed a brief in the Superior Court

21   on your own; is that right?

22        A    Yes, for unemployment.

23        Q    In the unemployment -- to Judge Cooch?

24        A    Yes.

Helen Martin

Page 56

1              MR. WIER:  That will be 7.

2          (Martin Exhibit 7 was marked for

3          identification.)

4  BY MR. WIER:

5      Q    Is that your brief?

6      A    Yes, sir, it is.

7      Q    Okay.  So you filed that.  And then you

8  filed a supplemental brief; is that right?

9      A    Yes.

10     Q    And this is all -- this will be your

11 supplemental brief.

12         (Martin Exhibit 8 was marked for

13         identification.)

14 BY MR. WIER:

15     Q    Is that your supplemental brief?

16     A    Yes, uh-huh.

17     Q    And attached to that brief was a medical

18 document from Julie Silverstein?

19     A    Yes.

20     Q    And you saw her the day you quit in 2003?

21     A    Yes.  That morning, yes.

22     Q    Had you treated with her before then?

23     A    Yes.

24     Q    Was she a psychologist?

Helen Martin

Page 57

1       A    No.  She's my -- well, she could be.  I
2   don't know.  But I know her as my family doctor.

3       Q    She's your family doctor?

4       A    Uh-huh.

5       Q    And we'll go through this in a minute.

6       A    Okay.

7       Q    But this says that you complained of
8   sleep problems and denied depression; complained of
9   anxiety, denied suicidal thoughts.

10                Was that accurate?

11      A    Correct, yes.

12      Q    And says that you gave your two-week
13  notice today, meaning January 13th?

14      A    Yes.

15      Q    Hates to go to work.  Has headache as
16  long as she is there; is that right?

17      A    Yes.

18      Q    Can't sleep at night, having problem with
19  management at work.  Works at law firm that deals
20  with bankruptcy.

21      A    Yes.

22      Q    So we'll get to that.  But initially --
23  just as I understand it, initially you filed a -- you
24  quit on January 13th, filed a claim for

Helen Martin

Page 58

1    unemployment compensation; and there was a hearing

2    held.  Your claim was denied; you took an appeal;

3    that was denied; and you filed some briefs in

4    connection with your appeal.  Is that right?  That

5    we've seen.

6         A    Yes.

7         Q    And Judge Cooch denied it.

8         A    Yes.

9                   MR. WIER:  Okay.  Then we have the

10   transcript, will be 9.

11                  (Martin Exhibit 9 was marked for

12                  identification.)

13   BY MR. WIER:

14        Q    This is a transcript of the hearing

15   before the appeal referee on your unemployment?

16        A    Yes, uh-huh.

17        Q    Do you see that?

18        A    Uh-huh.

19        Q    Okay.  And you said you received that

20   previously; is that right?

21        A    Yes; I received it in the mail.

22        Q    Okay.  So now what we have is we have a

23   claim on January 13th, the basis -- your claim as

24   to why you quit; and you gave testimony before the

Helen Martin

Page 59

1    appeal referee as to the reasons why you quit.

2         A    Yes.

3         Q    Okay.  When was the last time you saw

4    this transcript?

5         A    Oh, I don't know.  Probably when I

6    received it in the mail.

7         Q    Okay.  Can you take a moment and let

8    me -- and tell me -- maybe it's too late.  But tell

9    me -- I don't recall what you told -- whether you

10   alleged any racial discrimination when you testified

11   before the appeal referee?

12        A    Yes, I believe I did speak that to her.

13        Q    About racial discrimination?

14        A    Yes, I did.

15        Q    Take a moment and look at your

16   transcript, and we'll take a break.  And I want you

17   to identify where in this transcript you've -- you

18   mention racial discrimination.

19                   We'll take a break.

20             (Brief recess.)

21   BY MR. WIER:

22        Q    I'm asking you where in that record,

23   before the appeal referee, did you mention racial

24   discrimination or any kind of racial complaint?

Helen Martin

Page 60

1      A      Indirectly, I spoke with her, which was

2  accumulated to distress disorder, when I was actually

3  talking to her about me being stressed.

4                And I explained -- I -- I noticed

5  it's not typed here.  I offered to give her evidence.

6      Q      My question, ma'am, is, in that

7  transcript, did you mention racial discrimination at

8  any time to the appeal referee?

9      A      I recall that I did, but I couldn't

10  actually say where it is here.

11      Q      You don't see it?

12      A      Well, no, I don't.  I don't have it here.

13      Q      The document will speak for itself.

14      A      That's true.  Okay.

15      Q      So getting back to the question of why

16  we're here and why you filed this complaint, you said

17  that -- and I don't want to put words in your mouth.

18  But as I understand it, you said that coworkers were

19  not doing their job, they were misusing breaks, they

20  were hiding work, not showing up for work, and then

21  you mentioned name-calling.

22      A      Yes.

23      Q      And my question to you was, what is your

24  complaint against Pachulski, Stang?

Helen Martin

Page 61

1       A    Pachulski, Stang discriminated against me

2   due to the fact that I'm black.  Had I been white, I

3   would not have ascertained any of the stress that I

4   ascertained while working there for the three-year

5   period.

6              Management never did anything to

7   take care of these problems, when they were notified

8   on numerous occasions about situations that were

9   taking place there.  They never did anything.

10  Everything continued to evolve continuously on a

11  daily basis.

12             Had I been white, management would

13  have took care of things.  As far as --

14      Q    Go on.  I'm sorry.

15      A    As far as even the equipment to work

16  with.

17             I wasn't ever properly given the

18  equipment that I should have received to work with.

19  Continuously asked for printers.  Was approved to

20  have them in June of '02; didn't get them until

21  December of '02.

22      Q    What other failures or allegations do you

23  make as to discrimination?  And just so I understand

24  it, you had a lot of stress --

Helen Martin

Page 62

1       A    Yes.

2       Q    -- because there were problems at work.

3       A    Yes.

4       Q    The problems had to do with personal

5   hygiene issue of coworkers?

6       A    Yes.

7       Q    And had to do with the other problems:

8   Not doing the work, misuse of breaks --

9       A    Yes.

10      Q    -- hiding work, I think you said not

11  showing up for work?

12      A    Exactly.

13      Q    And your claim against Pachulski, Stang

14  is that they didn't deal with those problems --

15      A    Correct.

16      Q    -- effectively; is that right?

17      A    Correct.

18      Q    And therefore, that caused you stress?

19      A    Yes.

20      Q    And because of that stress, you then

21  quit?

22      A    Yes.

23      Q    And your allegation with respect to the

24  name-calling is that Cheryl Pitman, who was a file

Helen Martin

Page 63

1    room employee, said to Wayne Cross -- or used the N

2    word at what point; is that right?

3           A    Yes.

4           Q    Is that the -- and you said because of

5    that, a complaint was made?

6           A    Yes.

7           Q    By whom?

8           A    The complaint was made through me --

9           Q    Someone made a complaint to you?

10          A    Yes; and I took it to the personnel

11   manager.

12          Q    And that was MaryRitchie Johnson?

13          A    Correct.

14          Q    And she did an investigation?

15          A    No, she did not.

16          Q    All right.  Tell me what happened.

17          A    Nothing.

18          Q    I thought you said there's a meeting with

19   MaryRitchie Johnson?

20          A    There was a meeting with MaryRitchie

21   Johnson.

22          Q    Who was in the meeting?

23          A    Wayne Cross and Cheryl Pitman.

24          Q    Tell me what happened and when the

Page 64

1    meeting took place?

2          A    I don't recall exactly when the meeting

3    took place.  But MaryRitchie, Kathy Wittig was

4    another personnel --

5          Q    I'm sorry?

6          A    Kathy Wittig, she was another

7    personnel -- she was like a second personnel manager.

8    She was the second personnel manager.

9                She, MaryRitchie, Cheryl Pitman,

10   Wayne Cross and myself was in a meeting and we

11   discussed the situation.  And Wayne said that he

12   didn't want Cheryl to talk to him anymore, and we

13   agreed to that because he could work without talking

14   to her.

15                And after the meeting, we all

16   agreed that everybody would try to make each other

17   happier again.  And nothing got evolved.  We went

18   right back to the same thing.  Right after coming out

19   the meeting they were arguing again over --

20   supposedly she called him another bad name.  So

21   nothing happened.

22         Q    But you don't know what that name was?

23         A    No.  I didn't work directly in there with

24   them.

Helen Martin

Page 65

1    Q    So you didn't hear the name-calling?

2    A    No.  I never heard it from the beginning.

3    I never heard it from the beginning.

4         Other employees heard it, and they

5    told MaryRitchie, and they told me.  I went to

6    MaryRitchie Johnson's office.  She said she heard

7    what had happened, she knew what was happening, when

8    we needed to sit down to have a meeting, which we

9    did.  We had a meeting with Cheryl and Wayne, and

10   nothing got evolved from that meeting.

11        Like I said, we left the meeting,

12   we went back to the file room, it started again, and

13   I told MaryRitchie nothing got resolved.

14   Q    They started arguing or --

15   A    Name-calling and arguing each other

16   again.

17   Q    Were there racial comments?

18   A    Yes, there were.

19   Q    But you didn't hear any of these?

20   A    No, I didn't.

21   Q    So nobody called you racial names?

22   A    Yes, racial names were mentioned against

23   me too.  But that doesn't bother me.  You can call me

24   what you want.  As long as I know I'm not that, you

Helen Martin

Page 66

1   can keep on.  Don't put your hands on.  That's a

2   different ballgame.

3          Q    Well, when you say name-calling, did

4   anyone calling you racial names?

5          A    There was a couple times that racial

6   things were said.

7          Q    Is that -- are you using that as a basis

8   for your complaint in this case?

9          A    Yes, I can.

10         Q    Well, I don't want you to just drum stuff

11  up.

12         A    No, I'm not drumming stuff up.  I'm

13  saying I can, because it should be already documented

14  in my personnel record.  But -- just yes, there was.

15         Q    Let's just deal with --

16         A    Yes, there was situations where I was

17  called names.

18         Q    Describe those and tell us by whom and

19  when.

20         A    Cassie Gillian.

21         Q    Who?

22         A    Cassie, C-A-S-S-I-E, Gillian.

23         Q    How did you spell that?

24         A    I'm spelling it G-I-L-L-I-A-N.  She made

Helen Martin

Page 67

1    verbal incentatives.

2         Q    Verbal incentives?

3         A    Yes.  She spoke things that she shouldn't

4    have spoke out of her mouth with MaryRitchie

5    referencing me.

6         Q    You got to be specific, Ms. Martin.

7    You're too vague.  I don't know what you're talking

8    about.

9                   When did this happen?

10        A    I don't recall the exact date.

11        Q    What year?

12        A    2002.

13        Q    When in 2002?

14        A    I would say the winter of 2002.  I don't

15   recall exactly dates.  I'm sorry.

16        Q    Well, I'm not asking for the exact date.

17   I'm asking, A, the year.  You say 2002.

18        A    Okay.  It was in the winter of 2002.  She

19   spoke negatively towards me with MaryRitchie using

20   verbal incentatives.  Exactly -- I don't know what

21   was taking place, but it was called to my attention,

22   which it had already been reported to MaryRitchie.  I

23   don't know what took place verbally, but I know she

24   said something.

Helen Martin

Page 68

1              What she said, I don't know, but it

2   was told to MaryRitchie.  MaryRitchie never told me

3   what she spoke, but I know it was some kind of name,

4   because the other coworkers explained to MaryRitchie

5   what had taken place.

6              I believe Cassie got terminated.

7   She didn't come back no more.  I never seen her

8   again, come to think of it.  So she either quit or

9   got fired.  But I know she was chastised.

10  MaryRitchie did say something to her.  I know that

11  for a fact.

12      Q    But you don't know what she said or the

13  context of what she said?

14      A    No, but I know it was something bad.

15  Whatever she said was bad, because the file room told

16  MaryRitchie.  In turn, MaryRitchie asked me did I

17  hear it, and I told her no, I did not hear it.  But I

18  know she said something, but I didn't know what she

19  said.  But I know she said something.

20              And I know she said something as --

21  she didn't say -- she said something negative, but I

22  don't know whether she said, You're a smart black

23  person or -- something -- I know she said negative to

24  that effect.  But exactly what she said, no,

Helen Martin

Page 69

1   physically I did not hear her with my own ears.  But

2   I know she said something, and I know that she either

3   quit or got terminated.  But I know it was something

4   negative said there.

5          Q    Cassie was an employee at the file room?

6          A    Yes.

7          Q    And Cassie, you think in the winter of

8   2002, spoke with MaryRitchie?

9          A    She said it to other file room employees.

10  They reported her to MaryRitchie.

11         Q    And then -- but you don't know what she

12  said?

13         A    I was right there, but I don't know

14  exactly what she said, but I know she said something.

15         Q    But you didn't hear it; you don't know

16  what she said?

17         A    No; I did not hear what she said.

18         Q    All right.  And what you know is that,

19  therefore, there was some follow-up by MaryRitchie?

20         A    Right.

21         Q    And Cassie Gillian either quit or was

22  fired?

23         A    Right.

24         Q    All right.  What other names --

Helen Martin

Page 70

1    name-calling --

2         A    Pam Pollack.

3         Q    Tell me what she allegedly said.

4         A    Pam Pollack called me Satan.

5         Q    Okay.  And when did she do that?

6         A    It was probably -- let's see.  That would

7    have been 2002.  Yeah, that would have been around

8    2002 -- wait a minute.

9                   No, I would say probably around

10   2001.  It was like in the early spring -- late

11   winter, early spring of 2001.

12        Q    Okay.

13        A    Right, 2001.

14        Q    She called you Satan?

15        A    Yes, she did.

16        Q    What other name-calling, if any?

17        A    She, Pam Pollack, and Christine Sentman

18   both used the N word.

19        Q    Sentman?

20        A    Yes, S-E-N-T-M-A-N.

21        Q    And when did they use the N word?

22        A    That was probably in February of '01.

23   I'm trying to think here.

24                   Yes, that would have been in

Helen Martin

Page 71

1    February.  Yes, that was in February of '01.

2         Q     Tell me the context.

3         A     I don't know again what happened.

4         Q     Did you hear it?

5         A     I heard the tail end of it.

6         Q     Well, what did you hear?

7         A     I just heard Christine said something

8    to -- no.  Pam said something to Christine.  Pam

9    Pollack said something to Christine.  In turn,

10   Christine, I believe, was -- I heard what Christine

11   was repeating.  Right.  Christine was repeating what

12   Pam had said.  That's how I heard it.

13        Q     What did Christine say?

14        A     Christine said that Pam had said that it

15   was only three black people in the file room.

16                   But she only got that from Pam.

17   She's repeating what Pam had said.  Right, she's

18   repeating what Pam had said.

19        Q     I don't understand.  Pam --

20        A     Christine repeated what Pam had said.

21        Q     And Pam's comment was there are only

22   three black people in the file room?

23        A     Exactly.  That's what Christine said:

24   Only three black people in the file room.

Helen Martin

Page 72

1      Q    Okay.  And that's the sum and substance

2  of what she said?

3      A    That's -- of what I heard her say.  I

4  don't know about what happened before then or any of

5  that.  I just know that's what I heard --

6      Q    -- her repeating?

7      A    Right.  Christine --

8      Q    Christine is repeating what Pam said.

9  You didn't hear what Pam said.

10     A    No.

11     Q    All you heard was only three black people

12  in the file room?

13     A    Yes.

14     Q    Any other names that you --

15     A    That's it, until April of '01.

16     Q    '01?

17     A    April of '01 -- no -- right.  Right,

18  April '01.  April '01 is when things got a little

19  haywire again and we had a couple of new employees

20  in.

21           Again, I don't know what was said.

22  I just know what personnel said to me.

23           And personnel mentioned about

24  verbal uses of people using the N word again, and the

Helen Martin

Page 73

1    same people were basically involved again.   April --

2    April's last name is Tabor, T-A-B-O-R.

3                April, Christine Sentman, and Pam

4    Pollack were involved.

5          Q    I'm sorry.  Personnel told you in April

6    of '01 what?

7          A    Was I aware that name-calling issues were

8    still taking place.

9          Q    And by "personnel," you mean who?

10         A    MaryRitchie Johnson.

11         Q    And you were not aware of it?

12         A    No, I was not.  Not that day, I had no

13   knowledge of it.

14         Q    So that -- but you didn't hear it, you

15   don't know what happened or what was said?

16         A    No, I did not.

17         Q    And did you know what personnel did or

18   did not do?

19         A    MaryRitchie, she asked me was I aware of

20   what was going on, and I told her no.

21         Q    Okay.  All right.  Do you have any other

22   facts relating to this occurrence in April of '01?

23         A    No, I don't.

24         Q    So just to be accurate, in the winter of

Helen Martin

Page 74

1    '02 was the Cassie Gillian comment?

2         A    Winter of '01, I believe.  I think Cassie

3    was there in '01.

4         Q    You said the winter of '02?

5         A    It could be '02, but I know it was in the

6    winter.  I'm trying to make sure I'm right here.

7         Q    Well, you said that Cassie Gillian spoke

8    with MaryRitchie, knew she said something, knew it

9    was negative but didn't know what it was.

10        A    Exactly.

11        Q    And then in early spring, late winter of

12   2001, Pam Pollack called you Satan.

13        A    Yes.

14        Q    And then in February or thereabouts of

15   '01 --

16        A    Christine -- that's when Christine and

17   Pam.

18        Q    Christine used the N word but you didn't

19   hear it?

20        A    No, I did not.

21        Q    And what you heard was Christine

22   repeating what Pam had said --

23        A    Yes.

24        Q    -- about there are only three black

Helen Martin

Page 75

1    people in the file room.

2         A    Correct.

3         Q    Then in April '01 you don't know what was

4    said, but you were questioned by personnel as to

5    whether you were aware that names were still being

6    called?

7         A    Yes, exactly.

8         Q    Any other name-calling of a racial nature

9    that you are aware of?

10        A    No, because I told you about the incident

11   with Wayne and Cheryl.

12                   No, not that I can recall.

13        Q    So during your employment, you've

14   described for us the name-calling that was of a

15   racial nature?

16        A    Yes.

17        Q    Now, you said that you had a lot of

18   stress, and the basic concern you had was that the

19   stress involved work conditions such as delaying a

20   printer, the hygiene issues, those kinds of things.

21        A    Yes.

22        Q    Equipment issues.

23        A    Yes.

24        Q    What other employment related issues

A83

Helen Martin

Page 76

1    caused the stress that caused you to quit?

2         A    The same repeated instances over and over

3    again.

4         Q    Like what?

5         A    Again, printer problems, not enough

6    equipment.  People were still continuously misuse of

7    breaks.  The same thing over and over, every day.

8         Q    I want the same thing.  So misuse of

9    breaks --

10         A    Misuse of breaks, personal hygiene issue.

11              Okay.  Misuse of breaks, personal

12    hygiene issue, same name-calling.

13         Q    And we described the name-calling; is

14    that right?

15         A    Yes.  Disrespect.  All these things

16    continued all day.  It got worse and worse and worse.

17         Q    What got worse and worse and worse?

18         A    The same things over and over again.

19    Personal hygiene issue.  Okay?  It was never

20    corrected; it got worse and worse and worse.

21              The same thing:  Disrespect issues.

22    We would get rid of employees; we would get new

23    employees.  The same thing would continue over again,

24    because we still had the bad employees.

Helen Martin

Page 77

1           The disrespect, people calling each

2     other names, fighting amongst each other.  Every

3     single day, the same things went on.

4           One day we would have one person

5     stinking.  The next day we would have two people

6     stinking.  The next day we would have three people

7     stinking.  No need to complain; management didn't do

8     anything.

9           Respect:  The same thing every day,

10    it got worse and worse and worse and worse.  The same

11    things continuously occurred.

12           Even with the name-calling.  I

13    believe that we had the final meeting, like the

14    latter part of 2002 with Cheryl and Wayne again.  The

15    same people -- Kathy Wittig, MaryRitchie, Cheryl,

16    Wayne and myself -- were in a conference room hoping

17    that we can iron out issues:  The same thing all over

18    again.

19           Pam Pollack.

20     Q    Wait, wait, wait.  But you're being very

21    vague here.

22           I thought we went through the

23    name-calling.

24     A    Yes, we did.

Helen Martin

Page 78

1         Q    Okay.  So when you say every day, that's

2    not true.

3         A    Yes, it is.  The same thing continued to

4    occur.

5         Q    What same thing?

6         A    People calling each other names.  It just

7    didn't stop.  It stopped.

8         Q    What names are you talking about?

9         A    You had people calling people -- like

10   Cheryl and Wayne calling each other poor white trash.

11   Okay?

12        Q    Well, what did you hear?

13        A    "Poor white trash" is what I heard.

14   Okay?

15        Q    So Cheryl called Wayne poor white trash.

16        A    Right.

17        Q    Now, you haven't mentioned that before.

18        A    He called her the same.  Okay?  He --

19   this is a continuous, everyday thing.

20              It's not like one issue didn't

21   happen one day.  The same thing continued to happen

22   day after day after day after day.  It continuously

23   got worse and worse.  The same with the personal

24   hygiene issue; the same thing with disrespect; the

Helen Martin

Page 79

1    same thing with the people misusing their breaks; the

2    same thing not showing up for work.

3                    The same exact thing continued.  It

4    was just the runoff.  Every day it got worse and

5    worse and worse and worse, and management never done

6    anything about it.

7                    The more I complained to

8    management, the worse it became.  Because they

9    already knew.  Management don't care, so we continued

10   to do what we're doing.

11        Q    When you say you complained to

12   management, did you do that in writing?

13        A    Not only do I do it in writing --

14        Q    So the answer is yes?

15        A    Yes, I did it in writing.

16        Q    And when did you do it in writing?

17        A    Numerous days I did it in writing.

18        Q    And what did you complain about in

19   writing?

20        A    The personal hygiene issue.

21        Q    What management are you talking about?

22        A    I'm talking about personnel management.

23        Q    Who was the management did you complain

24   to?  Who was it?

Helen Martin

Page 80

| | | |
|---|---|---|
| 1 | A | MaryRitchie, personnel manager. |
| 2 | Q | MaryRitchie? |
| 3 | A | Yes. |
| 4 | Q | You complained to her? |
| 5 | A | Yes. |
| 6 | Q | In writing? |
| 7 | A | Yes. |
| 8 | Q | About these issues that we've talked |
| 9 | | about? |
| 10 | A | Yes. |
| 11 | Q | I just want to make sure we have the |
| 12 | | issues down. |
| 13 | A | Yes. |
| 14 | Q | The issues are personal hygiene? |
| 15 | A | Yes. |
| 16 | Q | Is that right? |
| 17 | A | Yes. |
| 18 | Q | Those personal hygiene of other |
| 19 | | employees? |
| 20 | A | Yes. |
| 21 | Q | I think you said they stunk? |
| 22 | A | Yes. |
| 23 | Q | Okay.  Misuse of breaks; is that right? |
| 24 | A | Yes. |

Helen Martin

Page 81

1          Q     You complained that employees were --

2     what?

3          A     Misusing their breaks.

4          Q     In what way?

5          A     Taking 20 minutes when it should have

6     been 10 or 15.

7          Q     So you were concerned about that, and

8     that was a continuing problem, was it?

9          A     Yes.

10         Q     And the other issues were --

11         A     Disrespect.

12         Q     And the disrespect was what?

13         A     People not doing what I asked them to do

14     as far as work-related issues.

15         Q     Okay.  What --

16         A     Not doing their work.

17         Q     What do you mean, not doing the work?

18         A     Not doing their work.  Not doing the job

19     they was hired to do.

20         Q     Well, what do you mean, not doing the

21     work?

22         A     Not doing their work.

23         Q     You mean they wouldn't show up for work?

24     I don't understand what you're talking about, not

Helen Martin

Page 82

1    doing their work.

2         A    They didn't physically do what they were

3    hired to do.  They were hired to do file room

4    procedures, which they were not doing.

5         Q    So that was stressful, because the

6    employees were not doing what you thought they should

7    be doing?  Is that --

8         A    The employees were not doing what they

9    were supposed to be doing.

10        Q    Okay.  What other personnel problems that

11   continued, continued, continued?  I just want the

12   kinds of problems and make sure that they're all the

13   same.

14                       That continued; is that right?

15        A    Yes.

16        Q    What else continued?

17        A    These are the problems that continued:

18   Personal hygiene issues.

19        Q    We talked about.

20        A    The disrespect.

21        Q    And not doing what you asked them to do?

22        A    Not doing what I asked them to do as far

23   as work-related issues.

24        Q    What else?  What other disrespect?

Helen Martin

Page 83

```
 1        A    All that comes in under same title.

 2        Q    Then let's not use the broad word

 3   disrespect.  Let's use the specific problems.

 4        A    Okay.  Not doing their work.

 5        Q    What else?

 6        A    Continuously misuse of breaks.

 7        Q    Okay.

 8        A    We said the personal hygiene.

 9             Like as far as total disrespect,

10   anything.  Even if I asked them to move some trash,

11   they wouldn't do it.  They just wouldn't do what they

12   were supposed to do.

13        Q    What else?

14        A    Misuse of the Internet.

15        Q    In what way?

16        A    You shouldn't be on it unless it's

17   work-related.

18        Q    So misuse of the Internet is employees

19   were on the Internet for non- --

20        A    For nonwork-related -- yes.

21        Q    Okay.  What else?

22        A    Dress appropriate was a problem.

23   Dressing appropriate was a problem.

24        Q    What's that mean?
```

Helen Martin

Page 84

1        A    You weren't -- they didn't adhere to the

2    dress code.

3        Q    "They" being other employees?

4        A    Yes.  People that I supervise.  Not

5    supposed to wear flip-flops, but they wore

6    flip-flops.  They did what they wanted to do when

7    they got ready.  We'll just sum it up like that.

8        Q    No, we're not going to sum it up.

9        A    Okay.

10       Q    We're going to find out what your claim

11   is.

12       A    Okay.

13       Q    What else?

14       A    That's all I can think about right now.

15       Q    All right.  So between whenever you began

16   and the time you quit, these are the kinds of

17   problems that you felt caused you stress, which

18   caused you then to quit?

19       A    Did not feel:  It did cause me stress.

20       Q    And are there any other actions of either

21   employees or management at Pachulski, Stang that you

22   can cite that you believe -- that -- that caused you

23   to quit?

24       A    Yes.  Management.

Helen Martin

Page 85

1      Q    What about it?

2      A    Management not doing what they were told

3   to do.  They were disrespectful as well.

4      Q    So your claim in terms of disrespect is,

5   you made these complaints; they didn't address these

6   complaints to your satisfaction --

7      A    Not to my satisfaction:  They didn't

8   address the complaints, period.

9      Q    Well, they got you the printer, did they

10   not?

11      A    Not that I know of.

12      Q    Or a copier.  Did they not get a

13   high-speed printer?

14      A    Not when I was there.

15      Q    Okay.

16      A    I was told that they were getting one,

17   but I never seen it.

18      Q    So that's one of your complaints, is that

19   they didn't get a printer quickly enough?

20      A    Exactly.

21      Q    So the disrespect is that the management

22   didn't take care of these personnel matters.

23      A    Exactly.

24      Q    Now, you mentioned some name-calling?

Helen Martin

Page 86

1        A    Yes.

2        Q    And I thought we had gone through that.

3   Did anyone call you names?

4        A    Yes.

5        Q    Other than Satan.

6        A    Yes.  I mentioned this earlier, that I

7   was called names.

8        Q    Okay.  Well, who called you names and

9   when?

10       A    I'm not exactly sure who said it.  But

11  like I said, as far as Cassie, I don't know what she

12  said.  I know she said something, but what I don't

13  know.

14            I know she said something, but what

15  she said, I don't know.  I can't say that.

16       Q    What else -- did anybody in your

17  presence, any management employee, make any racial

18  comments, or did any co-employee make any additional

19  racial comments in your presence, other than what

20  you've talked about?

21       A    Not that I'm aware of.

22       Q    Okay.  All right.  Now, why did you quit?

23       A    I quit because the way that I was being

24  treated.

Helen Martin

Page 87

1          Q     All right.   Tell me what caused you to

2     quit and the treatment that you're alleging.

3          A     The treatment that I'm alleging is that,

4     was my rights was being violated by me being a black

5     supervisor there at Pachulski.

6          Q     Wait.   I don't understand that.

7                     There were other supervisors, were

8     there not?

9          A     Not that I know of.

10         Q     Your claim is that you were the only

11    black supervisor?

12         A     As far as I know, when I worked there.

13         Q     And therefore, you're just assuming that

14    because --

15         A     I'm not assuming anything.

16         Q     Well, you are.

17         A     No, I'm not.

18         Q     Okay.   Is your claim that they didn't

19    deal with these problems because -- they did not do

20    that because of you?

21         A     Yes, it is.

22         Q     Because you were black?

23         A     Yes.

24         Q     So they didn't deal with the personnel

Helen Martin

Page 88

1    issues because you were black?

2          A    Exactly.

3          Q    And they didn't deal with the other

4    personnel kinds of issues, equipment issues, because

5    you were black?

6          A    Exactly.

7          Q    I see.

8          A    Exactly.

9          Q    All right.  Were there other supervisory

10   employees at Pachulski?

11         A    There was no other black supervisors at

12   Pachulski, again, for the second time, in the

13   Wilmington office where I worked.

14         Q    Well, were there black supervisors in the

15   other offices?

16         A    I wouldn't know.  I have no knowledge of

17   that.

18         Q    Who was Lawrence Newton?

19         A    Regular coworker.

20         Q    Was he an information technology manager?

21         A    Not that I know of.  Not when I was

22   working there he was not.

23         Q    Was he black?

24         A    Yes, he is.

Helen Martin

Page 89

```
 1      Q    Was he working in the Wilmington office?

 2      A    Yes, he did.

 3      Q    Did he work for you?

 4      A    No, he did not.

 5      Q    Can you tell us what his title was?

 6      A    As far as I know, he did not have no

 7  title.

 8      Q    You didn't know?  You don't know

 9  whether -- well, strike that.

10                That section did he work in?

11      A    IT.

12      Q    Okay.  Was he there when you -- was he

13  still employed when you quit?

14      A    Yes, he was.

15      Q    Is he still there?

16      A    I don't know.

17      Q    And how about Vanessa Preston, who is

18  she?

19      A    A work-flow coordinator, secretary.

20      Q    Is she black or white?

21      A    She's black.

22      Q    What was her title?

23      A    Work-flow coordinator.

24      Q    Head word processer?
```

**A97**

Helen Martin

Page 90

1       A    No.  Work-flow coordinator.

2       Q    Was she a supervisor?

3       A    No, she's not.

4       Q    How do you know that?

5       A    Because if she was, wouldn't it say

6    "supervisor, work flow coordinator."

7       Q    Do you know whether she supervised

8    employees?

9       A    No, she did not.  Not that I know of.

10      Q    And Mr. Newton, he was an information

11   technology manager.  Do you know whether that's --

12      A    Not to my knowledge.

13      Q    -- accurate or not?

14      A    Not to my knowledge he was not.

15      Q    Now, let's get back to why you quit on

16   January 13th.

17           As I understand it, you were having

18   stress throughout because of these ongoing problems

19   at work?

20      A    Yes.

21      Q    Is that right?

22           Have you given me all of the

23   specific racial issues that occurred up until

24   January 13th of '01?

Helen Martin

Page 91

1        A      As far as I know, yes.

2        Q      And then why did you quit on

3    January 10th?  Actually, you started preparing your

4    resignation letter in December of '02; correct?

5        A      Yes, uh-huh.

6        Q      And why did you begin preparing a

7    resignation letter in December of '02?

8        A      Because of the -- the personnel issue.

9        Q      What personnel issues?

10        A      Laura Davis Jones, which was the senior

11    partner, and MaryRitchie Johnson, which was the

12    personnel manager, and myself, we had had a meeting.

13                  That meeting became very hostile,

14    should I say.  And at that particular stage of the

15    game, all the same issues had -- they were just there

16    again.  And Laura wanted to know why things weren't

17    getting done.

18                  Of course, I couldn't answer that

19    for her, because I'm just a supervisor of the file

20    room personnel, so I can't answer for your personnel

21    people.

22                  But one thing led to another, and

23    like I said, that was a very hostile meeting.  And at

24    that particular stage of the game, I told Laura Davis

Helen Martin

Page 92

1    Jones what I felt and exactly how I felt, and I told

2    MaryRitchie Johnson the same thing:  It was not my

3    job for me to continue to come there on a daily

4    basis, trying to assume my people and remind

5    MaryRitchie of what needs to be done as far as the

6    file room is concerned.

7                    Laura explained that she was not

8    aware of certain things going on in that file room,

9    which was not true.  She knew everything that was

10   going on in there.  But however, I told her then --

11       Q    "Her" being?

12       A    Laura Davis Jones.  I'm sorry.

13                   I told Laura Davis Jones then that

14   she needed to talk to MaryRitchie and find out what

15   was going on, because there was a lot of things that

16   was going that Laura pretended that she had no

17   knowledge of, which was not true.

18                   Laura was aware of everything that

19   was going on, and I'm sure that MaryRitchie was

20   communicating with her properly.  It was just things

21   that there were allowed to continue to happen on a

22   daily basis that were not taking care, which should

23   have been taken care of.  And that was my final

24   meeting with Laura and MaryRitchie.

Helen Martin

Page 93

1    Q    All right.  Let me just go back.

2                The problems that you discussed in

3    the meeting with Laura Davis Jones and MaryRitchie,

4    when was the meeting?

5        A    It was the later part of December.  I

6    don't recall the exact date.

7        Q    And what were the issues that were

8    discussed?

9        A    The same issues --

10       Q    I want you to tell me --

11       A    The personal hygiene issues --

12       Q    Just step by step.

13                Who called the meeting?

14       A    Laura Davis Jones.

15       Q    And why was the meeting called, if you

16   know?

17       A    Because we hadn't received the high-speed

18   printers.

19       Q    Okay.  So printers had been ordered for

20   the file room, and they had not been received?

21       A    I don't know whether they had been

22   ordered or not, but I know we didn't have them.

23       Q    So who called the meeting?

24       A    Laura Davis Jones.

**A101**

Helen Martin

Page 94

1        Q      And the purpose of the meeting, as you

2     understood it, what was?

3        A      To find out what was going on --

4        Q      With respect to the printers?

5        A      With respect to the printers, and Laura

6     just wanted an overall view of everything that was

7     going on in the file room.

8        Q      Okay.  So Laura Davis Jones called a

9     meeting, and you attended?

10       A      Yes, I did.

11       Q      And MaryRitchie Johnson was there as

12     well?

13       A      Yes, sir.

14       Q      Okay.  And what were the issues that were

15     discussed in that meeting?

16       A      Personal hygiene.

17       Q      So what -- tell me about that.

18       A      The same thing as I mentioned before.

19       Q      Well, did you -- did someone say, Oh,

20     these employees are still odoriferous?

21       A      Yes.  I told her that.  I told Laura that

22     in front of MaryRitchie, that the same personal

23     hygiene problems were still continuing, the

24     disrespect was at an all-time low.

Helen Martin

Page 95

1        Q        Disrespect of employees of you?

2        A        Yes.

3        Q        Is that what you mean by disrespect?

4        A        Yes.

5        Q        Where they were not following your

6    directions?

7        A        Not my directions.  The company policy

8    directions.

9        Q        So they weren't following the policy?

10       A        Right.

11       Q        And were those the issues about they were

12   misusing the time?

13       A        Yes, sir.

14       Q        And that was mentioned in the meeting?

15       A        Yes, sir.

16       Q        And they were using the Internet

17   inappropriately?

18       A        Yes, sir.

19       Q        What else -- did you talk about hiding

20   documents in this meeting?

21       A        Yes, sir.

22       Q        Yes?

23       A        Yes, sir.

24       Q        What other issues did you talk about in

Helen Martin

Page 96

1    the meeting?

2          A    The name-calling.

3          Q    What name-calling?

4          A    As far as coworkers disrespecting people,

5    calling names and stuff of that nature.

6          Q    Well, I don't understand what you mean.

7                What specific name-calling did you

8    discuss in that meeting?

9          A    The name-calling -- I didn't know exactly

10   what names were being called, but we knew that

11   name-calling was still existing, because MaryRitchie

12   had been notified of that and she had shared that

13   with me.  And we couldn't really pinpoint who had

14   said what, but we knew something had taken place.

15         Q    So Mary had done an investigation and

16   couldn't figure out who said what?

17         A    Right.  She didn't know -- they wouldn't

18   tell you who said what.

19         Q    Okay.

20         A    But the same issues were still going on

21   when we had the meeting in December of '02 with Laura

22   Davis Jones.

23                At that particular stage of the

24   game, Laura accused MaryRitchie and I of both -- of

Helen Martin

Page 97

1   not doing our jobs, which on my behalf was not true.

2   I can't speak for MaryRitchie, but I know as far as

3   me, I know I went beyond the call of duty up until

4   that day.

5              My physical, last verbal meeting

6   that I had was with Donna Carr.

7        Q    I'm just still on the December meeting.

8        A    Okay.

9        Q    So you had this December meeting with

10  Laura Davis Jones, MaryRitchie.  And in that meeting,

11  Laura Davis Jones wanted to find out what was

12  happening?

13       A    Right.

14       Q    And she criticized you and MaryRitchie

15  about not doing your jobs.

16       A    Right.

17       Q    What else was discussed in that meeting

18  and what came out of it?

19       A    The same issues discussed prior -- same

20  thing all over again.  Nothing actually came out of

21  it.  Nothing came -- a follow-up meeting was supposed

22  to take place.  A follow-up meeting was supposed to

23  take place, because Laura did ask us for a follow-up

24  meeting.  But I don't think -- we never actually

**A105**

Helen Martin

Page 98

1    physically gave her a date, because we all -- the

2    meeting ended with MaryRitchie and I both exiting,

3    because Laura Davis Jones got a phone call or

4    something.  We were interrupted.

5                      But there was supposed to be a

6    follow-up meeting, but it never --

7         Q    But why did you start submitting your

8    resignation?

9         A    For the same things that I just told you.

10   All those same things:  Stress every day, all day.

11        Q    So this is the work-related stress

12   because these issues were not being dealt with, in

13   your view --

14        A    Not in my view --

15        Q    Caused you stress?

16        A    Yes.

17        Q    And therefore, because you had stress,

18   you wanted to quit?

19        A    No, I didn't want to.  I did.

20        Q    Well, you started to prepare a

21   resignation letter in December.

22        A    Exactly.

23        Q    And I asked you what -- was there a

24   precipitating factor that caused you to --

Helen Martin

Page 99

1          A     Yes, personal hygiene.  Personal hygiene

2     is what threw me over the edge.

3          Q     And what threw you over the edge there?

4     Tell me.

5          A     The personal hygiene issue, Kathy Wittig,

6     which was the second personnel manager in

7     Wilmington -- she walked past my office, and I

8     forget -- I think it was either Drew or Charles was

9     in there, one of them was in there.  And she just

10    said, Helen, I know what you mean now -- and I didn't

11    understand what she said.

12                But she called me down to Mary

13    Ritchie's office, and she asked me to close the door,

14    and I closed the door.  And she told me, I never

15    smelled it before, but now I know exactly what you

16    mean.

17                I'm like, so finally, all of a

18    sudden, now everybody smells this, and we've been

19    complaining about this for over a year and a half.

20                And I was done.  I was just totally

21    baffled, and I left.  I never went back.  That day,

22    from that -- when she told me that, I just packed my

23    stuff up and left and never went back.  Well, I did

24    go back, because I went back to finish picking up my

Helen Martin

Page 100

1   final stuff.  But I never went back after that, I kid

2   you not.  And it was early in the morning.

3          Q    That was on January the 10th, was it?

4          A    It might have been January 10th.  But

5   whatever -- it was the last day that I physically

6   went there to work.

7          Q    Well, January -- as I recall your

8   testimony before the appeal referee is, you submitted

9   your resignation letter on January the 10th, which

10  was a Friday.  And then you sought to pull that back,

11  because you wanted to have it effective

12  January 13th, to give two weeks' notice.  Is that

13  accurate.

14         A    Right.  But my two weeks' notice been to

15  January 27th or something like that.

16         Q    So you wanted --

17         A    Yeah, I drew it up in December, and I

18  drew it back.  Then I sent it on the 13th.

19         Q    No, you sent it on January 10th?

20         A    January 10th?  Fine.  I sent it on

21  January 10th, for my last workday to be effective

22  January 27.

23         Q    But then you withdrew it on

24  January 10th, because you wanted it effective on

Helen Martin

Page 101

1    the 14th, which is what I believe your testimony was.

2                    Do you recall that?  You tell me

3    what you recall.

4         A    Wait a minute.  Effective on the 13th,

5    but my last workday would have been January 27th.

6    That sounds about right.

7         Q    But you didn't work January 13th to

8    January 27th, did you?

9         A    I think I worked up until January 14th

10   or 15th.

11        Q    And why did you not work until the 27th?

12        A    Because, like that said, that personal

13   hygiene issue was what threw it over the edge for me.

14   Whatever that day was, that morning, I left and I

15   took some personal belongings, but I never went back

16   to physically work.

17        Q    Well, I'm a little unclear.  Why did you

18   resign?

19        A    I resigned due to the fact of disrespect

20   and stress-related issues involving my work.

21        Q    That you've described?

22        A    Yes.

23        Q    And I'm a little unclear as to this Kathy

24   Wittig situation.

A109

Helen Martin

Page 102

1                          Are you telling me that you had

2    resigned when Kathy Wittig told you that she had

3    smelled the employee?

4          A    Yes.  And I had already given my notice

5    and everything.

6          Q    So that -- when she told you that, that

7    caused you not to work your two weeks?

8          A    Right.  I just totally threw my hands up

9    at her, and I'm like, now she's complaining that she

10   smells it and it's atrocious, and I've been sitting

11   right there dealing with it for over a year and a

12   half, and now finally understands what I've been

13   complaining about?

14         Q    So that caused you then to say, I'm not

15   going to complete my two weeks --

16         A    I told her I was leaving, and I left.

17         Q    And you did not work from January 14th

18   or so until the 27th?

19         A    Right; I did not.

20         Q    Did you get paid for that period of time?

21         A    No, I did not.

22         Q    Are you sure?

23         A    I'm positive I didn't.

24         Q    So the Kathy Wittig coming into your

Helen Martin

Page 103

1    office and saying to you words to the effect, Now I

2    know what you're talking about because I smelled it,

3    that's not why you submitted your resignation?

4            A    No, because that happened afterwards.

5            Q    You submitted your resignation --

6            A    Prior.

7            Q    -- because of what?

8            A    Because of the things that was happening

9    at work.

10                   Let's go back.  I'm sorry.

11           Q    Because there were these personal issues

12   that were not being resolved?

13           A    Right; which related to the stress that I

14   was ascertaining at work.

15           Q    When did you first seek treatment for

16   your stress?

17           A    I had been going to my doctor.

18           Q    Your doctor is Silverstein, is it?

19           A    Yes.

20           Q    When did you start going to her?  Because

21   I asked you to bring your medical records.  Did you

22   do that?

23           A    I don't recall you asking me.

24           Q    In the subpoena.  The subpoena asked you

Helen Martin

Page 104

1    to bring all your documents that supported your

2    claim.

3         A    Okay.  I wouldn't think that my medical

4    records would support my claim, only one issue.

5         Q    Well, are you claiming emotional

6    distress?

7         A    Yes, I did claim stress.

8         Q    Did you file workman's comp?

9         A    No, I did not.

10        Q    And the stress was work-related, was it?

11        A    Yes, sir.

12        Q    But you didn't file a workman's comp

13   claim?

14        A    No, I did not.

15        Q    Now, when you went to Silverstein, did

16   you seek any psychology or psychiatric --

17        A    She did offer it to me.

18        Q    Did you seek any?

19        A    No, I did not.

20        Q    Okay.  So the only medical treatment you

21   got was with your primary-care physician,

22   Silverstein?

23        A    Yes.

24        Q    She was your PCP, primary-care physician?

Helen Martin

Page 105

1          A     Yes.

2          Q     What kind of a doctor was she?

3          A     OB/GYN.  And she does something else.

4     Let me get this right.

5                She's a family medical doctor but

6     she does OB/GYN, because that OB/GYN is not her

7     specialty.

8          Q     And was she treating you for stress?

9          A     She offered to treat me for stress, yes.

10         Q     Well, did she treat you for stress?

11         A     She gave me sleeping pills -- she didn't

12    give me sleeping pills, but she gave give a

13    prescription for sleeping pills.  Excuse me.

14         Q     Okay.

15         A     She gave me the --

16         Q     Ambien, was it?

17         A     I don't remember.

18         Q     Something like that?

19         A     Yes, possibly could have been.  I'm not

20    exactly sure.

21         Q     So you were not able to sleep --

22         A     No, I was not.

23         Q     -- because of these stresses at work?

24         A     Exactly.

Helen Martin

Page 106

1        Q    And when did you start getting treatment

2    with Dr. Silverstein?  If you can recall.

3        A    I always got treatment.  She was always

4    my doctor.

5        Q    When did you go to her for the stress at

6    work?

7        A    I was going to her periodically.  Like I

8    was going to her like routinely, I'm supposed to.

9    Like I would go and see her, and she said, well, Come

10   back in three months, I would go see her and she

11   would say come back in three months, or whatever.

12       Q    Well, did you ever go to her specifically

13   for your stress?

14       A    Yes.  She was my doctor.

15       Q    Did you go to her specifically for your

16   stress or for female issues?

17       A    Both.

18       Q    So whenever you went to her, they were

19   routine appointments, were they?

20       A    Yes.

21       Q    And they would be regularly scheduled?

22       A    Yes.

23       Q    She would do a physical exam?

24       A    Sometimes she did a physical exam and

Helen Martin

Page 107

1   sometimes we just talked.

2        Q    Okay.  And you went to her on

3   January 13th, the day you just walked out?

4        A    Yes, I did.

5             Now, I had went to her that

6   morning.  I'm not -- I think I went to her that

7   morning.  Then I came to work.

8        Q    Then you came to work?

9        A    Yeah, I went to her that morning.  I came

10  to work, and that's when -- actually, I was just

11  coming in to work when I ran into Kathy Wittig when

12  Charles was sitting in my office -- I'm not exactly

13  sure if it was Charles or Drew.

14            But one of them was waiting in my

15  office for me, which is what he was supposed to do.

16  He was supposed to wait for me in my office until I

17  got there, and he did that.

18            But I'm not sure whichever one it

19  was.  But whoever it was, when I got to my office and

20  I saw Kathy Wittig and she said made the statement to

21  me that she understood what I'm talking about.  And

22  she told me to come in Mary Ritchie's office.

23            And when I went in there, that's

24  when she told me that she -- I believe it was

Page 108

1   Charles, I want to say Charles -- that she smelled

2   the odor and now she understands what I'm talking

3   about.

4                    And I'm like, You finally do?  I'm

5   like, I'm quitting, bye, I'm outta here, and I left.

6   And I took some of my personal belongings.

7        Q    And that was after you had met with

8   Silverstein that morning?

9        A    Yes.

10       Q    Okay.  Were there any other -- other than

11  the ongoing stress that you got from management's, in

12  your review, nonresponsiveness to these personnel

13  issues, any other reasons why you quit?

14       A    For the reasons that I told you, is why I

15  quit.

16       Q    Have you accurately described

17  everything --

18       A    To the best my ability, yes.

19       Q    -- on the record?  Because this is your

20  chance to tell us why you were discriminated against.

21       A    I was discriminated against, because

22  again, I'm a black female.  Management did not care.

23  The more I asked for things to happen, the less they

24  paid attention to me.

Helen Martin

Page 109

1          Had I been white, I would not have

2     suffered any of the problems -- especially with

3     people stealing work -- well, actually, stealing

4     work, hiding work.  This is sensitive information.

5     You're not supposed to do that.

6          Had it been me, I would have been

7     terminated immediately.  That was swept right

8     underneath the rug.

9          Q     And why are you saying -- are you

10    comparing yourself to some --

11         A     Yes, I am.  I'm --

12         Q     -- some white --

13         A     I can't say I'm comparing myself to a

14    white supervisor, because we didn't have one there

15    that I know of.  There was no other supervisor there

16    that I know of.  There was no --

17         Q     Well, what's the basis for your claim

18    that they didn't deal with these issues because of

19    your race?

20         A     Again, had I been white, these issues

21    would have never arose.  They would have never

22    extended to the period that they extended to.

23         Q     But why you do say that?

24         A     With the personal hygiene issue.

Helen Martin

Page 110

1            Because like I said, there were
2    other people that worked there -- back to Tish Wanda
3    Coleman.
4            She was fired immediately for
5    things that she did.  Did they fire Pam Pollack for
6    actually stealing documents and hiding them?  No,
7    they did not.
8            Did they fire Christine Sentman for
9    causing trouble with Violet, a black person, in the
10   file room, hollering and screaming at her like she
11   was a dog?  No, they did not.
12           But they fired Ashley Grasty.  Did
13   they even tell me -- have enough respect to tell me
14   that they had fired her?
15           Here I am writing her up, thinking
16   that she didn't return back from lunch properly, like
17   I was supposed to do.
18           So when I go on to the personnel
19   manager to explain to her, "I'm writing Ashley up, I
20   haven't seen her," she's like, "Oh, by the way, I
21   fired Ashley."  I'm like, "What?"
22           April Tabor, she started there on
23   April the 1st of 2001.  She worked through
24   April 2nd of 2002 -- I mean April 1st of 2002.

Helen Martin

Page 111

1                     Continuously, since they hired her,

2    she was a bad pick from the beginning.  Nothing.

3    Every day it was a problem, as long as she worked

4    there, and it was crazy.

5                     I complained all the time.  Other

6    people started to complain about her.  When they

7    finally fired her, she had pissed MaryRitchie off.

8    That wasn't fair to me.  Why are you going to fire

9    her because she made you mad?  She made you mad over

10   something that's not even work-related, so you're

11   going to fire her because of that?  That's not right.

12                     When you should have fired her was

13   when she was sitting on somebody's desk with her legs

14   spreaded out wide, but she didn't do that, because

15   that didn't affect her.

16                     So that was continuous things of

17   the same thing, of bad management not doing what they

18   were supposed to do as far as me, being a supervisor

19   there.

20                     As far as the equipment.  I mean,

21   you have plenty of documentation here.  And I'm sure

22   you understand and realize that other employees said

23   as well, we have been promised a printer.  It was

24   approved six months ago.  Why didn't I have it?

Helen Martin

Page 112

1              You're talking about 17 people

2    printing to a copier and two printers when we have to

3    prepare double hearing binders for the court?

4    There's no way possible.

5         Q    And how is this related to race?

6         A    All that is related to race, because

7    again, had I been white, I would never have suffered

8    any of that.  My equipment I would have had from

9    day 1.

10              The personal hygiene problem, why

11   should I have to put up with that?  You don't have to

12   work directly with these people.  They never came to

13   your office; they always came to my office.  My

14   office wasn't even as big as this table.  And I have

15   to sit right next to them to train them, and I have

16   to sit there and endure, not to say something because

17   management told me that I wasn't allowed to say

18   anything to them?

19        Q    You mean on the personal hygiene?

20        A    Yes.  Not only on the personal hygiene

21   issue.  Management also told me that I wasn't allowed

22   to say anything to certain employees referencing

23   work, that they would handle it.

24              So it was a whole combination of

**A120**

Helen Martin

Page 113

1    things that threw me to the extent that I had been --

2    given the fact now, keep in mind, that when something

3    went wrong or when my people didn't come, I never ran

4    to them and said, and I need help, or I can't do this

5    or I can't do that.

6                MaryRitchie and Laura can never

7    come to you and say, Helen complained about anything

8    except for those issues that I explained to you:  The

9    disrespect, the personal hygiene, people

10   name-calling.

11               Other things, when people were

12   late, I never said, Oh, the file room can't function

13   because of this.  I would get up in the morning, to

14   go there or stay late at night to make sure that

15   their firm was adequately covered.  If somebody

16   needed something, they would call me at home, 2,

17   3 o'clock in the morning.  I never said, Don't call

18   me at home or you can't get this or I can't get that

19   for you.  I would never ever do that.  Because that

20   was my job, to make sure that things run properly.

21               But on the other hand, if I'm going

22   beyond the call of duty, even if they would have

23   sufficed as far as the printer or the personal

24   hygiene, I would have been happy.  Give me something.

**A121**

Helen Martin

Page 114

1    Don't make me continue to come here every day begging

2    you for things that you rightfully know that I should

3    have, equipmentwise; or to the fact that you know

4    that these people are coming here continuously and

5    not bathing and you're allowing this to continue to

6    happen because you don't want us to approach them.

7    You asked for other employees to do it; other

8    employees did that.  And still, the same problems

9    still continued to exist.

10                    What am I supposed to think?  Am I

11   just talking to you just to be talking to you?  No,

12   but you can make sure, when other people need things,

13   that they have it.  It wasn't an issue for the

14   secretaries.  It wasn't an issue for the paralegals.

15   So why was it an issue for me?

16                    I'm the one that had to deal with

17   these problems.  When I come to you not -- on every

18   month I sat down with all my employees and had a

19   one-on-one.

20                    And I'm sure if you requested

21   document information, you would have that.  In my

22   Rule 26, it tells you about other information that I

23   will be providing to you as I get it.

24                    But it's amazing to sit here and

Helen Martin

Page 115

1    just realize and understand that, okay, I'm supposed

2    to continue to go to work every day and work with

3    these people, where you have a personnel manager walk

4    up to me and say finally she realized what I've been

5    saying.  So you know it must have been awful terrible

6    if she didn't even want to wait in my office to tell

7    me that I approached her in the hallway.  Then she

8    called me to the personnel manager's office and said

9    that she realized what I've been going through?

10   You're talking about a year and a half putting up

11   with this crap.

12        Q    The crap being the personal hygiene?

13        A    Everything.  The personal hygiene, the

14   disrespect.  I mean, these are all experiences that

15   had taken place over and over and over and over and

16   over and over again.

17        Q    In your charge of discrimination, you say

18   that -- I just want to go through this.

19                  This is the particulars of your

20   claim of discrimination.  Is this an accurate

21   statement of the particulars of your claim of

22   discrimination?

23        A    When you're saying accurate, this is

24   what's typed here and that's what it is.

Helen Martin

Page 116

1        Q      Is this what you told the Department of

2    Labor the basis for your claim was?

3        A      When you're saying the Department of

4    Labor, does that include the EEOC?  Because the EEOC,

5    this is not the Department of Labor.

6        Q      No, this is the Delaware Department of

7    Labor.  If you look at the top of it.

8        A      Okay.  Up here it says Delaware

9    Department of Labor.  Okay.  EEOC.

10       Q      They're two charges.  One is with the

11   Delaware Department of Labor, which is this form.

12       A      Okay.

13       Q      And then down at the bottom, you see the

14   little checked box that says, I also want this filed

15   with the EEOC.

16       A      Yes.

17       Q      Is that your signature on that?

18       A      Yes, it is.

19       Q      Okay.  And then look at the top right.

20   You see the FEPA the EEOC; there are two separate

21   numbers.

22       A      Okay.

23       Q      So there's a state claim and there's a

24   federal claim.

Helen Martin

Page 117

1        A    Okay.

2        Q    Do you see that?

3        A    Yes.  So the state is who I talked to.

4        Q    Well, I don't know who you talked to.

5   I'm just saying this is the Delaware Department of

6   labor.

7        A    Yeah, the State of Delaware.  Okay.

8   Delaware Department of Labor.

9        Q    So they did an investigation, which we

10   saw.  That's an exhibit here.

11        A    Okay.

12        Q    Okay?  Their investigation is Exhibit 3.

13            Do you see that, notice of

14   dismissal?

15        A    Uh-huh.

16        Q    Now, let's go through your claim here.

17            In your charge of discrimination,

18   you complain that, "I was first hired by Respondent

19   January 10th, 2002."  Is that accurate?

20        A    Yes.

21        Q    And you say, "In or about September 2001,

22   Jim Stang, white, appeared in my office, told me he

23   was in charge while I conducting company business."

24            We've discussed that; is that

Page 118

1    right?

2          A    Correct.

3          Q    I was told that MaryRitchie Johnson, my

4    direct supervisor, would negatively describe me to

5    prospective employees.

6          A    Uh-huh.

7          Q    When were you told that?

8          A    One of the employees had mentioned that

9    prior in an email.  And also he written it in a

10   Christmas card that he gave me.  He written that

11   statement.

12         Q    This is in December of 2002?

13         A    Yes.

14         Q    Is it?

15         A    Yes.

16         Q    That Christmas?

17         A    Yes.

18         Q    Okay.  So when you're referencing I was

19   told that my direct supervisor would negatively

20   describe me to prospective employees, a prospective

21   employee told you that?

22         A    Yes.

23         Q    Is that the basis for that claim?

24         A    Not only did he tell me, several other

Helen Martin

Page 119

1    ones did too, yes.

2         Q     And tell me -- as I recall your testimony

3    under oath below, it was that he -- you were

4    described as blunt and -- what is it?  What were you

5    described as?

6         A     I believe she stated to him that I was

7    blunt and outspoken.

8         Q     So that's the name-calling that's

9    referenced here -- I'm sorry -- described you

10   negatively.

11        A     Yes.  That's -- yes to half of that, and

12   no to the other.  Due to the fact that not only --

13   she not only said that to one employee -- prospective

14   employee; she said that to numerous employees.

15        Q     Said what?  That you were blunt and

16   outspoken?

17        A     Exactly.  Exactly.  My character was

18   already attacked before these people was even hired,

19   though she still continued to hire them.

20        Q     Well, in the appeal referee decision --

21   just go through this for a minute.

22        A     That's Exhibit 2?

23        Q     This is Exhibit 2.

24        A     Okay.

Helen Martin

Page 120

1          Q    This is the decision from the appeal

2     referee, and we have the transcript that you began to

3     look at.  Do you see that?

4          A    Back to the transcript.  Okay.  Yes, I

5     have the transcript here.

6          Q    Is this summary accurate?

7          A    For the Exhibit 2, or the transcript

8     itself?

9          Q    Both.

10         A    I would say accurate to some degree.

11         Q    How is it inaccurate?

12         A    I think if you look in the transcript for

13    the State from the referee, there's, at a particular

14    stage of the game where that tape had actually ran

15    out of things and she and I was still talking, even

16    though we cease -- that information -- she never went

17    back and asked those questions.  She just kept right

18    on going, we continued on.  And that should be in

19    that transcript.  I don't know if it's there or not.

20         Q    Well, I do know there is -- the

21    transcript will speak for itself.  I'm just trying to

22    indicate here -- and the transcript we can look at.

23              But this is the decision by the

24    appeal referee based on that transcript.

Helen Martin

Page 121

1      A    Yes, exactly.

2      Q    Okay.  Why don't we just go through this.

3           This is a summary of the evidence,

4  and I just want to go through this and see if it's

5  accurate.  Okay?

6      A    What are we looking at here?

7      Q    I'm looking at Exhibit No. 2 and

8  Exhibit No. 1.

9           So we have your complaint, and then

10 we have the appeal referee decision.

11     A    Okay.

12     Q    So in Exhibit No. 2 -- okay?

13     A    Yes.

14     Q    This says, "The claimant" -- the claimant

15 was you -- "was employed by Pachulski, Stang, a

16 bankruptcy law office with offices in Delaware and

17 California, from January 2000 to January 13th,

18 2003, when she resigned."

19           Is that accurate?

20     A    Yes.

21     Q    The time of her separation of employment

22 you were the supervisor for the file room at 919

23 Market Street, in Wilmington, earned 18.96 an hour

24 working full time.

**A129**

Helen Martin

Page 122

1                        Is that accurate?

2          A     Yes.

3          Q     You testified that you resigned over an

4    accumulation of stress during your three years of

5    employment.

6                        Was that accurate?

7          A     Yes.

8          Q     In 2002 personnel failed to discipline

9    employees for violating directions.  The claimant was

10   new, however, and thought it would be all right.  In

11   2001, an employee stole sensitive documents and hid

12   them.  Another employee who had charge of the

13   documents was upset the whole day.  There were

14   numerous other personnel problems, but no discipline

15   was imposed.

16                       Is that accurate?

17         A     Yes.

18         Q     And we've discussed those personal

19   problems, haven't we?

20         A     Yes.

21         Q     You spoke to personnel about the problems

22   in August of 2000.  Is that right?

23         A     Yes.

24         Q     Personnel said it had to build a case; is

Helen Martin

Page 123

1    that right?

2          A      Yes.

3          Q      You took it upon yourself to speak

4    one-on-one to the staff to try to find ways that the

5    employees could enjoy their jobs?

6          A      Correct.

7          Q      Do you want to add anything to that?

8          A      No, I do not.

9          Q      On September 11th, 2001, the day of the

10   attacks, they received an email from the

11   San Francisco office saying that the day -- that they

12   were going to close.

13                      Is that accurate?

14         A      Yes.

15         Q      No one knew what was going to happen

16   regarding the world events.

17                      Is that accurate?

18         A      Yes.

19         Q      The claimant pulled her staff together

20   and told them that if they could work together, they

21   could finish the day's work.  However, if the firm

22   said to shut down, they would do that.  A few minutes

23   later the senior partner came in and told the

24   claimant that he was in charge -- quote, What I say

**A131**

Helen Martin

Page 124

1    goes, end quote.  Two employees had told the senior

2    partner that she was making them stay.  As a result,

3    you quit, but returned to work later that month.

4         A    Yes.

5         Q    Have we accurately discussed that event?

6         A    Uh-huh.  We talked about that.  Yes, we

7    did.

8         Q    Anything you want to add to that event?

9         A    No, not that I know of.

10        Q    Okay.  Near the end of 2001, you and your

11   file room staff met with personnel to explain their

12   concerns.  Employees were not listening to direction.

13   There was no discipline.  There was one employee in

14   particular with whom you had stopped meeting

15   one-on-one.

16        A    Correct.

17        Q    Near the end of 2001, you met with

18   personnel.

19             What personnel did you meet with?

20        A    The personnel for the Wilmington office.

21        Q    Was that MaryRitchie Johnson?

22        A    Yes.

23        Q    Anybody else?

24        A    Laura Davis Jones was there.

Helen Martin

Page 125

1        Q      Kathy Wittig?

2        A      I don't recall if Kathy Wittig was there

3    at that one.

4        Q      And the concerns were what?

5        A      Are we talking about in August 2002, down

6    here?

7        Q      Now, this says near the end of 2001?

8        A      Oh, okay.

9        Q      You and your file room staff met with

10   personnel to explain their concerns.

11                    Is this the concerns, employees

12   were not listening to direction?

13       A      Right.  There was no discipline, employee

14   had stopped meeting one-on-one.

15       Q      Those were the concerns that were

16   discussed?

17       A      At that particular stage, yes.

18       Q      2002 the same problems occurred.

19       A      Uh-huh.

20       Q      Those problems were what?

21       A      Affecting new personnel.

22       Q      I mean, the problems were personal

23   hygiene?

24       A      The same problems that we discussed

Helen Martin

Page 126

1    previously.

2              The same problems continued to

3    occur, sir.  The same problems.  There was no change

4    in the situation.  It continued, the same things.

5         Q    All right.  In April of that year, 2004,

6    personnel finally terminated one of the troublesome

7    employees.

8         A    Yes.

9         Q    Who was that?

10        A    April Tabor.

11        Q    August 2002 there were two employees with

12   personal hygiene issues.

13        A    Uh-huh.

14        Q    You met with all staff about the need for

15   personal hygiene.

16        A    Uh-huh.

17        Q    Situation became worse.

18        A    Uh-huh.

19        Q    Personnel was aware?

20        A    Yes.

21        Q    A big meeting was held with the personnel

22   manager, the senior partner, the claimant and the

23   file room staff.

24        A    Uh-huh.

Helen Martin

Page 127

1          Q    I realize this is the appeal referee's

2   summary of the evidence.

3          A    Right.

4          Q    But I'm just trying to get you to see if

5   this is accurate and if you wish to add anything to

6   this.

7          A    Okay.  No, I don't want to add anything.

8          Q    Okay.  Discussion involved many things,

9   but especially personal hygiene.

10                    Is that right?

11         A    Yes.

12         Q    This is in August of 2002?

13         A    Yes.

14         Q    And again, these were personnel issues?

15         A    The same thing.  The same problems over

16   again.

17         Q    In early fall 2002, the senior partner

18   directed to say nothing to the two employees with

19   personal hygiene issues.

20                    That was Laura Davis Jones?

21         A    Yes.

22         Q    It says "he" also told the personnel

23   manager."

24                    I thought Laura Davis Jones was a

Helen Martin

Page 128

1    female.

2         A    Laura Davis Jones is a female.

3         Q    So the senior partner was whom?

4         A    Laura Davis Jones.  She's a woman.

5         Q    Well, then -- it says "he" also told the

6    personnel manager to say nothing.

7         A    Well, I guess the lady made a mistake

8    whoever typed this up.  I can't help you there, sir.

9    But it is -- Laura Davis Jones is a lady.  Trust me,

10   she's a lady.

11        Q    Right.  And you're referring to --

12        A    Laura Davis Jones.

13        Q    -- that she told the personnel manager,

14   MaryRitchie Johnson?

15        A    Right.

16        Q    To say nothing?

17        A    Exactly.

18        Q    That you were directed -- you were

19   directed to find another coworker to speak one-on-one

20   with the individuals; coworker did so; problem did

21   not improve?

22        A    Correct.

23        Q    This is now causing you stress?

24        A    Yes.  All of this continuous stress.

Helen Martin

Page 129

1    Okay.

2        Q    In the winter of 2002, the personal

3    hygiene problem continued as well as the bad

4    attitudes; is that right?

5        A    Uh-huh.

6        Q    There was also a problem with the printer

7    and copy machine.  What was the problem?

8        A    I don't know.  I wasn't there that day

9    when it happened.  Thank God I wasn't.  But something

10   happened with the --

11            See, the copier was the printer.

12   Okay?  But something happened where it had like --

13   whatever happened, it had shut down the whole

14   complete -- everything had shut down, and it was like

15   pure chaos.

16            I wasn't there that day when it

17   actually happened, so I don't know what happened.

18   But I just know that people had called me at home

19   saying this, that, and the other.  And come to find

20   out it wasn't something that someone had done; it was

21   a computer problem.  Because I think the copy

22   center's copier was down too.

23            It was just one big mess that day.

24   I don't know exactly what took place.

Helen Martin

Page 130

1    Q    This says in June 2002 you had told

2    management that an additional printer was need --

3    A    Yes.

4    Q    Is that accurate?

5    A    Yes.

6    Q    It was approved, but by winter it had

7    still not been received; is that correct?

8    A    That's true.

9    Q    Nor had the new copier?

10    A    They weren't there.

11    Q    Was that causing you stress?

12    A    Yes, it was.

13    Q    Is that one of the reasons you quit?

14    A    Yes, it is.

15    Q    Because you hadn't gotten the printer?

16    A    Not only because I hadn't gotten the

17    printer.  I quit because of the abundance of

18    everything continuing going on:  The personal

19    hygiene, the people calling names.  All that stuff

20    like I keep telling you.  It was a continuous ordeal,

21    day after day after day after day.  It was -- it just

22    didn't stop.  It just didn't stop.

23    Q    And you've described for us, as best you

24    can under oath, the name-calling that you recall?

Helen Martin

Page 131

1    A    Yes.  Now, keeping in mind that I didn't
2  always hear everything, because I did not sit
3  directly in there with them.

4    Q    I understand.

5    A    Okay.

6    Q    In December 2002 your surroundings were
7  causing you tremendous stress.

8    A    Uh-huh.

9    Q    You lost two employees.

10   A    Yes.

11   Q    Who did you lose?

12   A    Violet Mobley and Jason Griffin.

13   Q    Did they quit?

14   A    Yes, they did.

15   Q    And they were in the file room?

16   A    Yes, they were.

17   Q    So that caused you what kind of stress?
18  You were shorthanded?

19   A    More stress.  Short -- not only
20  short-handed.  You've taken away two employees that
21  did the job for eight people.

22   Q    On December 30th, 2003, senior partner
23  was very hostile to you and used vulgarities to
24  express it.

Helen Martin

Page 132

1                      Who was that?

2        A    Laura Davis Jones.

3        Q    Was this in that meeting?

4        A    Yes.

5        Q    What vulgarities did she use?

6        A    She actually cursed for the first time.

7        Q    That was the vulgarity?

8        A    Yeah.  And I mean, I had never heard

9    Laura Davis Jones curse in the whole nine years that

10   I had known her.

11       Q    Yeah.  She was a good boss, wasn't she?

12       A    I still love her despite all this,

13   because I knew -- I think basically with Laura is

14   that she was depending on people to do things that

15   basically she should have followed up on herself, or

16   even her secretary.  Because things wasn't always

17   working out, like -- as far as she telling me to

18   remind MaryRitchie to do her job.  There's many a

19   things that I did that I didn't have to do so to keep

20   people from doing bad things to the firm.

21                      Like with Pam Pollack.  Pam Pollack

22   called personnel -- she call the State and tried to

23   get all of us involved.  But just knowing Pam as the

24   person that I knew her to be, I knew what she would

Helen Martin

Page 133

1    try and do and things that she did do -- a lot of

2    that is in this Rule 26.

3                    But as far as like Laura as a

4    person, even when I see her on the street today, I

5    will still speak to her, because I don't have no

6    grief with her.  But what she has to realize and

7    understand, we all can't satisfy everybody all the

8    time.

9                    But these are things that I

10   complained to her about.  I never said, Laura, I'm

11   short-staffed.  Can you get somebody or can you give

12   me some help, or something like that.

13                   I never once went to Laura with

14   anything besides the things that I just told you

15   about right now.  And the only reason I went over

16   Mary Ritchie's head is because Mary Ritchie

17   continuously told me that she would take care of the

18   problem, but she would never take care of the

19   problem.

20        Q    This is the personal hygiene you're

21   talking about?

22        A    Yes.  She never took care of the problem.

23                   When Laura came to my office, it

24   was like 9 o'clock at night, and we talked about the

Helen Martin

Page 134

1    personal hygiene issue.  And I told her, I was like,

2    I don't know how much more, you know, that we could

3    take.  And I told her, I said, Violet is not quitting

4    because of anything else but what's going on here.

5                    Yet and still, MaryRitchie told

6    Laura and Laura don't know, so she's going to believe

7    what MaryRitchie tell her because --

8         Q    Well, what vulgarities did Laura use?

9         A    She was like, you know, You all -- how

10   did she have it?

11                   I couldn't believe she said that.

12   She said, You and Mary Ritchie both should know

13   better than to cause this kind of F chaos in the

14   firm, and this is all BS.

15                   And I'm like, Laura, no, it's not.

16   And once I kind of like explained to Laura --

17        Q    All right.  Was that the vulgarity?

18        A    Yes, that she used.

19        Q    BS and what?

20        A    F.

21        Q    F'n work or F'n problem or what?

22        A    F as in F-U-C-K.

23        Q    No, no.  I'm just saying, what is that

24   modifying, what word?

Helen Martin

Page 135

1      A    F-U-C-K.

2      Q    No, no --

3      A    When she said, she can't believe that we
4    allowed these F'n problems.

5      Q    Oh, problems?

6      A    Yeah, to go to the level that they've
7    been to --

8      Q    Okay.  That's was the vulgarity?

9      A    Yeah, that she used.

10               Like I said, I still love her.  I
11    do.

12     Q    So she told you -- "she" being laura
13    Davis Jones -- told both you and --

14     A    Both of us.

15     Q    -- Mary Ritchie that you both need to get
16    your act together?

17     A    Yes, she did.

18     Q    And you were instructed to remind
19    MaryRitchie to do her job?

20     A    Exactly.  Which I was not going to do.
21    Which I had done -- you'll see again in Rule 26, it's
22    there.

23     Q    Well, we'll get there.

24               You again told Laura Davis Jones

Helen Martin

Page 136

1  about the problems with the printers and asked for a

2  new copier?

3      A    Right.

4      Q    This is in the December meeting; is that

5  right?

6      A    Yes.

7            And she -- Laura Davis Jones --

8  it's not written here -- she looked at me like I was

9  crazy, because she already assumed that we had

10  already had this equipment.  She's like, What are you

11  talking about, I just bought you brand-new equipment.

12  And that's when she went off the deep end again.  And

13  I'm like, Well we don't have it.

14            And again, you'll see that it's an

15  email in here from Mary Ritchie from Ray Slough,

16  which is the computer supervisor telling her, on

17  December 30th, that he would get the printers and

18  stuff there.

19            And when I left, they were not

20  there.  When I left in January, they were still not

21  there.

22      Q    And that's one of the reasons that you

23  quit?

24      A    No; that's part of the reason.

Helen Martin

Page 137

1          Q    I said that's one of the reasons that you

2     quit?

3          A    Yes.  Yes.

4          Q    Said she -- being you -- also told the

5     senior partner that there needed to be meetings; is

6     that right?

7          A    Yes.

8          Q    Meetings had been scheduled but something

9     came up to prevent them from occurring.

10         A    Exactly.

11         Q    That's after the December?

12         A    Prior.

13         Q    Prior.

14         A    Prior, yes.

15         Q    After December 30th meeting with Laura

16    Davis Jones, the senior partner, things went

17    downhill.

18         A    Uh-huh.

19         Q    It says you received a Christmas card

20    from someone who had been to an interview.

21              Is that what you were referring to

22    where you were --

23         A    Yes.

24         Q    -- referred to as straightforward and

Helen Martin

Page 138

1    blunt.

2         A    Exactly.

3         Q    Is that how you were referred to?

4         A    Yes.  That's how she described me.

5         Q    Okay.  This upset you terribly, and you

6    wondered whether the senior partner was using this

7    language to refer to you in other situations.

8         A    Exactly.

9         Q    So it's your understanding that Laura

10   Davis Jones had -- you heard from someone else that

11   Laura Davis Jones had said that you were

12   straightforward and blunt.

13        A    No, not Laura.  Mary Ritchie Johnson.

14        Q    Oh, MaryRitchie Johnson?

15        A    Yes.  The personnel manager.  Not Laura

16   Davis Jones; the personnel manager.

17        Q    Well, it says in informing the claimant

18   that the senior partner had described her as

19   straightforward and blunt.

20        A    No, it should not --

21        Q    It wasn't Laura Davis Jones; it was

22   MaryRitchie Johnson --

23        A    No, it was MaryRitchie Johnson, the

24   personnel manager.

Helen Martin

Page 139

1       Q    -- had referred to you as straightforward

2    and blunt.

3       A    Yes.  Yes, I was upset about that.

4       Q    You met monthly with the personnel

5    manager.  That's MaryRitchie Johnson?

6       A    Yes.

7       Q    You complained all through 2002.

8       A    I sure did.

9       Q    It says in January of 2002, at your

10    review, you told the personnel manager you were not

11    happy with certain members of your staff.

12       A    Correct.

13       Q    Have we discussed that situation today?

14       A    No, we didn't.

15       Q    Why were you not happy with certain

16    members of your staff?

17       A    Because of the same issues of personal

18    hygiene problems, the name-calling.

19       Q    March, you spoke again about the

20    personnel manager about the same matters.  Is that

21    the personal hygiene matter?

22       A    The same issues continuously, sir.

23       Q    Well, you haven't told me about continual

24    issues with name-calling, ma'am.

Helen Martin

Page 140

1      A      I think I did say that, previously on.

2    I'm sure I did.

3      Q      Well, you've described some name-calling,

4    but that's either stuff you didn't hear or --

5      A      And it would be the same.

6              You have to remember, again, I

7    didn't sit directly with these folks.  I'm just going

8    on what people have reported to me and I know that

9    they spoke to MaryRitchie Johnson about.

10     Q      So you didn't hear the name-calling.

11     A      Not all of it; no, I did not.  I didn't

12   sit directly in there with them.  I had to leave and

13   walk around the corner to get to the file room.

14     Q      I'm not certain that you've told me that

15   you heard any name-calling in your presence.

16              What did you hear?

17     A      Yes, I did.  Because I do recall --

18     Q      You told me what you heard.

19     A      I heard what Christine Sentman said that

20   Pam Pollack said.  I think I told you that.

21     Q      That's hearsay.

22     A      Well --

23     Q      Did you hear --

24     A      I didn't hear Pam said it; no, I did not.

Helen Martin

Page 141

1    Q    Did you hear Pam Pollack -- did you hear

2   anybody say anything racial in your presence?

3    A    No.

4    Q    All right.  Now, let's go back to No. 2,

5   appeal referee decision.

6    A    We're still on 2?  Okay.

7    Q    And in that appeal referee hearing, she

8   asked you what happened, and you said you complained.

9   And this is her summary of what the transcript said.

10    A    Okay.

11    Q    So May, you again complained to the

12   personnel manager; nothing happened again on personal

13   issues.  Is that right?

14    A    Correct, yes.

15    Q    June 2002 you asked for another printer

16   and for a copier, and your requests were approved at

17   that time?

18    A    Yes.

19    Q    July, you complained to the personnel

20   manager about nothing happened.

21                What was that about?  The same

22   personal hygiene?

23    A    Same issues.  Nothing happened.  Same

24   issues.  The same exact issues, sir.  Nothing had

Helen Martin

Page 142

1    happened.  And as you can see continuously in this

2    thing, nothing happened, nothing happened, month

3    after month after month after month.  The same

4    occurrences continuously.

5        Q    Well, it says -- I just want to make sure

6    that we're on the same page as to what you were

7    complaining about.

8                    You told me personal hygiene.

9        A    Yes.

10       Q    So that was a continuing problem?

11       A    Yes.

12       Q    Okay.  What other complaints, personnel

13   issues did you continue to complain about?

14       A    The disrespect.

15       Q    And disrespect in that people would not

16   follow your orders?

17       A    Was not following my instructions.

18       Q    What else?

19       A    Misuse of breaks.

20       Q    Is that a continual situation?

21       A    Yes.

22       Q    And then the misuse of the Internet was a

23   continual --

24       A    Yes.

Helen Martin

Page 143

```
1        Q    Yes?

2        A    Yes.

3        Q    And the inappropriate dress?

4        A    Yes.

5        Q    Any other personnel issues that you

6   would --

7        A    The same occurrences.  There's other

8   things, but right now these are the issues that we're

9   dealing with, which was the most important.

10        Q    Well, that's what you were complaining

11   about.

12        A    Yes.

13        Q    These issues?

14        A    Continuously, yes.

15        Q    And these caused you stress, because they

16   weren't being resolved by the management to your

17   satisfaction?

18        A    They weren't resolved -- not only to my

19   satisfaction.  They weren't resolved to the whole

20   company's satisfaction.

21        Q    Okay.  You complained about a problem you

22   had with your secretary.

23        A    Where are you seeing that at, because I

24   never had a secretary.
```

**A151**

Helen Martin

Page 144

1          Q     It says had with her secretary.

2          A     I didn't have a secretary.

3          Q     It says October.

4          A     No.  I didn't have a secretary.  I

5     complained about a problem that I had with a

6     secretary.

7          Q     Oh, with a secretary.  And what was that

8     problem?

9          A     One of the secretaries there, Mary

10    Cochran, whenever -- I guess we -- I didn't care what

11    it was, even if it was something simple, she always

12    had a problem with me.  And I never understood why

13    she had a problem.

14                   And finally one day I'm like, I'm

15    going to make sure that I am not the person and that

16    it's her.  And I was convinced that it was her, it

17    wasn't me, because I didn't have problems with other

18    people that I worked with there.

19                   And it would be like -- I don't

20    care -- even if I prepare hearing binders for one of

21    the attorneys that she worked with, she always had

22    some kind of problem with me.  It was either I didn't

23    do something right, or I should have put it here when

24    I have no knowledge of what you do down there.  It

Helen Martin

Page 145

1    was always something.  Whatever nitpicking thing she

2    could find with me was a problem for her.

3                    And I requested a meeting with

4    MaryRitchie and Kathy Wittig.  And Kathy Wittig

5    responded; MaryRitchie never did.  And the meeting

6    never took place, and --

7        Q    This is a secretary to whom?

8        A    I'm not --

9        Q    To a lawyer?

10       A    Yeah, I believe she was one of the

11   lawyers' secretaries.  I forget who she worked for.

12   I don't recall who she worked for exactly.

13       Q    And then November you complained that

14   they were not receiving agenda letters telling

15   them -- meaning the file room I guess -- what

16   documents needed to be in your binders, causing your

17   unit to be criticized; is that right?

18       A    Oh, yes, most definitely.

19       Q    Okay.  And then you complained that in

20   December people were incorrectly ordering file room

21   staff to prepare binders when the work was to be

22   placed in a central location.

23       A    Exactly.

24       Q    It says during these complaints -- this

Helen Martin

Page 146

1    is now through 2002.

2                    Are these the complaints that you

3    made through 2002?

4        A    Yes, continuously, uh-huh.

5        Q    You want to add anything to them?

6        A    Oh, no, thank you.

7        Q    Then on January 9th, 2003, someone in

8    personnel finally noticed the personal hygiene

9    problem of one of the employees.

10                   Is that the Kathy Wittig situation?

11       A    Yes, that's Kathy Wittig.

12       Q    Personnel manager -- which is MaryRitchie

13   Johnson; is that right?

14       A    Yes.

15       Q    -- talked to the employee about the

16   situation.  This was at the end of the day, and you

17   went home.

18       A    Right, I went home.

19       Q    It says meanwhile you began drafting a

20   letter of resignation around Christmas.

21       A    Yes, uh-huh.

22       Q    And we talked about that.

23       A    Yes, we did.

24       Q    And you then said you had a meeting in

Helen Martin

Page 147

1    December with Laura Davis Jones, MaryRitchie Johnson.

2    And you've described that previously; is that right?

3         A    Yes.

4         Q    That's where the vulgarity took place?

5         A    Yes, with Laura Davis Jones, uh-huh.

6         Q    Vulgarities being BS and F'n problem?

7         A    Yes.

8         Q    Then it says January 10th, you typed

9    your resignation and emailed it.

10                   This -- this says that this Kathy

11   Wittig situation occurred on the 9th, not the

12   13th.

13        A    I'm not -- you're talking, but I have

14   that in my mind too.  I think they got dates mixed up

15   here, because -- I am not exactly certain; I can't

16   say that it was the 9th.  But I recall it being

17   when I came in from the doctor, so I don't know.

18        Q    Well, you wrote your -- typed your

19   resignation letter on January the 10th, which is a

20   Friday.

21        A    No.  No.  I typed it -- I had already

22   started working on it in December.

23        Q    Right.  Then it says Friday,

24   January 10th, you typed your resignation and

Helen Martin

Page 148

1    emailed.  Is that accurate?

2           A    No, it's not.  Because if it says right

3    there, Meanwhile I had already begun drafting it in

4    December.  December -- so I had already started it in

5    December, so I probably finished it up on the 10th.

6           Q    Okay.  But you typed it, and then emailed

7    it on the 10th?

8           A    I continued typing it and emailed it.

9           Q    You emailed it on the 10th?

10          A    Yes.

11          Q    You then decided to unsend it to as many

12   people as possible and resubmit it on Monday the

13   13th.

14          A    Exactly.

15          Q    Is that accurate?

16          A    Yes.

17          Q    Senior partner called to say he'd gotten

18   it.

19                    Who is the senior partner?

20          A    I thought it was Laura called.  I don't

21   know -- I thought it was Laura.

22          Q    Okay.  And you wanted the resignation to

23   go out on the 13th so you could give your two

24   weeks' notice?

Helen Martin

Page 149

1      A     Right.

2      Q     Is that accurate?

3      A     Yes.

4      Q     On the 13th you had to leave to go to a

5   doctor's appointment.

6      A     Right.

7      Q     Is that with Dr. Silverstein?

8      A     Yes.

9      Q     And the personnel manager was very

10  hostile to you and reminded you that you had to make

11  up the time?

12     A     Right.  That was Mary Ritchie Johnson.

13     Q     And how was she hostile to you.

14     A     Hollering at me in the hallway.

15     Q     What did she say?

16     A     Exactly what I typed there:  That I had

17  to make up my time.

18     Q     Oh, I'm sorry.  And so after that day,

19  you could not take it anymore; you called out sick

20  and didn't work the two weeks.

21     A     Right.  But I think these dates are not

22  right here.  Because I remember -- I remember

23  precisely it was Kathy Wittig that mentioned the

24  personal hygiene.  It wasn't MaryRitchie.  It wasn't

Helen Martin

Page 150

1    MaryRitchie.  It was Kathy Wittig.  Because I don't

2    think MaryRitchie was there.

3                    But these dates may be a little --

4    but they're in a -- it's ballpark.  But I don't think

5    it was the --

6        Q    Well, is it fair to say that you had

7    already resigned prior to Kathy Wittig's smelling

8    this employee?

9        A    Yes; I had already given my resignation,

10   yes.  I had given it, uh-huh.

11                   (Brief recess.)

12   BY MR. WIER:

13       Q    Now, let's go to the Exhibit 3, which was

14   the no-cause finding.

15                   It says that you allege that

16   because of a racially hostile work environment, you

17   felt as though you had no other choice than to resign

18   your position.

19                   Did you make that allegation?

20       A    Yes, I did.

21       Q    What was the racially hostile work

22   environment?

23       A    Everything that I mentioned to you

24   previously.

Helen Martin

Page 151

1        Q     I haven't heard anything about race.

2    Tell me what was racially offensive about the work

3    environment.

4        A     My character being attacked when she

5    introduced me to people for preference -- what do you

6    call them people?

7        Q     Oh, straightforward and blunt?

8        A     Yes.

9        Q     What else?

10        A     Like I said, there was name-calling that

11    I wasn't aware of what was exactly said by Cassie

12    Gillian, but I know she said something.

13        Q     But nobody said it in your presence?

14        A     She did say it my presence; I just didn't

15    hear her.

16        Q     Okay.  You didn't hear any name-calling.

17        A     I didn't hear what she said, but I know

18    she said something.

19        Q     What other hostile environment was there

20    other than the stress?

21        A     The same thing.  The same issues that

22    I've told you continuously.

23        Q     But how is that related to race?

24        A     Again, if I were white, I would not have

Helen Martin

Page 152

1    had to put up with people with personal hygiene

2    problems.  That would have never taken place.

3                    Secondly, I would have had the

4    equipment that I needed to do my job.

5                    If I were white, I would -- I bet

6    you people in the LA office had everything they

7    needed.  San Francisco had everything they needed.

8    I'm certain New York had everything they needed.

9                    Why was I the only one that did not

10   have what I needed?

11        Q    And that's the printer and the copier?

12        A    And also other things, like them not

13   taking care of things that needed to be taken care.

14        Q    Like what?

15        A    The personal hygiene issues.

16        Q    Okay.

17        A    Okay?

18        Q    So it's your claim that you think they

19   didn't deal with the personal hygiene issues because

20   you're black?

21        A    Because they didn't care.

22        Q    Because you're black?

23        A    Yes.  They didn't care.  They did not

24   care.  Had I been white, that would have never

Helen Martin

Page 153

1    happened.

2        Q    You state your immediate supervisor,

3    MaryRitchie Johnson, would describe you negatively to

4    prospective employees.

5              That's the straightforward and

6    blunt?

7        A    Yes.  And not only -- you see where it

8    says "employees."  Employees is what it means.

9        Q    It says to prospective?

10       A    Yes.  But those people were hired.

11       Q    All right.  And then -- all right.

12             You said you were never given

13    timely information involved with your department.

14       A    No, I wasn't.

15       Q    And you think that's because you're

16    black?

17       A    Yes, exactly.

18       Q    In your charge of discrimination and in

19    this DOL thing, it says that, "I was told that

20    MaryRitchie Johnson, my direct supervisor, would

21    negatively describe me to prospective employees that

22    I would supervise, before I met them.

23             We've discussed that, have we?

24       A    Yes, we have.

Helen Martin

Page 154

1      Q    "I was never timely told information that

2   involved me or my department."

3                    We've described that; is that

4   right?

5      A    Correct, uh-huh.

6      Q    "On January 13th, I was forced to

7   tenure" -- tender -- "my resignation because of

8   intolerable working conditions."

9                    And we've described those

10  conditions; is that right?

11     A    Yes.

12     Q    Do you wish to add anything to those

13  conditions?

14     A    No.

15     Q    Now, it says, "A, I'm black."  Is that

16  right?

17     A    Yes, it does.

18     Q    "I'm Respondent's only black supervisory

19  employee in Delaware."

20     A    I don't see where you say that on this

21  page.

22     Q    I'm looking at the charge.

23     A    Okay.  I have it here.

24     Q    "I believe I was discriminated against

Helen Martin

Page 155

1    because, 1, I'm Respondent's only black supervisory

2    employee."

3                    Do you see that --

4         A    Yes, I do.

5         Q    -- at the bottom?

6         A    Uh-huh.

7         Q    "I was promised a pay raise for the file

8    room employees but never received it."

9         A    Did not.

10        Q    The pay raise for what employees?

11        A    For the file room employees, as well as

12   myself.  I never received it.

13        Q    Well, you got a raise, did you not?

14        A    The year-end raise, yes.  But this was a

15   raise that I was promised in August, I believe, of

16   2001, I believe it was.

17        Q    So August 2001?

18        A    I also asked for a raise and didn't get

19   that.

20        Q    All right.  But let's just deal --

21                    This refers to August 2001, you

22   were promised a pay raise?

23        A    Yes, I was promised a pay raise.

24        Q    By whom?

Helen Martin

Page 156

1        A    Laura Davis Jones, for me and the file

2   room employees.

3        Q    For all of you?

4        A    Yes.

5        Q    And you guys didn't get it?

6        A    No; we did not.

7        Q    Were those employees white?

8        A    Black and white.

9        Q    And did she quantify the pay raise that

10   she was talking about?

11        A    I don't understand what you mean.

12        Q    Well, when she discussed with you the pay

13   raise, did she tell you what the pay raise was?

14        A    No, she did not.

15        Q    Just that, "You'll be getting a pay

16   raise"?

17        A    Yes, she did.  Those were her words.

18        Q    She didn't say how much or what

19   percentage or anything like that?

20        A    No, she did not.

21        Q    Did you get a pay raise?

22        A    Not at that time, no.

23        Q    When did you get a pay raise?  At the end

24   of the year?

Helen Martin

Page 157

1          A    At the end of the year, yes.

2          Q    So at the end of the 2001, you got a pay

3    raise?

4          A    Yes.

5          Q    The end of 2002, you got a pay raise?

6          A    Yes.

7          Q    And the end of 2003, you got a pay raise?

8          A    No.

9          Q    You got a 5 percent pay raise, did you

10   not?

11         A    I did?  If I did, I don't know anything

12   about that.

13         Q    You don't recall -- you don't know --

14         A    No.

15         Q    -- whether you did or didn't?

16         A    I don't think that I did.

17         Q    Well, you got a 5 percent pay raise, did

18   you not, at the end of --

19         A    I can't say that I did.

20         Q    But you then quit in --

21              At the end of 2002, you got a

22   5 percent pay raise.

23         A    I can't say that I did.  Because if I

24   did, when I had my review with Donna Carr, she never

**A165**

Helen Martin

Page 158

1    said that.

2        Q    Well, you were dissatisfied with your pay

3    raise, were you not?

4        A    I didn't know I was given one.  So how

5    I'm going to be dissatisfied with something I didn't

6    even know about?

7        Q    Well, let's just deal with that.  Bear

8    with me for a moment.

9        A    Take your time.

10       Q    Pachulski, Stang, in the Delaware

11   Department of Labor, said that effective January

12   1st, 2003 you received a salary increase of

13   5 percent, which was the same percentage increase

14   given to most support staff members; some departments

15   only received 4 percent.

16                Are you able to say that's correct

17   or incorrect?

18       A    I would say it's incorrect, because I

19   don't know anything about that.

20       Q    What was your salary in January 2002?

21       A    I think it was $18 and some cents an

22   hour.  I'm not exactly sure.

23       Q    Were you paid monthly?

24       A    No, I think we got paid -- I forget.  I

Helen Martin

Page 159

1    don't think we got paid twice a month.  I'm not sure.

2    Did we get paid every two weeks?

3                    I think we got paid every two

4    weeks.  Don't hold me to that, because I know.  I

5    forget.  But I just know we got paid.

6                    I don't know if it was biweekly.

7    But I know it wasn't monthly.  I think we got paid

8    every two weeks.  I don't know, because I never

9    received my last paystub from them.

10       Q    Do you know what you received on a

11   monthly basis?

12       A    No, I have no idea.

13       Q    Were you salaried or hourly?

14       A    Hourly.

15       Q    This says that you're hourly -- that's of

16   January 1st, 2002, $1,445.83.

17       A    Okay.

18       Q    Was that your monthly pay or were you

19   paid biweekly?

20       A    Every two weeks.  I think it was every

21   two weeks.

22       Q    Does that sound accurate, the 1445.83

23   every two weeks?

24       A    Is that the net or bring home?

Helen Martin

Page 160

1    Q    I don't know.

2    A    I don't know, Mr. Wier.  I don't want to

3  tell a lie.

4              MR. WIER:  We'll mark this as

5  Exhibit 10.  This is their response to the Department

6  of Labor -- when you filed your complaint.

7              (Martin Exhibit 10 was marked for

8              identification.)

9              THE WITNESS:  Well, when I filed my

10  complaint, that was a different story with them.  I

11  filed my complaint with them because they didn't pay

12  me all my money.

13  BY MR. WIER:

14    Q    Pardon?

15    A    I filed my complaint with them for the

16  financial part because they didn't pay me all my

17  money.

18    Q    Well, this is a -- this is not the wage

19  division; this is the discrimination division.

20    A    Okay.

21    Q    We saw your complaint, which we've talked

22  about.  Pachulski then sent a response.

23    A    Okay.

24    Q    You're not able to tell us whether you

Helen Martin

Page 161

1    got a pay raise or didn't?

2         A    I don't think I received one.  I really
3    don't.

4         Q    And you can't tell us whether other
5    individuals got pay raises or did not get pay raises?

6         A    No, because I wasn't involved in the
7    financial part of that.  I don't know what employees
8    got.

9         Q    All right.  What is the factual basis for
10   your claim in your complaint --

11        A    The same things that I've told you
12   previously.

13        Q    No.  "When I asked for a pay raise for
14   myself I was denied, unlike that my similarly
15   situated fellow white coworkers."

16              What similarly situated fellow
17   white coworkers are you referring to?

18        A    A paralegal.

19        Q    What's her name?

20        A    Melanie Olson, O-L-S-O-N.  And Kim Garza.

21        Q    Who?

22        A    Kim Garza.

23        Q    Okay.  And what was her position?

24        A    Secretary.  And Amy Miles was a

Helen Martin

Page 162

1    secretary.

2            Q    M-I-L-E-S?

3            A    Yes.

4            Q    And she's -- and these are people in the

5    Wilmington office?

6            A    Yes.

7            Q    And they got pay raises, and you say you

8    didn't?

9            A    I did not.

10           Q    And what pay raises did they get?

11           A    I don't know when they got, but I know

12   they got one.

13           Q    How do you know?

14           A    Melanie was a file room employee.  They

15   snatched her out as a file room employee.  I'm sure

16   they had to give her more money in order for her to

17   take a paralegal position.

18           Q    So she went from the file room to become

19   a paralegal?

20           A    Yes.

21           Q    Did paralegals make more money than the

22   file room employees?

23           A    Of course.

24           Q    So your allegation is -- I don't know

Helen Martin

Page 163

1    what your allegation is.  Is your allegation --

2         A    My allegation is I asked for a raise and

3    I didn't receive it.

4         Q    All right.  By you're comparing yourself

5    to Melanie Olson, who is a paralegal; she's not --

6         A    She was a file room employee.  They

7    promoted her to a paralegal.

8         Q    And when did they do that?

9         A    I don't remember when that happened.  Let

10   me think.

11                   I want to say maybe in the fall of

12   '01.  I tell you, I'm not good with dates at all, but

13   I know it took place; I just don't know when.

14        Q    In '01?

15        A    I believe so.

16        Q    So she had been a paralegal for a couple

17   years before you quit?

18        A    No, she had not.

19        Q    I'm saying from '01 to '03 she was a

20   paralegal?

21        A    Yeah, because was she a paralegal when I

22   was there.

23                   Yeah, I'll give her two years,

24   maybe she is a paralegal.

Helen Martin

Page 164

1      Q     So the allegation of this giving her a

2   pay raise and not you goes back to the fall of '01?

3      A     I think I asked for -- she was long gone

4   out the file room when I asked for a raise.  Yes, she

5   wasn't in the file room when I asked for a raise.

6   She was gone.

7      Q     So you're comparing yourself to somebody

8   who was a paralegal?

9      A     Yes, she was a paralegal.

10      Q     How about Kim Garza?

11      A     Kim was a secretary.  She was a file room

12   employee for two weeks when they promoted her to a

13   secretary.

14      Q     All right.  So your allegation -- and

15   when did they promote her to a secretary?

16      A     I don't recall when.  I don't recall

17   when.

18      Q     So you're saying that you were

19   discriminated against because Kim Garza was promoted

20   to a secretary and got a pay raise because of the

21   promotion?

22      A     Right; the whole scenario.

23      Q     And how is she similarly situated to you?

24      A     She's not similarly situated to me at

Helen Martin

Page 165

1    all, due to the fact that she didn't even have a

2    secretarial background.

3            They never asked any folks in the

4    file room, other people, they never asked me -- I

5    could have maybe wanted to be a secretary.  She

6    didn't ask Violet.  They just picked who they wanted

7    to ask at that particular time when they need

8    somebody.  And would always come and snatch from me.

9    Why not?

10       Q    Was a secretary a promotion?

11       A    Yes, it was a promotion.  Yes.

12       Q    Did it have supervisory responsibilities?

13       A    Probably so.

14       Q    You don't know?

15       A    I'm not exactly sure; no, I don't.

16       Q    Well, I'm a little unclear.  It says --

17       A    Amy Miles.

18       Q    -- "when I asked for a pay raise for

19    myself, I was denied a pay raise, unlike that of my

20    similarly situated fellow white coworkers."

21       A    Exactly.

22       Q    And what I'm asking you is, when did you

23    ask for a pay raise?

24       A    I believe it was --

Helen Martin

Page 166

1        Q    You're saying it was the fall of '01?

2        A    I think it was the fall of '01.  It was

3   either the fall of '01 or the fall of '02.  I'm not

4   exactly sure when it happened.  But I just know it

5   happened.

6        Q    Okay.  Well, we knew it was not fall of

7   '03.

8        A    No, it was before '03.

9        Q    Well, you resigned in January of '03.

10       A    Right.  I believe it -- I would say '01.

11  I would really say '01.

12       Q    And at that time, you're comparing

13  yourself at that time with Melanie Olson, who was

14  promoted to a paralegal, and Kim Garza and Amy Miles,

15  who were secretaries?

16       A    Both of those were secretaries.  Amy

17  Miles was always a secretary.  Right, exactly.

18       Q    Okay.  And you're saying you're assuming

19  she got a pay raise, because --

20       A    No, I'm not assuming she got one.

21       Q    Oh, she got one.

22       A    I'm sure she did.

23       Q    And you're sure she did because of what?

24       A    Because she got a pay raise.

Helen Martin

Page 167

1    Q    Well, I mean how do you know that?

2    A    News never wants for a carrier.

3    Q    Huh?

4    A    I said news -- trust me, these people got

5    pay raises.

6                        And I talked with Donna Carr

7    referencing Amy Miles.  And Donna Carr said to me

8    that the reason why Amy Miles received a pay raise is

9    because they started her with a low rate.  Which

10   didn't matter whether anybody got anything, who

11   started with what.

12                       My -- it was me asking for a pay

13   raise for myself.  In turn, through all this, Laura

14   is going to tell me she's got to see what the other

15   companies are paying.  I don't work for the other

16   companies; I work for you.

17                       So all this wishy-washy stuff that

18   was going on about me getting a pay raise, which I

19   still didn't get, unless you consider the end of the

20   year, a pay raise, no.

21                       I'm sorry.  I asked for a pay raise

22   for me.  What goes on with those other people, I

23   don't have no clue about.  But when I was denied a

24   pay raise, that was unfair to me.

**A175**

Helen Martin

Page 168

1    Q    When were you denied the pay raise?

2    A    When she didn't give it to me when I

3    asked for.

4    Q    In '01?

5    A    I believe it was '01.  I'm not sure if it

6    was exactly '01 or not.  I'm not good with dates.  I

7    just know it happened.  I just know it happened.

8    Q    Well, did it happen in 2000?

9    A    No, it wasn't 2000.  It wasn't 2000.  It

10   definitely wasn't 2000.

11   Q    And what pay raise did you request?

12   A    I didn't request anything.  I just asked

13   for more money.  I didn't say you got to give me

14   10,000 more for $20 more or whatever.  I just asked

15   for more money.  It wasn't a situation where I was

16   asking for a particular amount.

17   Q    So the allegation is premised about the

18   fact that Kim Garza and Amy Miles received pay

19   raises; is that right?

20   A    I asked for a pay raise for me.

21   Q    Right.

22   A    After I was denied a pay raise, I

23   questioned them why, when other people had received a

24   pay raise, and received them.

Helen Martin

Page 169

1      Q      What did they say?

2      A      MaryRitchie in turn told me that it was

3  because the Delaware file room -- how did she have

4  it?

5             Oh, Laura Davis Jones told me she

6  had to check and see.  Okay?  In turn, MaryRitchie

7  got back to me and said that we -- I was not getting

8  a raise because of the scale level for the file rooms

9  for the city of Wilmington for the state of Delaware.

10            In turn, I asked MaryRitchie what

11  does that have to do with me?  These are file rooms

12  do not prepare hearing binders or do any agenda

13  letters.

14     Q      So the articulated reason for -- in

15  response to your question was that they did a survey

16  of other comparable positions?

17     A      Right.  So she said, yes.  This is what

18  MaryRitchie is saying now.  Okay?

19     Q      But this is why they said --

20     A      This is MaryRitchie.  Okay?  Can't say

21  Laura.  We're saying MaryRitchie.

22     Q      MaryRitchie is the one you spoke with?

23     A      Yes.

24     Q      Mary Ritchie said that they did a

Helen Martin

Page 170

1    survey --

2        A    Of the file rooms in the city of

3    Wilmington for the state of Delaware, and it was in

4    coherent to what they was paying.  And I'm like -- in

5    my thinking, no, it's not, because these file rooms

6    around here do not prepare hearing binders nor agenda

7    letters and for the City of Wilmington, for the State

8    of Delaware.

9        Q    In any event, all the employees in the

10   file room were treated the same; is that right?  They

11   weren't given the pay raise?

12       A    I don't know.  I can't see -- as far as

13   their salaries and stuff, I have no knowledge of

14   them.  I couldn't tell you what they made or anything

15   like.  I didn't get involved with the finances of

16   them.

17       Q    Let's look at your 26A disclosures.  Did

18   you bring those with you?

19       A    You have it right there.

20       Q    This is what you gave me.  Did you bring

21   in a copy?

22       A    No, I did it.  I know what I put in

23   there.

24       Q    Okay.  These are -- the first thing is

Helen Martin

Page 171

1    your letter to the Delaware Department of Labor.

2                    You didn't bring a copy with you,

3    did you?

4           A    My letter to the Department of Labor?

5           Q    The Rule 26, you didn't bring a copy?

6           A    No, I know what's there.  Trust me.  I

7    put it together.  I know.

8                    MR. WIER:  Let's mark it as

9    Exhibit 11.

10                   (Martin Exhibit 11 was marked for

11                   identification.)

12                   MR. WIER:  I'll make a copy.

13                   THE WITNESS:  No, I don't need a

14   copy.  Trust me.  I just didn't know whether I needed

15   to bring one in with me or not.

16   BY MR. WIER:

17          Q    Exhibit A is your letter to the

18   Department of Labor setting forth why you believe you

19   were discriminated against; is that right?

20          A    Yes.

21          Q    And -- he.

22          A    Actually, no.  That's a response to a

23   letter that they sent me.

24          Q    Saying what Pachulski, Stang had said?

Page 172

1       A     Yes.

2       Q     And this is your response?

3       A     Yes.

4       Q     Is this the basis for your belief that

5   you were treated differently because of your race?

6       A     That's in a response to a letter that

7   they had sent me.

8       Q     But are you setting forth the factual

9   basis for why you believe you were discriminated

10  against?

11      A     Yes.  That helps out to a degree.

12      Q     You say, "I have strong feelings that I

13  was discriminated upon due to numerous work-related

14  conditions as well as being black."

15      A     Uh-huh.

16      Q     "My employment began January 2000.  I was

17  the only black supervisor at that time within the

18  Delaware office."

19      A     Uh-huh.

20      Q     "A hostile work environment was

21  definitely a nonprofessional demeanor."

22      A     True.

23      Q     The nonprofessional demeanor was that

24  they did not handle these personnel issues; is that

Helen Martin

Page 173

1    right?

2         A    Correct.

3         Q    "Communication to me as being Delaware

4    file room supervisor was strongly terrible.  Being

5    described negatively to prospective employee

6    candidates in a negative fashion, verbal

7    communication should never occur."

8                   That's the straightforward and

9    blunt comment?

10        A    Yes.

11        Q    On September 11th, Mr. Stang, along

12   with Mr. Grohsgal appeared at my office door, where I

13   was conducting company business, let me know that he,

14   Mr. Stang, was in charge.

15                  That's -- you've described that; is

16   that right?

17        A    Yes.  We already talked about that.

18        Q    Ms. Jones had approached me in

19   August 2001, advised me that she would be giving the

20   file room a pay raise.  Effective January 27th,

21   2003, my employment with the firm came to an end.

22   I'm certain that cultural diversity was mentioned.

23                  What do you mean, cultural

24   diversity?

Page 174

1       A    Cultural diversity as far as their

2   attitudes toward people working there of culture,

3   black people in general.

4               The things that I had endured there

5   would never had happened had I been white.  It would

6   have never had taken place, under no circumstances.

7       Q    Mr. Stang and Mr. Grohsgal did appear at

8   my office door where I was conducting office

9   business.  Ignoring him did not take place.

10  Mr. Stang explain to me who was, that he was in

11  charge.  Never once did he ask if I spoken with file

12  room employees, et cetera.

13              So you're responding to what

14  Mr. Steven Willis is telling you --

15      A    Yes.

16      Q    -- Pachulski is saying?

17      A    Yes.

18      Q    So you're responding to that?

19      A    Yes.

20      Q    Do you have Willis's letter in this

21  packet?

22      A    No, I don't.

23      Q    I want to ask you to produce that.

24              Did you get Pachulski's response,

Helen Martin

Page 175

1    or is he just summarizing it for you; do you recall?

2         A     I guess he's summarizing what Pachulski

3    told him.

4         Q     Well, Pachulski's response is an exhibit.

5    Did you ever see that before?

6                   It's one of the next-to-last

7    exhibits.  It's this one.

8                   Did you ever see that before?

9         A     This is Pachulski's --

10        Q     -- response to the Department of Labor.

11        A     No.

12        Q     So he must have summarized it for you.

13        A     No.  This is a different matter.  See

14   this is what -- for -- for the -- what do you call

15   these people?  These are not the same thing for him.

16   His letter is different.

17                   I received a letter from him

18   mentioning everything that I said there.  I responded

19   to his paragraph, paragraph by paragraph.

20                   But this is not -- this is not --

21   these are two different instances.  I understand what

22   you're saying, but this is different.  This -- the

23   financial --

24        Q     Let me just explain something.

Helen Martin

Page 176

1          A     Okay.

2          Q     Exhibit No. 10 --

3          A     Yes.

4          Q     -- is Pachulski's response to your

5    complaint of discrimination.

6          A     Okay.   That's the complaint.   That's

7    different.   This is the letter from --

8          Q     Is this on the wage-an-hour issue?

9          A     No; this is.

10         Q     No, that's the discrimination complaint.

11   But since you've not seen it, you don't know.

12         A     No, because I don't think I never seen

13   this.

14         Q     Well, they may not have sent that to you.

15   Just like they didn't sent Pachulski your letter.

16         A     Okay.   I'm understanding what you're

17   saying.

18         Q     Like the investigator gets the

19   information --

20         A     Okay, yes.

21         Q     -- but doesn't necessarily share what

22   you're telling him with Pachulski or vice versa.

23         A     Okay.   Well, I see that you did --

24         Q     And what Willis did is, I guess he took

Helen Martin

Page 177

1    this Exhibit 10 and wrote you; and then you responded

2    to it.

3         A    Yes.  I'll see that you get the actual

4    letter that he sent me.  I'll make sure you get a

5    copy of that.

6         Q    "I did walk off the job on two different

7    occasions."

8                        When was the other occasion?

9         A    I don't remember, but I know it happened.

10   I really don't.  I wish I did.

11                       What happened?  Let me think.

12        Q    Are you currently working?

13        A    Yes, I do work now.

14        Q    You quit on January 13th; is that

15   right?  Effective January 27th of '03.

16        A    No.  I didn't, see -- I went -- I worked

17   past January 13th, because I worked -- I think I

18   worked up until the 14th.

19        Q    All right.  And then --

20        A    I never went back no more.  I mean, I did

21   go back to pick up my personal belongings, but I

22   never worked no more.

23        Q    Now, you're saying Kim -- white coworkers

24   were given promotions.

Helen Martin

Page 178

1                          That's Kim Garza.  She was promoted

2    to secretary, and Melanie Olson worked in the

3    Delaware file room, was promoted to paralegal.

4          A    Yes.

5          Q    And that was back in '01, you think?  Is

6    that right?

7          A    I'm not exactly sure when it took place,

8    but I know it happened.  But they didn't go at the

9    same time.  They didn't snatch them both from me at

10   the same time, but they did take them from me.  But

11   not at the same time.

12                         Why do I think it was '02?  I don't

13   know.  I don't remember dates.  That's one of my

14   weaknesses.

15         Q    Exhibit Tab B to this Rule 26 disclosure

16   is -- it was attached to your brief that we've marked

17   as an exhibit.

18         A    Yes, the medical.

19         Q    And that's this one-page office visit,

20   January 13th.

21         A    It should be three pages there.

22         Q    Well, it's the same -- it's one visit,

23   though, correct?

24         A    Yes, uh-huh, yeah.

Helen Martin

Page 179

1      Q     Let me just go through this for a minute.

2            The documents that you've attached

3      to this Rule 26 disclosure, these emails, et cetera,

4      do any of them relate to -- let's see this for a

5      moment.

6                  Okay.  The attachments to

7      Exhibit 11 --

8      A     Okay.  Which you have, uh-huh.

9      Q     -- and I think I've seen these documents

10     before in connection with your appeal.  But tell me

11     what document supports your claim that you were

12     discriminated against because you were black.

13     A     All these documents in here --

14     Q     No, I want you to go through.

15     A     You want me to find one?

16     Q     I want you to find any document that

17     establishes any claim of racial discrimination.

18     A     Let's see if we have it here.

19     Q     We have your letter response to

20     Mr. Willis; is that right?

21     A     Yes.

22     Q     I'm interested in Exhibits B through --

23     what is B?  What is Exhibit B?

24     A     B is the doctor's notes.

Page 180

1        Q     Okay.

2        A     So C through D?  C through S?

3        Q     Hold on.  B is simply your office visit

4    with your doctor; correct?

5        A     Yes, that's what B is.

6        Q     Okay.  And you've attached a number of

7    emails, et cetera.

8                        What is C?

9        A     C is for the -- when Donna Carr called to

10   asked me to come and speak with her about what was

11   going on in the file room.  She sent me that email,

12   asking me to come.

13       Q     But how does that support your claim of

14   racial discrimination?

15       A     From what we discussed in the meeting.

16       Q     What meeting?

17       A     The meeting that I had with her.

18                        I had a meeting -- that's what I

19   was going on to tell you.  I had a meeting with Donna

20   Carr referencing everything that we had discussed

21   here today as well as the incident with Laura and

22   MaryRitchie.

23                        And in the meeting that I had with

24   Donna Carr, she and I discussed at great length

Helen Martin

Page 181

1   things that was going on, which she was aware of what

2   was going on, because I had told her, upon numerous

3   visits -- when she came to Delaware, she and I would

4   always talk, and I would tell her certain things that

5   was going on.

6               And she was aware of the

7   name-calling, which I never even told her that,

8   because that was something that we was trying to

9   handle in-house and didn't really want to get to that

10  level.  We didn't even want it to get to that level

11  where she would even hear about it.  So somebody had

12  to tell her, because I don't think MaryRitchie told

13  her, and I know Laura --

14          Q    So Donna came in when?

15          A    She came in like the early part of

16  January.  I think she came like that morning.

17          Q    Of '03?

18          A    January -- no, hold on.  When did Donna

19  come?  I'll tell you exactly when she came.

20               She came that morning.  She came

21  January the 14th.  That was my last workday,

22  January the 14th.

23          Q    So you had a meeting with her on the

24  14th?

Helen Martin

Page 182

1        A    Yes.

2        Q    What did you discuss?

3        A    Everything that we discussed here today:

4    The name-calling, the personal hygiene issue.  In the

5    meeting we discussed about the pay raise that I had

6    asked for.  She also mentioned during that time that

7    she was aware of the things that was going on.  Even

8    things that I didn't think that she was aware of, she

9    knew about.

10       Q    Like what?

11       A    The personal hygiene issue.  I told her

12   who all three people were.

13                As far as the name-calling.  Again,

14   I wasn't sure what exactly Cheryl had said to make

15   Wayne angry.  And I told her how that affected me,

16   because whatever she said, it wasn't directed at

17   Wayne the second time; it was directed at me.  But

18   Wayne told somebody else in the file room.  I don't

19   know who he told, but somehow or another it got to

20   her about what had taken place.  And she asked me did

21   I know that that was going on.  And I told her

22   indirectly, I knew about the name-calling, but it

23   didn't affect me, because I never heard it.  I just

24   only knew what people had said.

Helen Martin

Page 183

1            And a couple times MaryRitchie

2     called me in and asked me did I hear what they said,

3     and I told MaryRitchie no.  And she asked me did

4     anybody put their hands on me, and I told her no.

5            And she also -- Donna Carr had

6     already mentioned the one attorney there, a female

7     attorney, she would say verbal things, which I knew

8     her but I would just laugh hers off as a joke.  But I

9     asked Donna when I talked to her that that not be

10    discussed.  And she said that it wouldn't be

11    discussed.  And I told her, I was like, I think it's

12    a joke thing; I don't think it's a real serious

13    thing, given the fact that I know this person and I

14    know her very well.  And she was like, well, if you

15    don't want us to say anything about it, we won't.

16    And I was like, okay, fine.

17         Q     And what was the joke?

18         A     I don't want to tell you.

19         Q     Was it racial?

20         A     Some people would take it racial.  But to

21    me, I didn't think that she --

22         Q     You didn't consider it racial?

23         A     No, I didn't consider it racial.  No, I

24    didn't.

Helen Martin

Page 184

1              But to some people, they became

2      offensive about that.  But I'm like certain things --

3      you just know when things are not right.  And with

4      her, I knew that that was a joke thing.  But she

5      didn't only say it about me, she said it about other

6      people.

7          Q    And what is it that she said?

8          A    I'm not telling tell you what she said.

9      I don't think you need to know.  If I didn't get

10     upset about it, I don't think nobody else should get

11     upset about it.  That's the whole thing in a

12     nutshell.

13         Q    All right.

14         A    Because people say things like that all

15     the time, and that's not a racially motivated thing.

16     It just happens.  It's a slip of the tongue.

17         Q    All right.  But I'm trying to ask you how

18     these documents are relevant to a racial --

19         A    All these documents are relevant.  They

20     pertain to the same thing.  But I'm trying to find --

21         Q    Do any of these documents represent a

22     complaint that you made that somebody acted racially

23     discriminatory to you?

24         A    Yes, one of them to do.

Helen Martin

Page 185

1        Q    And which one?

2        A    I'm trying to find it, and I may not have

3    it.  But I know I have it, because it actually

4    mentions name-calling.

5                I may not have it, but I'll make

6    sure you get it.  Because I just received it myself

7    not too long ago.  But it does mention the

8    name-calling.

9        Q    But we discussed the name-calling, did we

10   not?

11       A    Yes.  It's not here, but I do have a

12   document mentioning such.  I actually have a physical

13   document that says about name-calling.

14       Q    But on these documents that you

15   produced --

16       A    It's not here.

17       Q    Let's go through which exhibit supports

18   any claim of racial discrimination.

19       A    All these do.

20       Q    Well, then tell me what C is.

21       A    Okay.  C is an email.

22       Q    What is it?

23       A    C is an email from Donna Carr.

24       Q    All right.  What date?

Helen Martin

Page 186

1       A       January 14th, 2003.

2       Q       And what's it say?

3       A       The email from Donna Carr is inviting me

4   to come and talk with her.

5       Q       How is that discriminatory?

6       A       It was discriminatory in the fact that

7   why do I have to come and talk with her someday when

8   she already knows what's going on?

9                      This is what she said to me:  "Do

10  you want to talk about this someday?"

11      Q       Okay.  So you think that that's

12  discriminatory because she uses the word "someday."

13      A       May I finish?

14                     "I know there's no need for a

15  review now" -- okay -- "but I would like to talk to

16  you about why you're leaving.  Let me know."

17                     Okay?  I responded back to her.

18  Okay?  And I called her on the phone, and she told me

19  to come down.  And we went down, and the first thing

20  we discussed was the racial issue.  Okay?  We talked

21  about that numerous times.

22      Q       What racial issue?

23      A       As far as Cheryl Pitman saying something,

24  which I did not hear.  Okay?  Again, I'm telling you,

Helen Martin

Page 187

1    I did not hear it.  I don't know what was exactly

2    said.  I know something was said, but I don't know

3    what exactly was said.

4                But obviously, it had to be

5    something really terrible for it to get all the way

6    to Donna Carr.

7        Q    Well, Donna Carr is coming in on the

8    day -- January 14th to discuss why you are

9    resigning.

10       A    Well, I don't know if she was coming just

11   that day to discuss why I was resigning.  I can't say

12   that.

13       Q    But this email is -- what is the date of

14   it?

15       A    The date is January the 14th.

16       Q    That's your last day at work?

17       A    Yes.

18       Q    She's asking you to come and meet with

19   her.

20       A    Yes, and I did.

21       Q    And how is that discriminatory?

22       A    Like I said, the first thing that we

23   discussed in her meeting was the racial issue.

24                Donna, I think, assumed that I was

Helen Martin

Page 188

1    leaving because of what I had heard referencing

2    Cheryl.  And I wanted to make sure that she

3    understood that that was not the only reason why I

4    was leaving.  I was leaving because of all the

5    things, not just that one instance.

6         Q    So you discussed all these things with

7    Donna?

8         A    Yes.

9         Q    And was she receptive?

10        A    She said -- you know, she mentioned about

11   some things that she knew about and some things that

12   she didn't know about.

13             And as far as the personal hygiene,

14   she was concerned, and she wanted me to tell her who

15   the three people were.  Which I did, I told her who

16   the three people were.

17             And she asked me is there anything

18   that she could do to change my mind.  And I also told

19   her at that time about what Kathy Wittig had said to

20   me that day.

21             And she told me that they were

22   going to try to do something about it.  She didn't

23   know what was going to happen, but she was going to

24   try to do something about it.

Helen Martin

Page 189

1          And I was like, Well, I hope you
2    do, because you're not going to be able to work here
3    with those people.

4          And she asked me again was I
5    leaving because of what Cheryl had said.  And I told
6    her no, because I didn't physically hear Cheryl say
7    it.  And I didn't.

8          I never heard her saying something,
9    but I knew something had been said, because
10   MaryRitchie had called me in her office, and she had
11   asked me was I aware.

12         And I told her the same thing that
13   I told Donna:  No, I wasn't aware, but I know Cheryl
14   has made remarks before and other people has heard
15   them.  But she never came to my face and said
16   anything to me; but that that wasn't the only reason
17   why I was leaving but it did need to cease.  And
18   that's the exact same thing that I told MaryRitchie,
19   I told Laura, and I told Kathy Wittig, and I told
20   Donna Carr.

21         All of them knew what was going on.
22   And that day, when I went to meet with Donna, like I
23   said, that was her first question, was I leaving
24   because of what Cheryl had said?  And I told her no,

Helen Martin

Page 190

1    because if that was the case, I would have been gone.

2        Q    All right.  So Donna was doing an

3    investigation, asking you to reconsider your

4    resignation?

5        A    She asked me was there anything I could

6    do -- that she could do to make me stay, because I

7    was an asset and an icon to the firm; and I told her

8    that I had enough.

9        Q    So that document is simply an email

10   saying she's going to set up this meeting?

11       A    Yes.  She did set it up.  She asked me to

12   just come down, and I went down.

13       Q    But that document doesn't describe the

14   meeting; it just simply says, Let's see.

15       A    Exactly.

16            When we go to the Exhibit D, is the

17   exhibit -- it was from Kathy Wittig.  Actually, it

18   was from Jason Griffin to Kathy -- how did I get

19   this?  That's interesting.

20       Q    Jason is a coworker?

21       A    Yes, he was.

22       Q    Jason resigned?

23       A    Yes, he resigned.

24       Q    And he writes an email saying -- what?

**A198**

Helen Martin

Page 191

1        A    A whole bunch of stuff to Kathy Wittig.

2    And he talks in there where MaryRitchie attacks my

3    character.  He mentions that in this email right

4    here.

5            All right.  And E is an email from

6    Ray Slough to MaryRitchie talking about the printers.

7        Q    What do you mean, talk about the

8    printers?  Saying that they've been ordered?

9        A    That's what it says.  "I have ordered two

10   replacement high-speed printers."  This was dated

11   December the 30th, 2002.

12       Q    So he's ordered printers.

13            What's the next exhibit?

14       A    This is one from Laura Davis Jones.

15       Q    What's the date?

16       A    December 31st.

17       Q    Of what year?

18       A    2002.

19            She's responding to me from an

20   email that I had sent.

21       Q    So it's an email from Laura Davis Jones

22   to you?

23       A    To me in the Delaware file room.

24       Q    And what does she say?

Helen Martin

Page 192

```
 1        , A     I should have said Monday, January the

 2    6th at 2:30.  But it stems from an email that she

 3    had set up a meeting; and she was in the office, but

 4    we didn't have the meeting.  So people were asking

 5    why we wasn't having the meeting, and I told them to

 6    ask her, because I didn't know.  Right.

 7                 Because the meeting was scheduled

 8    for Tuesday, January 6th at 2:30.  But people saw

 9    Laura in the office, and she couldn't attend the

10    meeting because she had a teleconference meeting,

11    blah, blah, blah.

12                 So she was rescheduling that with

13    us, and she would get back with us.  But the main

14    issue was that she wanted people to understand that

15    she was in the office, and that people had

16    communicated to me why she was there, why wasn't we

17    having the meeting?

18                 So we were all notified at the same

19    time, because I told them to send her a note.

20        Q    So I'm unclear.  This is a an email from

21    Laura Davis Jones saying she's going to set up a

22    meeting?

23        A    Reschedule.

24        Q    She's going to reschedule a meeting.
```

Helen Martin

Page 193

1    A    Right.

2    Q    Was that meeting ever held --

3    A    No.

4    Q    -- before your resignation?

5    A    No.

6    Q    It was not.

7              What's the next document?

8    A    This is Kathy Wittig.

9    Q    What's the date?

10   A    December the 23rd, 2002.

11             It's from Kathy Wittig to me.  And

12   she's mentioning MaryRitchie Johnson got angry and

13   insisted she could not suggest possibly seeing a

14   doctor for the people that had the personal hygiene

15   problem.  And she faxed her the links that I had told

16   her about.

17   Q    About personal issues?

18   A    Yes.

19             The next one is from Paula

20   Galbraith, and it's dated Wednesday, December 18th,

21   2002, and it's to me.  And Paula is thanking me for

22   whatever -- oh, because the lack of communication.

23   That's what it's all about, the lack of

24   communication.

Helen Martin

Page 194

1           Like as mentioned previously, the

2    file room was never informed of the electronic

3    E-filings proper procedure.  So therefore, that

4    created problems with the attorneys requesting

5    information.  They were requesting information that

6    they should have been going to somebody else to get,

7    because the file room had no knowledge of it.

8           When they went to the electric

9    e-filings, no one met with me to say that we had to

10   prepare the hearing binders for the judges.  It was

11   just something that was threw on us.  And Paula was

12   new at the time, so she didn't understand the file

13   room procedures.

14           This is another email from me to

15   Andrea Paul responding to an email from Andrea Paul

16   dated December the 3rd, 2002.

17           In this email Andrea is asking me

18   to tell people again what they're supposed to do as

19   far as the agenda letters.  Again, an ongoing

20   problem.  And I just written back to her, and she

21   said that she was going to mention that in the

22   meeting that we were supposed to have with Laura,

23   which never took place.

24       Q    That's tab I, is it?

Helen Martin

Page 195

1       A    Yes.

2       Q    And that relates to --

3       A    The people bringing their agenda letters

4    and different things to the file room.  And instead

5    of them doing when they're supposed to do, they need

6    to find out who is working on this.

7                 It's a bunch of crazy stuff that,

8    again, Andrea is asking me to mention -- and she was

9    going to mention it also in the meeting that we were

10   supposed to have with Laura.

11      Q    Who is Andrea?

12      A    She's one of the file room people.

13      Q    But I'm unclear as to the subject matter

14   of this.  The subject matter of this is what?

15      A    The subject matter of this is paralegals

16   and agenda letters.

17      Q    So the problem is -- what?  Paralegals

18   were performing -- were supposed to do the agenda

19   letters and --

20      A    No.  What happens is they were supposed

21   to bring them to the file room, put them on a roster.

22   In turn, we take them from the roster.  But what

23   happened was they was bringing them in -- instead of

24   them doing what I had asked them to do, they would

Page 196

1    just give the agenda letter to whomever they seen

2    instead of just doing what they were supposed to do.

3    Which was put the agenda letter on a roster, write it

4    down, put the stuff with it, leave it there and go on

5    about their business.

6        Q    These are the paralegals?

7        A    Yes.  And this was an ongoing problem too

8    that Laura was aware of.

9        Q    Okay.

10       A    Okay.

11       Q    Well, the problem is that the paralegals

12   were giving work to file room employees and not

13   following the procedures?

14       A    Exactly.

15       Q    Is that right?

16       A    Yes.

17       Q    Okay.  Go on.

18       A    Okay.

19       Q    What's the next document?

20       A    This is from --

21       Q    Exhibit J, is it?

22       A    Yes, Louise Tuschak.

23       Q    Who is that?

24       A    That's a paralegal.

Helen Martin

Page 197

1    Q    What date?

2    A    November 26th, '02.

3    Q    '02?

4    A    Yes.

5    Q    And what's that relate to?

6    A    The same thing.

7    Q    What same thing?

8    A    The agenda letter.  Now, that's her

9    sending me the agenda letter.  I, in turn, respond to

10   her, same thing.  Same date and everything.

11   Q    What do you mean, the same thing?

12   A    As far as people bringing the agenda

13   letters to the file room to prepare their hearing

14   binders.

15   Q    All right.  What is an agenda letter?

16   A    An agenda letter is a letter that gives

17   you specific documents that you had to prepare for

18   hearings for the judge.

19   Q    This is an agenda letter from the judge?

20   A    No.  It's prepared in-house from the

21   attorney.

22   Q    So an attorney prepares an agenda letter?

23   A    Well, the secretary or somebody prepares

24   it, yes.

Helen Martin

Page 198

1      Q      Saying these are the documents we need

2      for this case?

3      A      Yes.

4      Q      And then that document goes -- it's

5      supposed to go to whom?

6      A      It comes to the file room, and it goes on

7      a roster.  They just give it to anybody, and then we

8      take it and write it on a roster.

9      Q      So A roster is like a calendar?

10     A      Assignment sheet.  A sign-in sheet.

11     Q      All right.

12     A      Then we would write it down, and we would

13     write whoever it's from and all that good stuff.  And

14     then I would give it to out to whoever needs to

15     prepare a hearing binder.

16     Q      Well, so the file room employee needs to

17     then go find the document?

18     A      They're supposed to bring the documents

19     with them.

20     Q      "They" being the paralegal?

21     A      Or the attorney.  Whoever is bringing the

22     agenda letter is supposed to supply the documents

23     with it.  Because our responsibility is just to take

24     that agenda letter, follow along; put it in, A, B, C

Helen Martin

Page 199

1  or whatever.

2          Q    So the file doesn't do any legal review.

3  It just simply takes the documents given to it by

4  someone else, paralegal or lawyer, just puts it in

5  binders?

6          A    We put it in binders, tabs.  We prepare

7  the hearing binders for the court.

8          Q    And the problem was -- what?  That the

9  secretaries or paralegals were giving it to --

10         A    They weren't doing what they were

11  supposed to do.  They would just come out of being

12  told numerous times, by me and whoever else, that you

13  just bring the agenda letter with the letters.  You

14  don't say, I want Mr. Wier to do it; you don't say, I

15  want the court stenographer.  You just give it to us

16  and we'll take it from there.

17                      And this was an ongoing problem.

18  This was a problem that resorted into a form of

19  name-calling too.  I don't have that piece of paper,

20  but I will get it.  I don't have it.

21                      But anyway --

22         Q    What piece of paper?

23         A    There's -- I have a piece of paper.  I

24  don't know why I don't have it, because I thought I

Helen Martin

Page 200

1    put it in here -- referencing the same, as far as the

2    agenda letters with names being called.  It mentions

3    this.

4         Q    Racial names?

5         A    I would say racial, yes.

6         Q    What were the names?

7         A    I didn't get the names.  I didn't write

8    the names down.  I didn't get the names.  Like I

9    said, you have to remember, I was not right there in

10   the file room.

11        Q    When you say racial names -- you're

12   testifying under oath.  Either you remember them or

13   you don't.

14                   Were there racial names?

15        A    Yes, there were racial names.  But again,

16   I was not directly there when --

17        Q    So you didn't hear them?

18        A    No, I did not.  I did not hear the names.

19        Q    But you've got a document that says --

20   what?

21        A    It tells you that names were called.  In

22   the document, it states that names were called.

23                   And the person that I sent the

24   letter to, she responds back and says that there were

Helen Martin

Page 201

1    names called.  So --

2                    But there is a document that states

3    that.  Like I said, this is from Louise Tuschak.

4         Q    What's the date?  What's the tab number?

5         A    It's same thing:  Letter J,

6    November 26th, 2002.  It's an email from her to me,

7    vice versa.

8         Q    What's that relate to?

9         A    The same thing:  Agenda letters.

10        Q    That's the same personnel issue?

11        A    Yes.

12        Q    Okay.

13        A    Exactly.

14                    Then we're moving on, and we got --

15   from Vanessa Preston as --

16        Q    Is this Exhibit K?

17        A    Yes.

18        Q    And what's the date?

19        A    Yes, sorry.  Exhibit K, Wednesday

20   November 13th, 2002 from Vanessa Preston to Laura

21   Davis Jones.

22        Q    That's November 2002?

23        A    Yes.  November 13th, 2002.

24        Q    Okay.

Page 202

1      A    She's complaining that secretaries are

2   doing hearing binders, which they were not allowed to

3   do.

4              And she went to the file room, and

5   she saw two people standing there with nothing to do,

6   and she was wondering why it wasn't given to them.

7   And she spoke with me, and I agreed to, yes, they

8   should have received the hearing binders to prepare.

9   The secretary should not be preparing them.

10     Q    So it relates to that issue?

11     A    The same thing. yes.

12     Q    Okay.

13     A    This is Exhibit L.  This is from Mary

14  Cochran, and it's coming to me.  And --

15  October 29th, 2002.

16              It's about the meeting which I just

17  mentioned to you, that she and I always have

18  problems, and I was wondering if we could have a

19  meeting.  And I had cc'd MaryRitchie and Kathy Wittig

20  on it; and MaryRitchie never responded back, but

21  Kathy Wittig did.  And that's as far as that went.

22     Q    And what's the subject matter of that

23  meeting?

24     A    Your attitude towards me.

Helen Martin

Page 203

1       Q       Was that racial?

2       A       I don't know.  It could have been.

3       Q       But you don't know?

4       A       I just know she had a problem with me.

5       Q       But she didn't say anything racial?  To

6    your knowledge.

7       A       No, but she was always real nasty, very

8    nasty.  If I asked her, Can I have a stapler? she

9    would have something nasty to say.

10                   This is Exhibit N was one-on-one

11   session.  It was October the 3rd, 2002.  It was

12   from me to the Pachulski file room, and I cc'd

13   MaryRitchie and Kathy Wittig on it.

14                   And it was talking about the

15   announcements -- like every month I would give my

16   people one-on-ones, just to find out what they liked,

17   what they didn't like, and I would share all that

18   information with MaryRitchie.  Which, again, the

19   name-calling came up in that.

20                   Okay.  This is in Exhibit N, and

21   it's Thursday, September the 12th, 2002.  It's from

22   me to MaryRitchie Johnson, and I cc'd the Delaware

23   file room, personal hygiene.

24                   Okay.  This is Exhibit O.  And it's

**A211**

Helen Martin

Page 204

1    from me and it's to the DE file room, and it's dated

2    December 4th, 2002, in our monthly one-on-ones.

3                    And again, I'm just -- overall

4    review, telling them about the things that we talked

5    about, referencing the one-on-ones and that I talked

6    to MaryRitchie every month, telling her about things

7    that's going on.  And several issues, which was the

8    issues that we have been discussing:  Breaks

9    responsibility, sharing desks, personal hygiene, all

10   that stuff.

11                   All right.  Exhibit P is from Holly

12   Walsh, July 8th, 2002 to me.  And she's saying, Way

13   to go, Helen, your persistence finally paid off.

14                   This was referencing our -- what

15   was, it?  Life insurance?  Right, life insurance.

16                   We were told one thing and

17   something else happened.  And something happened

18   where we were promised life insurance but it was not

19   there -- well, I shouldn't say it wasn't there.

20                   Some people were aware of it and

21   some people wasn't.  And I was one of the people that

22   was not aware of it.  I knew that we had it, but I

23   didn't know that it had increased.  And come to find

24   out, other people was aware, but I didn't know

Helen Martin

Page 205

1    anything about it.  And there were other people that

2    didn't know anything about it.

3                    So I was persistent, because I just

4    stayed on their back, and that's why Holly is

5    thanking me for that, because some people knew, some

6    people didn't.

7                    April 24th, '02 --

8        Q    And what tab is this?

9        A    I'm sorry.  Q.

10       Q    April 24th, what?

11       A    2002.

12       Q    And that's from whom to whom?

13       A    This is from me, and it's to April Tabor.

14       Q    Who is she?

15       A    File room employee.  All these are file

16   room employees.

17       Q    And April is the girl who was fired?

18       A    Yes, she's one of the people that was

19   fired.

20                    April Tabor, Jason Griffin, and

21   Christina Schaefer.  Christina Schaefer has passed

22   away, too.  And I cc'd MaryRitchie Johnson and Kathy

23   Wittig.

24                    Who wants to remember this crap?

Helen Martin

Page 206

```
 1              This was a reminder that we had had
 2    a meeting with the three of them, and those three,
 3    they were just different people.  But we tried to
 4    resolve it, but it was a bunch of crazy stuff.  The
 5    same thing over and over again -- the name-calling,
 6    you know, not coming to work, taking extra breaks.
 7    You know, all kind of craziness.
 8              But to sum that up, we also had an
 9    attachment with that where we -- the whole DE file
10    room had had over April Tabor in general.  And that
11    goes on to tell the same thing, the same occurrences.
12    Everything was the same.
13         Q    And what's the problem with April?
14         A    April's problem was -- my problem with
15    April was the name-calling indirectly, which again I
16    never heard.  But people did tell MaryRitchie that
17    she did call me names and disrespect me, she did that
18    to my face.  So that was not a problem.
19              But her -- she would just tell me
20    no, it didn't matter.  She would just walk right up
21    in my face and say, No, I'm not doing such and such a
22    thing, and you can go do whatever.
23              So that was the kind of problems
24    that I had with her, besides her not doing her work.
```

Helen Martin

Page 207

1    But that didn't get resolved, like I said.  She

2    pissed MaryRitchie off and finally she got fired.

3         Q    She never made any racial comments

4    directly to you?

5         A    She never said them directly to my face,

6    but she said them.  She's one of the people that

7    MaryRitchie Johnson had --

8         Q    So then she was fired?

9         A    Right.  Well, that's not the reason why

10   MaryRitchie fired her; it was for another reason.

11   But that was part of the problem, too.

12        Q    Okay.

13        A    We was glad that she was gone -- "we"

14   meaning the whole firm.

15                   This is Exhibit R.  This is from

16   Jason to me, and he's thanking me, and again, telling

17   me what MaryRitchie said when he came for his

18   interview.  And blah, blah this and blah, blah that.

19        Q    I'm sorry?

20        A    This is from Jason Griffin.  It's dated

21   October the 16th, 2002.  And he's telling me about

22   what MaryRitchie said to him when he came for his

23   interview referencing me.

24        Q    That you're straightforward and blunt?

Helen Martin

Page 208

1          A     Straightforward and blunt, and blah, blah

2     this and blah, blah that.

3          Q     And did he say any racial comments?

4          A     No.  He typed here what she just said:

5     "Took a moment to warn me that you're very

6     straightforward and blunt, et cetera," is what he

7     put, E-T-C, is what he put, ETC.  Okay?

8                     This is the email now, and that's

9     what he put:  E-T-C.

10         Q     Did he ever fill in the E-T-C?

11         A     He don't have to fill it in.

12         Q     So the answer is no?

13         A     Yes.  He filled it in verbally.  Yes, he

14    filled it in verbally.

15         Q     Other than straightforward and blunt --

16         A     "Et cetera."

17         Q     -- which is the only comment you made to

18    the appeal referee, and the only comment you've made

19    in your Department of Labor response, what other

20    statements did he tell you were made about him?

21         A     He doesn't have to tell me other

22    statements, like --

23         Q     I'm not asking you what he had to do.

24    I'm asking what he told you, if anything --

Helen Martin

Page 209

1       A     Okay.

2       Q     -- other than straightforward and blunt?

3       A     Okay.  As well as I said before, he told

4  me exactly what's typed here, "straightforward and

5  blunt, et cetera."  Which not only him, other

6  employees had told me the same thing.  Other

7  prospective employees that she hired there, they all

8  told me the same thing.  Everybody told me the same

9  thing.

10      Q     I'm trying to ask you, what, other than

11 saying that you were straightforward and blunt, did

12 people tell you she said?

13      A     Exactly what I just said to you:

14 Straightforward, blunt, et cetera.

15      Q     So no one told you what "et cetera"

16 meant?

17      A     No.  "Et cetera" meant -- but it must

18 have been something else that was said.

19      Q     But no one ever told you?

20      A     Well, people have told me, yes.

21      Q     Well, what did they tell you?

22      A     Okay.  Again, people told me that

23 MaryRitchie told them that I was straightforward,

24 blunt, and et cetera.

A217

Helen Martin

Page 210

1          Q    All right.  Go on.

2          A    Okay.  Exhibit S states -- this is from

3    Ashley Grasty and it's to Pachulski, everyone,

4    document request:  "Due to Helen's absence, we're

5    asking everyone" -- this is after 9/11 -- to please

6    send my document requests to Ashley Grasty, April

7    Tabor.  "We will handle them.  Thank you for your

8    cooperation."

9                    No one gave either of them

10   authority to do that.  They just took it upon

11   themselves.

12         Q    And is that the sum and substance of the

13   documents you've produced?

14         A    This is it.  These are the documents that

15   I'm producing to you in Rule 26.

16         Q    All right.  When have you seen -- from

17   January 13th to today, have you seen

18   Dr. Silverstein about any emotional problems?

19         A    No, I haven't.  Not today.

20         Q    So from that last visit until today,

21   there's been no further discussions with her about

22   emotional --

23         A    Oh, yes, there have.  Oh, yeah.  She

24   wanted to know -- I went to her numerous times.  And

Helen Martin

Page 211

1     she, you know, explained to me what I needed to do.

2     I told her I had stopped working.  And she told me

3     that my weight was increasing.

4                    But I've seen her numerous times.

5     I've talked to her -- what?  From 2002 -- when I went

6     there in 2003, I think I went back about four or five

7     times prior, yes.  I talked to her.

8          Q     From the time you resigned until today,

9     did you meet with her periodically?

10         A     Yes.  And -- yeah, this year I started

11    seeing her yearly again.  Yes.

12         Q     Just once a year.  And these are for the

13    same OB/GYN kinds of issues?

14         A     For now, yes.

15         Q     From the 13th until today, have you

16    sought any kind of treatment for emotional problems?

17         A     Yes.  She still was mentoring me, yes.

18         Q     Are you under any psychiatric or

19    psychological care?

20         A     No, I'm not.

21         Q     Have you ever been hospitalized in a

22    mental hospital?

23         A     No, I haven't.

24         Q     Now, from January 13th to the present,

Helen Martin

Page 212

1    where have you been employed?

2        A    I worked with temp agencies.

3        Q    When did you begin -- what employment

4    have you had since resigning?

5        A    As far as full-time employment?  I've

6    worked full time.

7        Q    I want to know what jobs you've had since

8    leaving, temporary or full time.

9        A    Oh, both temp and full time.  I'm sorry.

10       Q    Let's start with your first job, and when

11   was it?

12       A    I temped for I think it was like -- no, I

13   didn't.  I worked for Heckler, Frabizzio full time.

14       Q    When?

15       A    June of '03 to March of '05.

16       Q    That was a full-time position?

17       A    Yes.

18       Q    And what did you do there?

19       A    Legal secretary.

20       Q    And why did you leave there?

21       A    Because I had to get an operation.

22       Q    So you resigned?

23       A    Yes, I did.

24       Q    And you were hired in January.  What did

**A220**

Helen Martin

Page 213

1    you do between January and June?

2         A    I didn't do anything.

3         Q    You did not work?

4         A    No, I did not.

5         Q    Why did you not work?

6         A    Because I wasn't up to working.

7         Q    Pardon?

8         A    I was not up to working.

9         Q    So you didn't seek employment?

10        A    No, I didn't.

11        Q    Did somebody tell you you were not able

12   to work?

13        A    No, no one told me I was not able to

14   work.  My mind wasn't right, so I didn't work.

15        Q    Did you ever threaten to quit Heckler,

16   Frabizzio?

17        A    No.

18        Q    Hmm?

19        A    No, I didn't threaten.

20        Q    What did you do at --

21        A    Secretary.

22        Q    Legal secretary or secretary?

23        A    Legal secretary.

24        Q    Did you type memoranda and those kinds of

Helen Martin

Page 214

1   things?

2           A    Yes.   Letters, documents, pleadings.

3           Q    Okay.   And you left there, and for

4   personal --

5           A    Right, reasons.

6           Q    Medical reasons?

7           A    Yes.

8           Q    And did you return to work any place

9   else?

10          A    No, I temped.

11          Q    And did you have an operation of some

12  sort?

13          A    Yes, I did.

14          Q    And when was the operation?

15          A    July the 30th of -- July the 2nd of

16  2005.

17          Q    And what did you do between March and

18  July?

19          A    Rested.

20          Q    I'm sorry?

21          A    I rested.

22          Q    What do you mean, you rested?

23          A    I went home and sat on my butt and

24  rested.

Helen Martin

Page 215

1        Q      Well, why?

2        A      Because I was sick.

3        Q      Hmm?

4        A      I had to get an operation.

5        Q      You rested because of your physical

6   condition?

7        A      Yes.

8        Q      All right.

9        A      Yeah.

10        Q      And who was treating you for this

11   physical condition?

12        A      Dr. Gordon.

13        Q      What's his first name?

14        A      Cecil.

15        Q      And what kind of doctor is he?

16        A      OB/GYN.

17        Q      Is he the one who did the operation?

18        A      Yes.

19        Q      Okay.  And where was the operation?

20        A      At Christiana Hospital.

21        Q      And how long were you hospitalized?

22        A      For two days and a half.

23        Q      So you went in on the 2nd?

24        A      I went in on the 2nd, and I got out on

Helen Martin

Page 216

1    the -- wait a minute.  Let me think.

2                    I went on in on the 2nd, and I

3    think I got out on the 4th.

4        Q    Okay.  And were you able to return to

5    work?

6        A    No, huh-uh.  I had to rest.

7        Q    And how long did you have to rest?

8        A    Six to eight weeks, I think it was.

9        Q    And did he provide a note to that effect?

10       A    No, I didn't need no note, because I

11   wasn't working.

12       Q    Did you receive unemployment comp?

13       A    No.

14       Q    What were you making at Heckler,

15   Frabizzio?  Were you hourly or --

16       A    I think I was hourly.  It might have been

17   salary.  Maybe it was salary.

18       Q    Were you making more money or less at

19   Heckler?  Or don't you know?

20       A    Oh, I made less money at Heckler.  Yeah,

21   at Heckler, I was only making 27,000 or something.

22       Q    How much?

23       A    27,000.  It wasn't 30,000, I know that.

24       Q    Well, you don't know whether you were

Helen Martin

Page 217

1    salaried or hourly?

2        A    I was definitely salaried.  I know that.

3        Q    Did you get performance evaluations at

4    Heckler, Frabizzio?

5        A    Oh, yes, uh-huh.  Yes, I did.

6                    That's probably my friend that's

7    coming to pick me up.

8                    (Discussion off the record.)

9    BY MR. WIER:

10       Q    So what was your first employment after

11   leaving Heckler?

12       A    I temped.

13       Q    For what agency?

14       A    Bernard Personnel and Exclusively Legal.

15       Q    Is that like a branch of that?

16       A    No, Exclusively Legal is a temporary

17   agency as well.

18       Q    So Bernard Personnel and Exclusively

19   Legal, those are two?

20       A    Yes, two.

21       Q    When was the first job you got with

22   Bernard Personnel or Exclusively Legal?

23       A    I think it was in August, I think, of

24   2005.

Page 218

```
 1        Q    And was that through Bernard?

 2        A    I think it was Exclusively Legal -- wait

 3   a minute.  Wait a minute.

 4             I worked for Exclusively Legal

 5   prior to my surgery -- yeah, that's mine.

 6        Q    Wait a second.

 7        A    Let me --

 8        Q    I've asked you questions.  My questions

 9   are, from January of '03 to June of '03, where did

10   you work?  You said you didn't work.

11        A    Right, I didn't.  But then I worked for

12   Heckler from June '03 through March of '05.

13        Q    Correct.  Then I asked you where did you

14   work, and you said you took off from March to July.

15        A    I temped prior to that a couple days here

16   and there.

17        Q    Prior to what?

18        A    From March '05 to July of '03, I temped

19   for Exclusively Legal, couple days here and couple

20   days there.

21        Q    And where did you temp?

22        A    Different law firms.  It was not the same

23   law firm.  I went to different places.

24        Q    Do you remember where?
```

Helen Martin

Page 219

1        A     Where did I go for them?  I forget the

2    name of the firm, but I know it's off of Foulk Road.

3    Richards something.

4        Q     How many days did you work?

5        A     I think I might have worked about two or

6    three days one week, and maybe two or three the next

7    week.

8        Q     And why did you leave those firms?

9        A     They were temp assignments.  I didn't

10   leave them.  I worked temp.  Temp.

11       Q     But sometimes temps get kicked out.  Did

12   you?

13       A     I don't think so.  I doubt that very

14   seriously.  If I did, nobody told me.

15       Q     Is that temp to perm?

16       A     No, because his secretary came back.

17   Yeah, his secretary came back.

18       Q     "His" being whom?

19       A     The gentleman that I worked for.  His

20   secretary.

21       Q     You don't remember his name?

22       A     I'm trying to think what his name was.  I

23   can't remember the firm.  But I know his secretary,

24   she was out having an operation, and she came back.

Helen Martin

Page 220

1          Q     Bernard -- or Exclusively Legal paid you;

2    is that right?

3          A     Yes.

4          Q     And then they billed the firm?

5          A     I guess so.   I'm not sure.

6          Q     How did Exclusively pay you?

7          A     Paid me by check.

8          Q     W2?

9          A     Yes.  I have W2s.

10         Q     I need your W2s.

11         A     Okay.

12         Q     Now, Bernard Personnel, you started

13   getting jobs through them in August of '05?

14         A     I think it was August '05.

15         Q     Where did you work?

16         A     Different law firms, too.

17                    Where was that one firm that I

18   worked for them?  I can't think of the name of it.

19         Q     Are these temp to perms?

20         A     No, none of his assignments were temp to

21   perms.

22                    Well, actually, one assignment was

23   temp to perm.

24                    At Cliff Hearn.  Cliff Hearn, 606

Helen Martin

Page 221

1    Market Street.   That was supposed to temp to perm,

2    but I quit.

3          Q     And how long did you work for Mr. Hearn?

4          A     I worked there from -- I know it was 2005

5    when I worked there, and I think I worked through

6    February or March of the next year, which would have

7    been 2006.

8          Q     How long did you work for Mr. Hearn?

9          A     I don't remember.   About seven or eight

10   months.

11         Q     As a secretary?

12         A     Yes.

13         Q     And why did you quit?

14         A     An unhealthy work environment.

15         Q     What's that mean?   Stress?

16         A     No, that doesn't mean stress.   That means

17   that the place was filthy and it wasn't fit for

18   humans.

19         Q     You mean it was environmentally unsound?

20         A     Yes.

21         Q     Okay.   Did you get a W2 from Bernard

22   for --

23         A     Yes, I did.

24         Q     -- for all these positions?

Helen Martin

Page 222

1        A      Yes.

2        Q      So did Mr. Hearn pay you or did Bernard

3    pay you?

4        A      Bernard paid me.

5        Q      Okay.

6        A      I temped at Mr. Hearn's office through

7    Bernard Personnel.

8        Q      Okay.  Any other jobs you recalled

9    through Bernard?

10        A      It was different day assignments here and

11    there.  I worked somewhere else for him.  I forget,

12    but -- I know it's on Market Street.  Aren't they

13    all?  But I don't recall the name of it.

14        Q      February of '06 to --

15        A      February of '06 --

16        Q      -- to June of '07 -- you left Mr. Hearn

17    in February of '06?

18        A      It was either February or March of '06.

19        Q      Where have you worked since then?

20        A      Temping for Bernard here and there.

21        Q      Is this a continual employment or is it

22    sporadic?

23        A      Sporadic.  Plus I received unemployment

24    too.

Helen Martin

Page 223

1     Q    And when did you -- oh, from Mr. Hearn?

2     A    No, not from Mr. Hearn.  From Bernard.

3     Q    Well, how did you receive unemployment?

4     A    But I went and filed for unemployment,

5   and I had a hearing.  I filed for unemployment in

6   March.

7     Q    Against Bernard?

8     A    Yes.

9     Q    You filed for unemployment March of what

10  year?

11    A    Of '06.

12    Q    After you left Mr. Hearn's office?

13    A    Yes.

14    Q    So they didn't have any jobs for you?

15    A    He had a one-day assignment here and

16  one-day assignment there, nothing long term.  So it

17  was just like different day assignments here and

18  there.

19    Q    Do you know what you earned in 2006?

20    A    No, not right offhand.

21    Q    Did you file income tax returns?

22    A    Yes, I have.

23    Q    You filed your 2006 tax return?

24    A    Yes.

Helen Martin

Page 224

1       Q    I'll ask you to produce that and any W2s

2   from Bernard.

3       A    And W2s from --

4       Q    From Exclusively Legal.

5       A    Exclusively Legal.

6       Q    Okay.  Any other employment other than

7   through Bernard?

8       A    No.

9       Q    Are you currently working?

10      A    Yes, I am.

11      Q    Where?

12      A    Plead the 5th.

13      Q    I'm sorry?

14      A    I plead the Fifth Amendment on.

15      Q    I don't think you can plead the 5th

16  Amendment on that.

17      A    Why can't I?

18      Q    Does it involve a crime?

19      A    Yes, it does.  A crime of you not need to

20  know.  What does my previous employers have to do

21  with me here with you -- referencing Pachulski?

22  Nothing.

23      Q    Well, you're claiming damages, and I'm

24  entitled to know whether you're claiming lost wages.

Helen Martin

Page 225

1    If you're not claiming lost wages, I don't have to

2    know.

3         A    Well, I would think that the employee

4    information that I have given you would be sufficient

5    for --

6         Q    No, no, no.  You don't determine what I

7    think is sufficient.

8                   If you're making a claim for lost

9    wages because you allege you were constructively

10   discharged, I'm entitled to find out whether you have

11   mitigated your damages; and relevant to that is your

12   employment.

13                  So I'm asking you -- you can't

14   plead the 5th Amendment unless the answer would be

15   likely to --

16        A    Do you have documentation proving that I

17   can't plead the 5th?

18        Q    -- would be likely to incriminate you.

19        A    Do you have documentation proving that

20   you can't plead the 5th?

21        Q    I'm asking you, would an answer to that

22   question cause you to incriminate yourself?

23        A    I'm asking you, do you have documentation

24   saying that I cannot plead the 5th?

Helen Martin

Page 226

1          Q    I don't need documentation.  I'm simply

2    asking you a question, and you're asserting a

3    privilege against self-incrimination.  And I'm asking

4    you, would the answer to that question implicate you

5    in a crime?  Because the privilege against

6    self-incrimination is a privilege to not incriminate

7    yourself for a crime.

8          A    I understand what you're saying.  But I'm

9    saying to you again, I'm pleading the 5th because

10   my current employer has nothing to do with this

11   situation.

12         Q    Is it a law firm?

13         A    Again, I'm pleading the 5th.

14         Q    Is it a full-time job?

15         A    Yes, it is.

16         Q    What kind of a job is it?

17         A    I do work.

18         Q    What kind of work?

19         A    It's in the legal field.

20         Q    Is it a secretarial position?

21         A    Yes, it is.

22         Q    Is it a legal secretary?

23         A    Yes, it is.

24         Q    And it's for a law firm?

Helen Martin

Page 227

1      A     Yes, it is.

2      Q     Is it a law firm in Delaware?

3      A     Yes, it is.

4      Q     Are you salaried?

5      A     No, I'm not.

6      Q     Are you hourly?

7      A     Yes, I am.

8      Q     What's your hourly rate?

9      A     I'm not exactly sure.

10     Q     When did you begin?

11     A     Last year.

12     Q     When?

13     A     June, June of '06 -- right.  We're in

14     '07.

15     Q     And that's to the present?

16     A     Yes.

17     Q     Have you received any raises?

18     A     Yes.

19     Q     Do you work for one attorney or more than

20     one attorney?

21     A     More than one.

22     Q     Is it in Wilmington?

23     A     Yes, it is.

24     Q     Is there a reason why you can't disclose

Helen Martin

Page 228

1    the name of it?

2         A    Because it's -- that has nothing to do

3    with me being involved with Pachulski.  I don't

4    understand -- if you could show me some documentation

5    say, Helen, yes, this has to take place.

6         Q    I understand you're pro se.  But let me

7    tell you, if you are claiming that you've been

8    damaged because you were forced to quit -- you've

9    alleged, even though you resigned, you've alleged

10   that you were forced to quit.  So you've alleged that

11   was a constructive discharge?

12        A    Right.

13        Q    So the claim would be, I'm therefore

14   entitled to lost wages, because had that not

15   happened, I would still be employed by Pachulski.

16        A    Well, you have enough information to see

17   that I've had lost wages.

18        Q    No, I'm entitled to find out what you're

19   earning in the interim.

20        A    Well, you are going to find out.

21        Q    Well, if you don't disclose who the

22   employer is, I can't find out.

23        A    Why can't you, when you just asked me to

24   give you check stubs and W2s?

Helen Martin

Page 229

1       Q     Well, if you can provide any earnings

2    history --

3       A     And my income tax check and -- not my

4    income tax check but my -- thing.  My -- what do you

5    call? -- my income taxes.  You just asked me did I

6    file my 2006 income tax.  So when --

7       Q     But you haven't filed 2007 yet.

8       A     Yes, but when I present you with 2006,

9    will not you have that information already?

10      Q     Not for 2006.

11      A     Well, it's the same employer.  I still

12   have the same employer.

13      Q     I want to know -- if you produce your pay

14   stubs from this employer --

15      A     Yes.

16      Q     -- for 2007, I'll look at those.

17      A     Well, you're going to have them anyway.

18      Q     How am I going to have them?

19      A     Because didn't you just ask me to give

20   you my 2006 income tax return?  That's the same

21   employer.

22      Q     I want to know what you've earned in

23   2007, because 2007 doesn't tell me -- if you'll

24   produce your earnings from 2007 with this employer,

Helen Martin

Page 230

1    then I can look at them.

2         A    Well, we already discussed that.  I'm

3    supposed to provide you with that.  Is that not what

4    you said?

5         Q    Why are you not disclosing the name of

6    the employer?

7         A    Why do you need to know the name of my

8    employer when you're going to get that information in

9    writing?

10        Q    Well, I'll look at what you produce, and

11   if I decide I need to communicate with that employer,

12   I'll let you know.

13        A    Well, I strongly suggest, why would you

14   need to communicate with that employer?  That

15   employer had nothing to do with this case.  So why

16   would you need to communicate with them?

17        Q    I will take discovery if I need it, and

18   if I have to take discovery from anybody, I'll let

19   you know.

20        A    No problem.  Thank you.

21        Q    But you don't know what your hourly rate

22   is, you don't know what your salary is, you don't

23   know what your earnings are?

24        A    My hourly rate, no, I don't know.  You

Helen Martin

Page 231

1    did not ask me what my earnings were.  I can tell you

2    that I make $33,000 a year.

3        Q    I said are you salaried or hourly, and

4    you said you were hourly.  I said, What's your rate;

5    you said you weren't sure.

6        A    I'm not exactly sure of what my rate is,

7    no.  But I do know what I make per year, because I'm

8    told that.

9        Q    All right.  What is your annual salary

10   from this new firm?

11       A    $33,000 a year.

12       Q    What else do you get?

13       A    As far as?

14       Q    Bonus, incentive comp, benefits.

15       A    Yes, I receive benefits.  Health

16   benefits.  I received a Christmas bonus.

17       Q    What was that?

18       A    It was for $400.

19       Q    Okay.  What else do you get?

20       A    Got a raise in January.

21       Q    Of what?

22       A    5 percent, I think.

23       Q    Did you put Pachulski down as a former

24   employer?

Helen Martin

Page 232

```
 1          A    Yes.  I gave them my resumè, had
 2     Pachulski on there.
 3          Q    Okay.  Do you know whether they contacted
 4     Pachulski?
 5          A    I don't know if they contacted Pachulski
 6     directly per se.  But they deal with lawyers that
 7     I've worked with from Pachulski, and they know me.
 8          Q    Right.  You got hired.  So to your
 9     knowledge, Pachulski didn't say anything negative
10     about you?
11          A    They have, though.  Not to them maybe,
12     but they have.
13          Q    They have what?
14          A    Described me negatively to prospective
15     employers for me.
16          Q    And who is that?
17          A    One employer was -- I forget the name of
18     the law firm.  Oh, God.  What is that law firm's
19     name?
20               Bayard Personnel -- I mean, the
21     Bayard Firm.  The Bayard Firm.  And --
22          Q    What's the allegation -- are you saying
23     that they said something negative about you?
24          A    Oh, they did say something negative about
```

Helen Martin

Page 233

1    me.

2         Q    What did they say?

3         A    I don't know exactly what they said,

4    because I wasn't there.  But I didn't receive the job

5    because of a negative report from a former employer.

6         Q    And they didn't tell you what?

7         A    They didn't tell me what was said, no.

8         Q    Okay.

9         A    They just said it was a negative report.

10        Q    Okay.  Anybody else?

11        A    I can't think of the name of the firm,

12   but I know -- what's the name of that firm?  Oh, God,

13   it's in triple deuces.  My goodness.

14                   I don't know the name of the firm,

15   but I have it at home, because they received a

16   negative report as well.

17        Q    But you don't know from whom?

18        A    It definitely wasn't from Heckler.  I

19   know that.  It wasn't from Young Conaway, and I only

20   worked for three firms, including the firm I'm

21   working for now.  So --

22        Q    Have there been any documents that you --

23   because I asked you to produce all documents that

24   support your claim or that you are going to rely

Helen Martin

Page 234

1    upon.

2                    Other than your economic

3    information which you're going to produce --

4        A    Right.

5        Q    -- and that one document that you say

6    should have been in that packet, are there any other

7    documents that you have?

8        A    Not that I presently have.  I'm expecting

9    a package to come today.

10       Q    From whom?

11       A    From people that I know that has been

12   sending me stuff in the home.  That's how I've

13   generated this stuff.

14       Q    All right.  What people are sending you

15   what stuff?

16       A    Various people.  I have a letter out to

17   the phone company requesting my phone bill.

18       Q    What's that have to do with it?

19       A    Because I talked to you, prior to you

20   taking this case on, on the phone.  You and I talked

21   about this case before.

22       Q    We talked about your case?

23       A    Yes.

24       Q    When was that?

Helen Martin

Page 235

1        A    In January of '03.

2        Q    Well, we opposed your unemployment.

3        A    No, even before it even got to that

4    extent.  I had talked to you on the phone referencing

5    this information.

6        Q    Well, we have no record of that.

7        A    I'm sure you don't.

8        Q    Did you retain me?

9        A    No.  You called me back, and you and I

10   discussed it.  And you never said that you

11   represented them or anything.  And I never heard from

12   you again.

13       Q    And you called when?

14       A    It was in January of '03.

15       Q    Well, I don't have any recollection of us

16   talking.

17       A    No problem.  I understand.  Can't

18   remember everything.

19       Q    Well, did you ever raise this when we

20   were representing Pachulski during the unemployment,

21   for years?

22       A    No.  Because I wasn't even sure if it was

23   you or not.  I wasn't sure if it was you or not.

24       Q    And you're seeking to find out when it

Helen Martin

Page 236

1    was?

2         A    Because you wasn't always here at Mill

3    Road.  You used to be downtown.  When I talked to

4    you, you were still downtown.  When I talked to you

5    on the phone, you were downtown.

6         Q    You talked to me or you -- are you

7    alleging a conflict of interest?

8         A    I did talk to you.  You and I talked on

9    the phone.  I called and left a message.  In turn,

10   you called me back.

11        Q    Okay.  And are you alleging a conflict of

12   interest?

13        A    Oh, I definitely know it's a conflict of

14   interest, but I have to have proof for that.  That's

15   why I have a request from the phone company for

16   records.

17        Q    Okay.  Well, what -- you never -- I guess

18   you're alleging you never came in; correct?  Never

19   retained us?

20        A    No, I didn't.

21        Q    Okay.  And when we entered our appearance

22   on behalf of Pachulski fighting your unemployment,

23   briefing it and all that stuff, you never raised this

24   issue?

Helen Martin

Page 237

1          A     No, I never raised this issue, because --

2          Q     And then when we defended this lawsuit,

3     you've never raised this issue?

4          A     The issue for the unemployment came after

5     I had even talked to you on the phone.

6          Q     My point is, you've never raised this

7     issue?

8          A     Because I wasn't even certain if it was

9     you or not, because I didn't know that you had moved

10    here.  The correspondence that I'm getting from you

11    is from Mill Road, not from downtown.  When I talked

12    to you, you were downtown.  You weren't always here.

13                    So in 2003, you were still downtown

14    on Market Street.  I want to say 1220.  I could be

15    wrong.  But I know you weren't here.

16         Q     Well, 2003, in connection with -- I guess

17    our defense -- in 2003, we were not in this office.

18         A     No, you wasn't.  When I talked to you in

19    January of '03, no, you were not here.  I know you

20    weren't here.  You were on Market Street somewhere.

21    Exactly where, I'm not sure.

22         Q     Well, I was on Market Street.  My

23    question is, though, in 2003, we were representing

24    Pachulski --

Helen Martin

Page 238

1        A    Yes, for the unemployment.

2        Q    And fighting the unemployment.

3        A    Yes.

4        Q    And my point is, you never raised any

5    conflict issue.

6        A    Yes, because I wasn't certain if that was

7    you or not.

8        Q    Well, we'll look at the records.  And I

9    can represent to you, I don't believe I was ever

10   retained or provided any advice of any --

11       A    No.  We just verbally communicated over

12   the phone and I told you what was going on and what

13   was about to take place, what I was about to do.  We

14   discussed it in a little bit of detail on the phone.

15       Q    Did you say I gave you advice?

16       A    Oh, no, you didn't give me no advice.

17   No, you didn't give me any advice.

18       Q    All right.  Well, we'll look at that.

19   And if you feel there's a conflict of some sort, then

20   we've got to raise that with the Court.  If you don't

21   think that creates a conflict, then that's something

22   that's separate.

23       A    Well, I can't really say, because I don't

24   know.  That's why I'm going to request the

Helen Martin

Page 239

1    information from the phone company.

2              Because like I said, I called you,

3    and in turn, you did call me back.  And I do remember

4    that you were not here.  You were not located here.

5    You were still downtown when I called.  Because I

6    left a message on your answering machine and you

7    called me about back -- you called me back.

8         Q    Okay.

9         A    And that was in January of '03.  That was

10   Definitely in January of '03.

11        Q    Okay.  But my point, I think, is that for

12   the last four years you've known I represented

13   Pachulski, but you've not raised this until just now?

14        A    Again, because I wasn't sure if you were

15   the same person or not.

16        Q    Okay.  What else are you waiting for?

17   What other documents?

18        A    Just -- I'm waiting for two people to

19   contact me back as far as them writing a letter of

20   reference of this and having it notarized.  So I need

21   them to call me back so I can get their address to

22   send them written documentation on my behalf so that

23   they can write to you or whatever.  Because I was

24   just going to ask them to draft a letter and have it

A247

Helen Martin

Page 240

1    notarized and mail it.

2         Q    This is from a former employer of some

3    sort?

4         A    Yes.

5         Q    Okay.

6         A    And have it notarized and send it to

7    the -- you know, just mail the original to the court

8    or whatever.

9              MR. WIER:  All right.  Let's take a

10   break for a minute.

11             (Discussion off the record.)

12             MR. WIER:  Thank you, Ms. Martin.

13   I don't have anything else.  You can waive reading of

14   the transcript.

15             My recommendation is you'll get a

16   copy of the transcript, and you'll get what's called

17   an errata sheet; and that just simply means that you

18   go through the transcript to see if it's inaccurate.

19             But you can't change it

20   substantively; but if there's a typo or there's

21   something that's incorrect, then you have to correct

22   it on that errata sheet.

23             THE WITNESS:  Okay.  All right.

24             (Deposition concluded at 1:15 p.m.)

**A248**

Helen Martin

Page 241

1                       C E R T I F I C A T I O N

2

3

4              I hereby certify that I have read

5    the foregoing transcript of my deposition testimony,

6    and that my answers to the questions propounded, with

7    the attached corrections or changes, if any, are true

8    and correct.

9                       _____

10                      HELEN MARTIN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Helen Martin

Page 242

```
1                      I N D E X

2   WITNESS:
                                                    PAGE
3   HELEN MARTIN

4      Mr. Wier
                                                     2
5

6                    E X H I B I T S

7   MARTIN        DESCRIPTION              PAGE

8    1          Charge of Discrimination
                                                     2
9    2          Referee's Decision on
                Unemployment                        51
10
     3          No Cause Finding from Delaware
11              Department of Labor                 51

12   4          Right to Sue letter from EEOC
                                                    51
13   5          Complaint in USDC case
                                                    53
14   6          Denial of Appeal by Judge Cooch
                                                    55
15   7          Appeal in Superior Court case
                                                    56
16   8          Supplemental brief in Superior
                Court case                          56
17
     9          Hearing transcript
18                                                  58

     10         Response of Pachulski, Stang to
19              Department of Labor                 160
                discrimination charge
20
     11         Plaintiff's Rule 26(a)
21              disclosures                         171

22

23

24
```

Helen Martin

Page 243

1          CERTIFICATE OF SHORTHAND REPORTER

2

3               I, Gail Inghram Verbano, CSR, RMR,

4     CLR, the officer before whom the foregoing

5     proceedings were taken, do hereby certify that the

6     foregoing transcript is a true and correct record of

7     the proceedings; that said proceedings were taken by

8     me stenographically and thereafter reduced to

9     typewriting under my supervision; and that I am

10    neither counsel for, related to, nor employed by any

11    of the parties to this case and have no interest,

12    financial or otherwise, in its outcome.

13

14

15

16                    _Gail Inghram Verbano_____

17                    Gail Inghram Verbano, CSR, RMR, CLR
                      CSR No. 8635
                      Certification No. 220

18                    (Expires 1-31-2008)

19

20

21

22

23

24

A251

2 0

# DEPARTMENT OF LABOR

## STATE OF DELAWARE

HELEN MARTIN )   APPEAL DOCKET: 148528
                 )
       v. )   Hearing:        5/14/03
                 )
PUCHULSKI STANG )   Place of Hearing:  Wilmington

Department of Labor
Division of Unemployment Insurance Appeals
4425 N. Market Street
P.O. Box 9950
Wilmington, Delaware  19809

BEFORE:

           BETTINA C. FERGUSON, Appeals Referee

APPEARANCES:

           HELEN MARTIN, Claimant

Witnesses:

## TRANSCRIPT OF HEARING

2 1

1

THE REFEREE:                    This is the Unemployment

Insurance Appeals Hearing in the matter of Martin and Puchulski Stang.  The

hearing is being held on May 14, 2003.  We are back on the record of Martin

and Puchulski Stang.  There was a malfunction of the tape cassette and the

tape was coming out.  Ms. Martin do you agree we did not discuss the case

while I was fixing the tape?

HELEN MARTIN:                    Correct we didn't.

THE REFEREE:                    Thanks.  So I said this the

Unemployment Insurance Appeals Hearing in the matter of Martin and

Puchulski Stang.  The hearing is being held May 14, 2003 at around 11:00

a.m. at the Department of Labor, 4425 N. Market Street, Wilmington,

Delaware.  The docket number is 148528.  The hearing is being held by

Bettina C. Ferguson, Appeals Referee.  Present also for the hearing is the

claimant, Helen D. Martin.  The employer has not telephoned in as they were

directed to do on the hearing notice.  This is the claimant's appeal from a

Deputy determination issued on April 21, 2003.  The claimant filed a timely

appeal on April 21 also 2003 and actually that date of the Deputy decision is

not correct that I read.   Who ever wrote it on the appeal made an error.

That decision was dated 4/11/2003 and so the appeal filed on the 21st is still

timely.  I will read the findings and fact made by the Department in the

determination that is being appealed.  They read as follows:  The claimant

**A253**

22

2

1   filed for benefits effective March 20, 2003.  She was employed from

2   January 10, 2000 through January 27, 2003 she resided.  The claimant

3   stated she resigned due to job related stress.  The claimant stated she spoke

4   to a senior partner concerning the stress, however, there was no relief.  She

5   further stated the problem started to rise more than a year ago and she

6   stayed on hoping things would get better, however, they did not.  In a

7   resignation situation the burden of proof is on the claimant to establish good

8   cause for resignation.  Section 3315 1 of Delaware Unemployment Law

9   mandates that prior to resigning a position the individual must exhaust all

10  administrative remedies available in order to correct problems associated

11  with the job.   There is not such evidence of such a condition exists in this

12  case.  Based on the information obtained it is determined the claimant

13  voluntarily quit her position for personal reasons and therefore is disqualified

14  from the receipt of benefits.  So that is the issue today, whether the

15  claimant voluntarily quit without good cause and therefore is disqualified.

16  Ms. Martin the law of Delaware requires testimony be under oath or

17  affirmation.  Do you have any objection of swearing on the bible?  Some

18  people prefer to affirm?

19         HELEN MARTIN:           No.

20         THE REFEREE:            Will you place your right hand

21  on that bible there?  Do you Helen D. Martin solemnly swear the testimony

**A254**

3

1    you are about to give this tribunal shall be the truth, the whole truth and

2    nothing but the truth so help you God?

3    　　　　HELEN MARTIN:　　　　I do.

4    　　　　THE REFEREE:　　　　Thanks very much.  Well Ms.

5    Martin the procedure is this.  In a voluntary quit case the burden of proof is

6    on the claimant and yours is the only testimony that I am going to be taking

7    today.  At the beginning I will ask you some basic questions about your

8    employment and then I will ask you to explain what happened and why you

9    don't work there anymore.  I may have a few questions and then I will

10   conclude the hearing and I will issue a written decision in less than 30 days

11   and that should be a great deal less than 30 days barring some unforeseen

12   circumstances.  A copy will be mailed to you and to the employer and if

13   either side has any dissatisfaction with the decision there is a right of further

14   appeal.  The next appeal step goes to the Unemployment Insurance Appeals

15   Board and finally these proceedings are being tape recorded so make all your

16   responses nice and clear as you have been doing so far.  Ms. Martin do you

17   have any questions about what we are going to do here today?

18   　　　　HELEN MARTIN:　　　　No.

19   　　　　THE REFEREE:　　　　Okay.  Ms. Martin is it

20   pronounced Puchulski Stang?  Am I doing that right?

21   　　　　HELEN MARTIN:　　　　Yes.

**A255**

24

4

1       THE REFEREE:            Okay when did you start

2    working there?

3       HELEN MARTIN:           January of 2000.

4       THE REFEREE:            Okay and when was the last

5    day you actually went in and performed services?  We got a 2003 calendar

6    up there if it helps.

7       HELEN MARTIN:           January 14, 2003,

8       THE REFEREE:            Okay what was your job at that

9    time?

10      HELEN MARTIN:           Supervisor for the file.

11      THE REFEREE:            For what?

12      HELEN MARTIN:           For file room.  File room.

13      THE REFEREE:            Oh sorry.  My ears, supervisor

14   for the file room.  Okay and your rate of pay at that time?  Ballpark figure.

15      HELEN MARTIN:           I think my hourly rate when I

16   left was $18.96.

17      THE REFEREE:            Okay.

18      THE REFEREE:            You were full-time?

19      HELEN MARTIN:           Yes.

20      THE REFEREE:            Where was this work

21   performed?

25

5

1    HELEN MARTIN:              At 919 Market Street, Suite

2    1600.

3    THE REFEREE:               Okay so we sent the notice to I

4    guess the parent organization in California.

5    HELEN MARTIN:              Right.

6    THE REFEREE:               But you worked here.

7    HELEN MARTIN:              Right.

8    THE REFEREE:               Okay.  Well what happened?

9    Why don't you work there any more?

10    HELEN MARTIN:              Basically I resigned due to

11    stress that accumulated over the three-year period that I was there.  In 2000

12    personnel failed to discipline employees for things that they were doing

13    repeatedly.   Directions wasn't followed...

14    THE REFEREE:               They failed to discipline?

15    HELEN MARTIN:              Yes.

16    THE REFEREE:               Okay.

17    HELEN MARTIN:              Employees were following

18    directions.  They were using the personal computer, the Internet for personal

19    use and numerous things occurred.  The first year you think okay we are

20    new.  Everybody is new to this so we got to like wean out the bad things

21    okay.  2001 rolled in.  We had an employee that she stole documents and

**A257**

1    hid them sensitive information.  Again she was never reprimanded for what

2    she had done and it was a sad situation due to the fact that she didn't

3    directly steal them from me but one of the other people that I supervise she

4    was new and she was worried you know that whole night you know if she

5    was going to be fired the next day if we don't find the documents and no

6    one let her to believe that but if someone took something that you was

7    working on we would probably feel the same.  Numerous problems still

8    occurred with these employees.  They still were not disciplined.  It went

9    from bad to worst.  I talked to personnel and in the interim they explained to

10   me in order for them to terminate someone they had to build a case and I

11   couldn't understand whey they had...

12          THE REFEREE:                Okay well hold on a second.

13   You spoke to personnel and you said and when was that?  You first spoke to

14   personnel.

15          HELEN MARTIN:               I first spoke to personnel in

16   August of 2000.

17          THE REFEREE:                Okay and they said they had to

18   build a case.

19          HELEN MARTIN:               Exactly.

20          THE REFEREE:                Okay.  Go ahead.

27

7

1    HELEN MARTIN:                She said she had to build a

2    case.  I had, it wasn't a part of my job.  I just took it upon myself to give

3    people one on one basically just to find out if you know how they enjoyed

4    their job.  If they wanted to be, if they were doing something that they

5    didn't like just to make things overall fun for the whole entire department.  I

6    had documentation here where I took monthly one on one then I would share

7    information with my co-workers which were the people that I supervised and

8    we would talk about different things referencing our discipline, what we

9    need to do as far as to make the job...

10   THE REFEREE:                These were co-workers or

11   people that you supervised?

12   HELEN MARTIN:                They, well they were my people

13   that I supervised but I considered them as my co-workers.

14   THE REFEREE:                Okay.

15   HELEN MARTIN:                Okay.  I didn't have it to the

16   point where I was better than them because I was the supervisor.  I worked

17   right along with them.  Then like I said things continued to happen.  In 2001

18   when the Nation was under attack that day one of the senior partners were

19   in our office and I had received an email from the ...

20   THE REFEREE:                You need to talk a little bit

21   slower okay.

**A259**

2 8

8

1    HELEN MARTIN:    I am sorry.

2    THE REFEREE:    Okay senior partner is in the

3    office.  Okay go ahead.

4    HELEN MARTIN:    This was on 9/11 and we had

5    received an email from our San Francisco office explaining that their office

6    was closing because nobody in the nation knew exactly what was going on.

7    All we knew is that something was going on.  I had ran around to the file

8    room.  I pulled my whole crew together and I asked...

9    THE REFEREE:    You did what?  Sorry, slow

10    down.

11    HELEN MARTIN:    I am sorry.

12    THE REFEREE:    You went around to the file

13    room and did what?

14    HELEN MARTIN:    I pulled the whole entire crew

15    together...

16    THE REFEREE:    Staff, okay.

17    HELEN MARTIN:    I got my staff together and I

18    explained to them if we all worked together we can finish our daily work and

19    we could leave if the firm says that is was going to shut down.

20    THE REFEREE:    Okay.

9

1    HELEN MARTIN:                This was agreed upon verbally.

2    All of us agreed.  About a half hour later the senior partner and one of our

3    attorneys in the Delaware office they came to my office when I...

4    THE REFEREE:                 Okay you are going to have to

5    slow down ma'am.

6    HELEN MARTIN:                Sorry.

7    THE REFEREE:                 I don't know how to tell you

8    again.  Okay I will tell you as many times as I have to but I don't want, you

9    obviously don't want me to miss anything you are telling me.

10    HELEN MARTIN:                Right.

11    THE REFEREE:                 Okay.

12    HELEN MARTIN:                Okay.

13    THE REFEREE:                 All right so you said the senior

14    partner was in the office and what did that senior partner do?

15    HELEN MARTIN:                He approached me and told me

16    that he was in charge and what he said went and I am like okay fine.  He

17    obviously didn't know what had occurred previously and he never bothered

18    to find out from me being a supervisor what exactly was going on.

19    THE REFEREE:                 Okay.

30

10

1       HELEN MARTIN:                During the after that two

2   employees that we continuously have problems with they had went to him

3   and told him that I was making them stay there and that wasn't true.

4       THE REFEREE:                When did they tell him that?

5       HELEN MARTIN:                They must have told him that a

6   couple, it probably was like I'll say it was 15 to 20 minutes prior before he

7   appeared at my door.

8       THE REFEREE:                Okay.  Okay go ahead.

9       HELEN MARTIN:                Okay and at that particular time

10  I quit.  The senior partner...

11      THE REFEREE:                You quit then in 01?

12      HELEN MARTIN:                Yes.

13      THE REFEREE:                Okay.

14      HELEN MARTIN:                That was my second time

15  quitting.  I just walked off the job.

16      THE REFEREE:                Okay I need, did, we need to

17  get into 2003 a little bit.  I mean you are giving me background but you quite

18  and did you come back to work after that?

19      HELEN MARTIN:                Yes I did.

20      THE REFEREE:                And when did you come back

21  to work?

1       HELEN MARTIN:                It was September.  I even

2   remember the exact date but it was September of 2001.

3       THE REFEREE:                Was there any gap in your pay?

4       HELEN MARTIN:                No they paid me.

5       THE REFEREE:                Okay.

6       HELEN MARTIN:                Or if they didn't I had vacation

7   or something.

8       THE REFEREE:                Okay.  All right so now you are

9   back to work.

10      HELEN MARTIN:                Okay so this is 2001.  So we

11  are near the end of 2001.  Okay now during this time we had employees

12  there that we would meet with Mary Johnson which was the personnel

13  person and we had an employee there that we...

14      THE REFEREE:                Okay, whoa, whoa, whoa.

15  Who is we?

16      HELEN MARTIN:                The file room would meet with

17  personnel.

18      THE REFEREE:                Now at this point I do have to

19  change, turn the tape over.  Okay we have the claimant.  I was concerned

20  about the tape.  We are back on the record in Martin and Puchulski Stang.

1    Ms. Martin do you agree we didn't discuss the case while we were off the

2    tape.

3        HELEN MARTIN:                No we didn't.

4        THE REFEREE:                Thank you.  Okay so the file

5    room personnel during this time.

6        HELEN MARTIN:                Okay we spoke with Personnel

7    and we explained our concerns and our concerns was again we had

8    employees that wasn't listening.  They were just doing what they wanted to

9    do and there was no disciplined given to these employees.  At this particular

10   time I had stopped giving this employee a one on one.  2002 same problems

11   continued...

12       THE REFEREE:                Okay slow up, stopped giving

13   this employee a one-on-one.  And now we are up to 2002.  Okay go ahead

14       HELEN MARTIN:                Same problems still occurring.

15   These problems effected other new personnel arriving into the firm.

16   Continuing on they finally terminated one employee around April of 2002.

17   She was just, it was just a lot for me there.  Now we are still in 2002.  We

18   just moved right along to August of 2002.  I had two employees there that I

19   supervised and they both had personal hygiene issues.  All the people in the

20   file room we talked about it.  Discussed it on numerous issues.  I tried to not

1    go to personnel and just talk to them one-on-one which when I gave them

2    their one-on-one in July I mentioned to everyone...

3        THE REFEREE:            Mentioned to the other people

4    too that she had...

5        HELEN MARTIN:           I mentioned personal hygiene to

6    everyone because I didn't want them...

7        THE REFEREE:            Okay to be singled out.

8        HELEN MARTIN:           ... to be singled out, no. I

9    mean I don't know much about personnel but some things I know that are

10   right, just common sense. At that particular time it continued to get worse.

11       THE REFEREE:            The hygiene?

12       HELEN MARTIN:           Yes. The personal hygiene

13   continued to get worse. In August another employee came on board. At

14   this particular time Personnel was aware of this problem.

15       THE REFEREE:            The personal hygiene problem?

16       HELEN MARTIN:           Yes.

17       THE REFEREE:            Okay.

18       HELEN MARTIN:           Okay. We had a big meeting

19   and the senior partner she was involved in it and she discussed, we talked

20   about numerous things. We talked about attitude, duties, personal hygiene,

21   equipment, breaks, lunch.

34

14

1    THE REFEREE:    Who, just you and the senior

2    partner?

3    HELEN MARTIN:    The senior partner, the

4    personnel manager and the entire file room.

5    THE REFEREE:    Okay.

6    HELEN MARTIN:    Okay and we really stressed

7    personal hygiene. All right. Now during the course of this probably early

8    fall, I would say October, the senior partner came to my office and she

9    explained that she did not want me to say anything to the individuals

10   referencing personal hygiene, nor did she want the personnel manager and

11   she asked me to find an employee that could do this endure discretely

12   without the rest of the file room knowing and that...

13   THE REFEREE:    Hold on a second. Going to

14   have to slow down.

15   HELEN MARTIN:    I am sorry.

16   THE REFEREE:    I am not sure all of this is

17   relevant but I am writing it down. Okay go ahead. Find somebody else to

18   do it.

19   HELEN MARTIN:    Exactly so I did find an

20   employee to do it. A co-worker to do it and at that particular time the co-

15

1  worker did express to them and he handled it.  The problem still exists

2  continuously.

3      THE REFEREE:              It continued to exist

4  afterwards?

5      HELEN MARTIN:              Yes.  Okay keep in mind that

6  management has not talked to either of these individuals and when I tell you

7  this was atrocious odor this was atrocious odor.

8      THE REFEREE:              Okay, okay.

9      HELEN MARTIN:              The problem still existed.  We

10  are moving into the winter of 2002.  The personal hygiene problem still

11  exists, attitude still exists, people still not doing their jobs.  We had

12  equipment problems with the copier, the printer.  I had eight people printing

13  to two printers.

14      THE REFEREE:              Okay.

15      HELEN MARTIN:              I had to ask for additional

16  printer in June.  Of 2002 it was approved.  Everything was taken care of and

17  it was still December we had not received the equipment.  Not to mention

18  we also had problems with the copier.  In December it was when the

19  pressure was really applied to me.

20      THE REFEREE:              Who applied pressure to you?

21      HELEN MARTIN:              I lost an employee.

1          THE REFEREE:                    You lost an employee?

2          HELEN MARTIN:                   Right.  I lost, she quit and she

3    quit for the reason that I am sitting here stating to you today.

4          THE REFEREE:                    Let's focus on you.

5          HELEN MARTIN:                   Okay.  I also lost another

6    employee.  The first employee that I lost I had a conversation with one of the

7    new...

8          THE REFEREE:                    Okay I am really not, I am

9    having trouble getting the relevance of this.  I need to know why you quit.

10   Not why anyone else quit.

11         HELEN MARTIN:                   Okay.

12         THE REFEREE:                    Pressure, I asked you, you said

13   pressure was being applied to you.  I asked you what, well who was

14   applying.

15         HELEN MARTIN:                   Okay.

16         THE REFEREE:                    Or was it just the surrounding?

17         HELEN MARTIN:                   They were the surroundings.  It

18   became very hostile.

19         THE REFEREE:                    Who was hostile?

20         HELEN MARTIN:                   The senior partner.

1    THE REFEREE:    And tell me what the senior

2    partner did that was hostile?

3    HELEN MARTIN:    She used vulgarity towards me

4    and...

5    THE REFEREE:    Tell me exactly what she said

6    and tell me when she said it.  I mean I notice you are checking notes but

7    they are not really helping me that much.  I really need to hear from you and

8    direct this in some kind of direction.

9    HELEN MARTIN:    Okay.

10    THE REFEREE:    Senior partner was hostile to

11    you.  You said she was vulgar.  First of all tell me when did this happened?

12    HELEN MARTIN:    On December the 29th.  Wait a

13    minute.  What ever that Monday was.

14    THE REFEREE:    Last year over here 2002.

15    December 29 was a Sunday so December 30th.

16    HELEN MARTIN:    Yes December 30th.

17    THE REFEREE:    Okay and what did she say as

18    best as you can remember?

19    HELEN MARTIN:    She pulled me into her office,

20    she, I and the personnel manager and explained...

21    THE REFEREE:    Personnel manager was there?

1    HELEN MARTIN:                Yes and she explained to us

2    that she was disappointed in both us and she didn't have time for the

3    necessary bullshit that was going on.  Not to mention that she was

4    disappointed in me due to the fact that I did not remind the...

5    THE REFEREE:                Slow down please.

6    HELEN MARTIN:                Sorry.

7    THE REFEREE:                Slow down.  Maybe you would

8    do better if you didn't read.  Sometimes when people bring things to read or

9    notes, I know you are not reading like word from word but sometimes people

10   bring notes they go much too fast.

11   HELEN MARTIN:                Okay.

12   THE REFEREE:                Where if they would just sit

13   there and just tell me in their own words...

14   HELEN MARTIN:                Okay.

15   THE REFEREE:                ...You can keep that there

16   because I don't want you to forget anything.

17   HELEN MARTIN:                I won't.

18   THE REFEREE:                Okay she was extremely

19   disappointed.  No time, something.  No time for the bullshit you said.

20   HELEN MARTIN:                She said she didn't have no

21   time for the bullshit.

19

| | | |
|---|---|---|
| 1 | THE REFEREE: | Okay. |
| 2 | HELEN MARTIN: | And we both needed to focus |

on our jobs and get our act together due to the fact that I did not remind the

personnel manager to do her job.  She doesn't have time for this type of

bullshit and the mother fucking shit needs to stop.

THE REFEREE:                    Okay.  Okay thank you.  And

what happened then?

HELEN MARTIN:                    At that particular time I told her

I wanted to express my feelings towards the personnel manager first and

then I would talk back to her and I explained to the personnel manager that

no one has to remind me when I am short staffed to get up a 4 o'clock in

the morning to be there at 5 a.m. so that the file room can be opened.  If I

am short staffed...

THE REFEREE:                    Hold on just a second.  Your

feelings personnel manager, why were you saying this about being short

staffed that no one has to remind you?  Who had said that somebody has to

remind you?

HELEN MARTIN:                    The senior partner said that I

should have reminded Mary Ritchie, the personnel manager, to do her job.

THE REFEREE:                    Okay and so you are saying

nobody has to remind me to my job.

**A271**

40

20

1    HELEN MARTIN:            Exactly.

2    THE REFEREE:            Okay, okay.  Go ahead.

3    HELEN MARTIN:            And I explained to the

4    personnel manager that no only was it a problem with the printers that I had

5    asked for in April and it was approved in June that I did not receive, I also

6    asked for additional things like you know getting us a brand new copier.

7    Talking to the people, having a meeting, we, they scheduled meetings with

8    us that did not take place because of one thing or another and basically the

9    senior partner she was upset with me because I had went to other partners

10   and discussed my concerns referenced in the file room.

11   THE REFEREE:            Okay.

12   HELEN MARTIN:            And she was a little upset at

13   me and from that point on it went downhill.

14   THE REFEREE:            Okay.  Go ahead.

15   HELEN MARTIN:            These are just emails and things

16   but to sum it up these are a bunch of emails that...

17   THE REFEREE:            Okay we are now at the end of

18   December?

19   HELEN MARTIN:            Right.

20   THE REFEREE:            Okay now what caused you to

21   quit on January 14?

**A272**

41

21

1          HELEN MARTIN:             On January 14 I received this

2    Christmas card from one of the people that worked there with me and in this

3    Christmas card this young man states that when he came for his interview

4    the personnel manager described me as being straight forward and blunt.

5    Okay not to mention all the other stuff that I had put up with.  For her to tell

6    people that is coming into that company that I am straight forward and blunt

7    she shouldn't have been discussing my character at all.

8          THE REFEREE:          Okay.

9          HELEN MARTIN:            That was wrong.  It was totally

10   wrong and actually after I sat back and thought about it out of all the people

11   that work there it was other people there that treated me very nasty and

12   they knew and I am like did she tell these people this during their interview.

13        THE REFEREE:          Okay.  Whom did you complain

14   to about the way the senior partner was treating you?

15        HELEN MARTIN:         I talked to the management

16   committee which is in the California office.

17        THE REFEREE:         When did you do that?

18        HELEN MARTIN:         I talked to her on, she came to

19   the office I think on the 13th of January.  What ever that Monday was after

20   the holiday.

21        THE REFEREE:         Okay.

**A273**

42

22

1    HELEN MARTIN:    And I spoke, well actually she

2    sent me an email because I had gave them my resignation letter that

3    Monday. She sent me an email asking me to come talk to her and I wouldn't

4    talk to her and I explained to her what was going on which none of it was

5    new to her because she knew about it. I talked to them numerous times.

6    THE REFEREE:    Okay. She just said clink she

7    didn't know anything about it. Tell me about the times that you did talk

8    before you submitted your resignation.

9    HELEN MARTIN:    Numerous times.

10    THE REFEREE:    Well.

11    HELEN MARTIN:    I talked to, like I said in 2000, I

12    talked to Management Committee...

13    THE REFEREE:    Okay how about let's talk about

14    2002. When did you complain to people in 2002?

15    HELEN MARTIN:    I complained in 2002, January,

16    February, the whole entire year. It was constantly complaints.

17    THE REFEREE:    I need more specifics.

18    HELEN MARTIN:    As far as the complaints?

19    THE REFEREE:    Yeah.

20    HELEN MARTIN:    Okay the complaints...

**A274**

1    THE REFEREE:                    Let me explain why.  When we

2    look at somebody who quits because maybe they are under stress or there is

3    a change or what ever we then look to see what efforts they made to allow

4    the management to correct the situation so that the person can stay

5    employed and so I need specifics.  When I render my decision I am going to

6    have to put in you know that you tried on this day, this day, this day...

7    HELEN MARTIN:                    Okay.

8    THE REFEREE:                    ...You know let them know that

9    you were going to quit or something like that.  Whatever the truth is.  I am

10   not putting words in your mouth.

11   HELEN MARTIN:                    No problem.  Okay.

12   THE REFEREE:                    Hold on just a second.

13   HELEN MARTIN:                    In January 2000 when I had my

14   review....

15   THE REFEREE:                    Let's get to 2002.

16   HELEN MARTIN:                    I am sorry.  I mean 2002...

17   THE REFEREE:                    That is all right.  January 2002

18   you had your review.

19   HELEN MARTIN:                    I had my review and at that

20   particular time I told them that I wasn't happy with the people that I was

*4 4*

24

1  supervising and a lot of those people needed to be terminated due to the fact

2  that they weren't following company procedures.

3  THE REFEREE:  And what did they do?

4  HELEN MARTIN:  Nothing.

5  THE REFEREE:  All right.

6  HELEN MARTIN:  Okay.  I also talked to them

7  again in March of 2002 and the same thing people not following procedures

8  and you know it is a big circus there.

9  THE REFEREE:  Now who did you talk to in

10  March 2002?

11  HELEN MARTIN:  I talked to personnel manager in

12  the Delaware office, Mary Ritchie Johnson.

13  THE REFEREE:  Okay and is that the same

14  person that did your review?  That you talked to in January of 02?

15  HELEN MARTIN  Yes and when she did my

16  review she did my review also with Donna Carr.  She is from the LA office.

17  THE REFEREE:  Okay so that is March.  And

18  again nothing happened?

19  HELEN MARTIN:  Nothing happened, nothing

20  happened.  All right, in April of 2002 it was, things were just totally out of

21  hand.  The whole entire file room was fed up.

45
25

1     THE REFEREE:     Okay who did you complain to?

2     HELEN MARTIN:     Mary Ritchie Johnson again.

3     THE REFEREE:     And that is the personnel

4 manager?

5     HELEN MARTIN:     Yes.

6     THE REFEREE:     And what did the personnel

7 manager do about it?

8     HELEN MARTIN:     She finally fired one of the

9 people.

10     THE REFEREE:     Okay.

11     HELEN MARTIN:     Okay.

12     THE REFEREE:     All right.  Now that is April.

13     HELEN MARTIN:     Then, let me find the date that

14 it was on, In May of 2002 the same problem still occurred, different

15 employees, you know just totally non-professional.  I mean...

16     THE REFEREE:     Okay and who did you complain

17 to?

18     HELEN MARTIN:     Mary Ritchie Johnson again.

19     THE REFEREE:     Okay and what did she do?

20     HELEN MARTIN:     Nothing.

21     THE REFEREE:     Okay.

1   HELEN MARTIN:           Nothing.  In June, I am sorry, in

2   April we had a big meeting with the senior partner and she talked to us

3   about different things, the work ethics, people coming to work and it is their

4   job to do what they are suppose to.

5   THE REFEREE:           Did you make any complaint at

6   that meeting?

7   HELEN MARTIN:           Yes I did.

8   THE REFEREE:           And what did you say

9   basically?

10  HELEN MARTIN:           My complaint was the same

11  thing.  People's attitude, personal hygiene, people not coming work,

12  disobeying company's policies and procedures.

13  THE REFEREE:           And what did the senior partner

14  do?

15  HELEN MARTIN:           Nothing.

16  THE REFEREE:           Okay go ahead.

17  HELEN MARTIN:           Okay in June we had a meeting

18  with the senior partner, Lori Davis Jones, and Mary Ritchie Johnson and at

19  this particular meeting we discussed the same issues and we asked for an

20  additional printer.

1          THE REFEREE:          You asked for an additional

2   printer.

3          HELEN MARTIN:         Yes, additional printer.

4          THE REFEREE:          Okay.

5          HELEN MARTIN:         And we also asked that we

6   needed to have a copy, a better copier.

7          THE REFEREE:          And they were approved or

8   not?

9          HELEN MARTIN:         Yes in June it was approved.

10         THE REFEREE:          But I understand they were not

11  received, correct?

12         HELEN MARTIN:         No they were not received.

13         THE REFEREE:          Okay how about July?

14         HELEN MARTIN:         July nothing.

15         THE REFEREE:          Okay.

16         HELEN MARTIN:         The same thing I talked to the

17  personnel manager again.  Same thing attitudes, duties, personal hygiene

18  and equipment.

19         THE REFEREE:          You talked to them again in

20  July?

21         HELEN MARTIN:         Yes.

48

28

1           THE REFEREE:                Okay.

2           HELEN MARTIN:            I talked to the personnel

3 manager every month after I had my one-on-ones with my people.

4           THE REFEREE:             Did you ever say that you were

5 going to quit if things didn't get better?

6           HELEN MARTIN:            No.

7           THE REFEREE:                Okay.

8           HELEN MARTIN:            No, I never said that.

9           THE REFEREE:             All right.  Okay now we are up

10 to July of 02.  What was it that you wanted personnel or the senior partner

11 to do?

12           HELEN MARTIN:            Basically all I wanted her to do

13 was just get us our equipment that we needed, which was an additional

14 printer.

15           THE REFEREE:             Yeah I understand.  You said

16 that.  Okay you wanted...

17           HELEN MARTIN:            Also she needed to like let

18 these people know that we are here to do a job and it had gotten to the

19 point it was so bad like I said...

**A280**

49
29

1      THE REFEREE:                Okay I want to focus on this

2    question.  In other words I want to know what management could have done

3    that would have kept you from quitting?

4      HELEN MARTIN:              They could have terminated

5    three people that needed to be terminated.

6      THE REFEREE:                Where those people ever

7    terminated?

8      HELEN MARTIN:              One of them was.

9      THE REFEREE:                Okay and that would have been

10    enough to save the job?

11      HELEN MARTIN:              Yeah if they would have got rid

12    of those three people and gave me my equipment I would still be there

13    today.   Do you think it was easy for me walk away from a job making the

14    kind of money that I making, no.  It hurt.

15      THE REFEREE:                Okay now and you, when you

16    complained about these people did you say they should be terminated?

17      HELEN MARTIN:              Yes I asked for them to be

18    terminated.

19      THE REFEREE:                Okay, all right.  We are up to

20    August.  What do you want to tell me about August?

**A281**

50

1        HELEN MARTIN:           August 2002 a new employee

2   came on board.

3        THE REFEREE:            Any complaints you made is

4   what I am looking at?

5        HELEN MARTIN:           Yes there was still the

6   complaints, still continued to grow.  The same complaints, people, personal

7   hygiene, people not coming to work and doing their, fulfilling their

8   responsibilities.

9        THE REFEREE:            And what did management do

10  about it?

11       HELEN MARTIN:           Nothing.

12       THE REFEREE:            Okay how about September?

13       HELEN MARTIN:           September was when we, the

14  same thing is continued on but then I had talked to the senior partner and I

15  got the employee to talk to the people that had the personal hygiene issue.

16       THE REFEREE:            Right but that didn't work?

17       HELEN MARTIN:           No it did not work.  It didn't

18  work.

19       THE REFEREE:            Okay.  October.

1        HELEN MARTIN:            All right in October, October I

2   had a problem and I have an email here where I had a problem with one of

3   the secretaries there and she...

4        THE REFEREE:            And did you make a complaint?

5        HELEN MARTIN:            Yes I did.

6        THE REFEREE:            To whom did you complain?

7        HELEN MARTIN:            Mary Ritchie Johnson and

8   Kathy Witt.

9        THE REFEREE:            And what did they do?

10       HELEN MARTIN:            Nothing.

11       THE REFEREE:            Okay, November.

12       HELEN MARTIN:            Okay, November one of the

13  secretaries, this was referenced in here in binders she came to me and she

14  explained to me she wanted to know why her secretaries were preparing

15  reminders for the Court and I explained to her that rightfully I don't think that

16  the file room actually received the agenda letters to prepare the hearing

17  binders which come to past that didn't happen but it was the file room's

18  fault anyway because in her email...

19       THE REFEREE:            Okay did you make any

20  complaints?

21       HELEN MARTIN:            Yes I did.

1          THE REFEREE:                    To whom did you complain?

2          HELEN MARTIN:                   Mary Ritchie Johnson.

3          THE REFEREE:                    And what was it that you were

4    complaining about?

5          HELEN MARTIN:                   The secretary approaching me

6    saying that my two people were just sitting around doing nothing while

7    secretaries were preparing hearing binders and I explained that we never

8    received the agenda letters.

9          THE REFEREE:                    So you complained about not

10   having received the agenda letters.

11         HELEN MARTIN:                   Exactly.

12         THE REFEREE:                    Who was suppose to give you

13   the agenda letters?

14         HELEN MARTIN:                   The paralegals or their

15   attorneys or the secretaries.

16         THE REFEREE:                    And you complained to whom?

17         HELEN MARTIN:                   Mary Ritchie Johnson.

18         THE REFEREE:                    And what did she do?

19         HELEN MARTIN:                   Nothing.

20         THE REFEREE:                    Okay December.  Now we are

21   getting up into the, up closer to the wire.

1    HELEN MARTIN:              Okay December on morning I go

2    to work.  As soon as I get there I received an email from one of my co-

3    workers, the person that I supervise, and she is telling me that people are

4    still giving, coming to the file room and incorrectly asking people to prepare

5    hearing binders like, when we prepare the hearing binders for the court we

6    prepare in two sets.  We are preparing a set for our attorneys in house as

7    well as for the Judge at the Court.

8    THE REFEREE:              Right.

9    HELEN MARTIN:              What will happen is that the

10   paralegals will come in and if they seen Christine Sentman was working on a

11   binder they would want to go to her and that is not the, that wasn't the

12   procedure and this was our ongoing occurrence to one of these young ladies.

13   THE REFEREE:              What were you to do?  Were

14   you suppose to like put in a central area where people could...

15   HELEN MARTIN:              Exactly.

16   THE REFEREE:              Okay.  Now I have to ask a

17   really stupid question.  Puchulski Stang was it a law firm or a...

18   HELEN MARTIN:              Yes.

19   THE REFEREE:              It is a law firm.

20   HELEN MARTIN:              Bankruptcy.

54

34

1          THE REFEREE:                    Okay gots you.  So but another

2    words they would say well this person is doing it so they would just give it

3    to her.

4          HELEN MARTIN:                    Exactly.

5          THE REFEREE:                    There would be people sitting

6    around doing nothing or other people would be complaining they didn't have

7    any work or...

8          HELEN MARTIN:                    No people never complained

9    that they didn't have to do their work.  Basically the whole thing in a nut

10   shell is that procedures weren't followed.

11         THE REFEREE:                    And you complained about this.

12         HELEN MARTIN:                    Numerous times.

13         THE REFEREE:                    And this particular incident in

14   December when you got an email from the co-worker.

15         HELEN MARTIN:                    Yes.  Totally out of hand.  That

16   went totally out of hand.

17         THE REFEREE:                    Any, any response to your

18   complaint?

19         HELEN MARTIN:                    None.

20         THE REFEREE:                    Okay.

21         HELEN MARTIN:                    None.

1    THE REFEREE:    Now why did you turn in your

2    resignation on the Friday before the 13th of January, on or about January

3    10th as you already testified?

4    HELEN MARTIN:    Okay January 10th...

5    THE REFEREE:    What was the straw that just

6    broke that camel's back?

7    HELEN MARTIN:    That Thursday before, let me

8    see, okay...

9    THE REFEREE:    There is a calendar up there.

10    HELEN MARTIN:    Okay January 13th was a

11    Monday.

12    THE REFEREE:    Right.

13    HELEN MARTIN:    So my anniversary was that

14    Friday the 10th, the 9th, that Thursday one of the people that had the

15    personal hygiene problem he was on his way to my office and one of the

16    personnel people was leaving my office so as she, she passed by him and I

17    noticed that she didn't leave immediately so he came into my office where I

18    was at and I smelled him instantly right so I went on and assisted him and he

19    went on and left and the personnel manager she came back into my office.

20    Well not the manager she is like the second personnel person...

21    THE REFEREE:    Okay.

**A287**

56

36

| | |
|---|---|
| 1 | HELEN MARTIN: |  She came back into my office |

1   HELEN MARTIN:          She came back into my office

2   and she told me that she smelled him.  That did it for me because I am like

3   you know I have been complaining and complaining and complaining to you

4   people and now you finally smell it.

5           THE REFEREE:          Okay.

6           HELEN MARTIN:          And when I am telling you it

7   was atrocious, it was atrocious.

8           THE REFEREE:          Okay.  Right.

9           HELEN MARTIN:          You know, so I went to the,

10   Mary Ritchie Johnson is the personnel manager and I explained that to her

11   and I am like you know she told me that she had talked to this young man

12   like around December 31st or something like that and I am like you know if

13   you talked to him and it is not working you know why should we continue to

14   be penalized here for this person.

15           THE REFEREE:          Okay.

16           HELEN MARTIN:          All right.  Then...

17           THE REFEREE:          So what did they do?

18           HELEN MARTIN:          Nothing.

19           THE REFEREE:          Okay so this was the 9th and

20   you discussion with the personnel manager how did that go?

**A288**

57

37

1        HELEN MARTIN:            Nothing, I mean nothing came

2    about it.  I mean he still works there.

3        THE REFEREE:            Did she say oh yeah I am going

4    to fire him tomorrow or anything?

5        HELEN MARTIN:            No.  She did not.

6        THE REFEREE:            Okay.  So that is January 9th.

7    Anything else happen on January 9th?

8        HELEN MARTIN:            That was at the end of the day

9    for me.  I just went home.

10        THE REFEREE:            Okay now you wake up it is

11    January 10th, your anniversary here.

12        HELEN MARTIN:            On January 10th it is my

13    anniversary date, right, and something happened that morning, that Friday

14    morning.  I don't exactly recall what happened that Friday morning but

15    something happened that Friday morning.  Oh, um, what had happened I had

16    typed my resume up that day and I sent it, I didn't mean to send it but I sent

17    it anyway but I was able to forward the emails back so sometime during the

18    course of the day the senior partner called me and she was like I got your

19    resume and I seen that you forwarded it back from other people and I was

20    like yes.

21        THE REFEREE:            What do you mean pulled back?

**A289**

58

38

1    HELEN MARTIN:                Yes.  She, like on their

2    computer if you send an email and you don't want, if people haven't opened

3    it up you can pull it back before they have a chance to read it.

4    THE REFEREE:                Okay who, you had sent, you

5    had put your resume, sent your resume as part of an email?

6    HELEN MARTIN:                Yes I did an email and paper

7    form too.

8    THE REFEREE:                To whom?

9    HELEN MARTIN:                I sent it to...

10   THE REFEREE:                To somebody outside the

11   business?

12   HELEN MARTIN:                No.

13   THE REFEREE:                Oh, okay.

14   HELEN MARTIN:                I sent it to the management

15   committee, the senior partners, the people that I work directly with...

16   THE REFEREE:                Were you trying to get a

17   transfer or what were you doing just updating it because it was your year

18   anniversary?

19   HELEN MARTIN:                No I actually had already typed

20   my resume, I mean, not my resume, my resignation.

**A290**

39

1    THE REFEREE:         Oh resignation.  Okay that is

2    why I was confused.

3    HELEN MARTIN:         Please forgive me.

4    THE REFEREE:         That is quite all right.  So you

5    typed your resignation and you emailed but you pulled it back.

6    HELEN MARTIN:         Right, I didn't, I wasn't ready to

7    send it then but I had already sent it so there was nothing I could do about

8    it.

9    THE REFEREE:         Now you see why I was asking

10   that question.

11   HELEN MARTIN:         But I had already sent it.  That

12   Friday morning when I went in I had already sent it but I was able to pull it

13   back because I wasn't ready to send it then because I had set it up so that it

14   could go on the 13th.

15   THE REFEREE:         Okay.

16   HELEN MARTIN:         Okay but during the interim of

17   that I pulled back the ones I could pull back and later on like I said that day

18   the senior partner for the Delaware office she called me.  She and I, no she

19   said well I received your resume and I noticed that you pulled it back and she

20   is like I am in the New York office and I am like you know by me answering

21   the phone I see that you are in the New York office, you know so, you know

**A291**

60

40

1    what do you want.  But she didn't have anything to say.  I guess she was

2    just calling to let me know this right so...

3              THE REFEREE:              When had you first prepared it

4    and started sending it out?

5              HELEN MARTIN:              I had started, I probably started

6    typing it probably like around, it had to be like Christmas week because I

7    started typing it when I received it...

8              THE REFEREE:              Okay but you were just thinking

9    about resigning at that point or had you decided you would?

10             HELEN MARTIN:              No I hadn't decided that I

11   would.

12             THE REFEREE:              You had or had not?

13             HELEN MARTIN:              I had not, no.

14             THE REFEREE:              Okay.

15             HELEN MARTIN:              No I had not.

16             THE REFEREE:              Okay so now it is going out

17   there.

18             HELEN MARTIN:              Yeah it is going out there but...

19             THE REFEREE:              But you wanted as you said I

20   think you testified that you wanted it to go out on the 13th.

21             HELEN MARTIN:              Exactly.

**A292**

1    THE REFEREE:            And why was that?

2    HELEN MARTIN:           Because that was the next

3    Monday.

4    THE REFEREE:            And what prompted you to

5    decide that you wanted to resign?  What is the straw that broke the camel's

6    back?

7    HELEN MARTIN:           Monday like they allowed us

8    the opportunity to make up our time for doctor's appointments and stuff and

9    I would always keep the personnel manager abreast of me having doctor's

10   appointments and everything so I told her I had a doctor's appointment and I

11   would come in early to...

12   THE REFEREE:            Monday the 6th or Monday the

13   13th?

14   HELEN MARTIN:           The 13th.

15   THE REFEREE:            Okay.

16   HELEN MARTIN:           I told her that I would come in

17   early to work and everything so when I got there I called her and I told her

18   you know I had to leave for my doctor's appointment and she was real

19   hostile towards me.  She was hostile towards me in a way that she has

20   never been hostile towards me before.

62

1      THE REFEREE:                    Okay I don't understand.  You

2      testified that on the 10th you had maybe started sending out your resignation

3      but decided to pull it back but some didn't get pulled back and that the

4      reason you wanted to pull it back was because you wanted it to go the 13th.

5      Why did you want it to resign the 13th?

6      HELEN MARTIN:                    Because of my two-week notice

7      from, I resigned on Monday because that would have gave me exactly two

8      weeks.

9      THE REFEREE:                    And did you serve out two

10     weeks?

11     HELEN MARTIN:                    No I didn't.

12     THE REFEREE:                    Okay.  Well why did you want

13     to resign, okay so why did you want to resign?  I am still waiting to find out

14     what it is.  Can you sum it up for me?  The reason like you are going along it

15     is awful, it is stressful, what happened when you just said look I need to get

16     out of here?  What was it?

17     HELEN MARTIN:                    It was a combination of

18     everything.

19     THE REFEREE:                    Okay.

20     HELEN MARTIN:                    A combination of everything.

63

43

1      THE REFEREE:              Now why didn't you serve out

2   the two weeks?

3      HELEN MARTIN:             I didn't serve out the two

4   weeks.

5      THE REFEREE:              Why not?

6      HELEN MARTIN:             That Monday which was the

7   13th when I went to work...

8      THE REFEREE:              You were going to leave early

9   for the doctor's appointment.

10      HELEN MARTIN:             I left work and I came back but

11   prior to that I had called the personnel manager and I told her that I was

12   getting ready to leave and her conversation, my conversation and her

13   conversation it was just, it wasn't on the same pew.

14      THE REFEREE:              She was more hostile you said

15   than usual.

16      HELEN MARTIN:             Yeah.  She was very hostile.  I

17   mean she was like you have to make up your time.  You didn't make up your

18   time and I am like you know I know I have to make up my time and I just

19   went on and left and went to my doctor's appointment and I came back and

20   at that particular stage of the game I was talking to one of another attorney

**A295**

6 4

44

1    there and we were talking about hearing binders that had went out the

2    previous week was incorrectly...

3         THE REFEREE:              Okay you are getting off the

4    track.

5         HELEN MARTIN:             I had already....

6         THE REFEREE:              Well I want to know why you

7    didn't serve out the two weeks?

8         HELEN MARTIN:             Monday, Monday was when I

9    went I went to the doctor's office, right.  Tuesday, I have to really think on

10   this because I have totally erased this from my brain.

11        THE REFEREE:              Okay another words was it your

12   idea not to serve out the two weeks or was it the employer's idea?

13        HELEN MARTIN:             No it was, I called out sick.  I

14   couldn't take it no more.

15        THE REFEREE:              Okay.

16        HELEN MARTIN:             Trust me when I tell you I

17   couldn't take it, I couldn't take it.

18        THE REFEREE:              Okay.  Did they ever tell you

19   that they got your resume, I mean your resignation and they accepted it?

20        HELEN MARTIN:             No they didn't but the

21   management, one of the people from the management committee, I don't

**A296**

1    know if it was that Monday or Tuesday she sent me an email stating she

2    wanted to talk to me about why I was leaving, the whole overall deal.

3              THE REFEREE:              Okay.

4              HELEN MARTIN:              Keep in mind this is the same

5    person the member of the management committee that I have been talking

6    to all along about the problems going on in the Delaware office.

7              THE REFEREE:              Okay.  So you told her why?

8              HELEN MARTIN:              Yes I went down and she and I

9    talked.

10              THE REFEREE:              What did you tell her?

11              HELEN MARTIN:              The same thing I sat here and

12    told you.

13              THE REFEREE:              Okay.  And what was her

14    reaction?

15              HELEN MARTIN:              She actually didn't have a

16    reaction.

17              THE REFEREE:              Okay.  All right.  Anything else?

18              HELEN MARTIN:              No.

19              THE REFEREE:              Okay.  That is fine.  I think I got

20    all the information I need.   This hearing is concluded.

1        HELEN MARTIN:      Would you like to have copies

2  of any of this information?

3        THE REFEREE:      I don't need them.

4        HELEN MARTIN:      Okay.

5        THE REFEREE:      Unless there is something an

6  absolute particular but I think your testimony is good enough.

7        HELEN MARTIN:      Well I think it would be

8  beneficial if you would summons this.

9        THE REFEREE:      I don't want your Christmas

10  card.  Christmas card is hearsay anyhow.

11        HELEN MARTIN:      You can have a copy of it.

12        THE REFEREE:      I don't want it.  It is hearsay.

13        HELEN MARTIN:      Okay, it is hearsay and

14  someone signed their name?

15        THE REFEREE:      Absolutely even if they swear.

16  Anything else that you need to be on the record?

17        HELEN MARTIN:      Yes.

18        THE REFEREE:      I think I have all the information

19  I need unless there is something else that is, there is nobody here to rebut

20  what you said.

21        HELEN MARTIN:      Nobody here to do what?

67

47

1      THE REFEREE:      There is nobody here to rebut

2  what you said so is there anything else that I need?

3      HELEN MARTIN:      Yeah I do, I would like for this

4  to go on record.

5      THE REFEREE:      What is that?

6      HELEN MARTIN:      It is an email.  It didn't come to

7  me.  It was given to me.

8      THE REFEREE:      And why would I want that?

9      HELEN MARTIN:      Well actually you don't have to

10  have it.

11      THE REFEREE:      I mean what is about it that you

12  thought it would be important?

13      HELEN MARTIN:      Basically it is an email that one

14  of the people that I supervise he resigned as well and he had some very...

15      THE REFEREE:      That is also hearsay so no.

16      HELEN MARTIN:      Okay.

17      THE REFEREE:      Anything else?

18      HELEN MARTIN:      No that is it.

19      THE REFEREE:      Okay this hearing is concluded

20  and I will issue a written decision in less than 30 days as I said.  Thank you

21  very much for coming.  Have a good day.

**A299**

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

**Delaware Department of Labor**
(State, or local Agency, if any)

ENTER CHARGE NUMBER

☐ FEPA 030C1839
☐ EEOC 17CA300191

and EEOC

NAME (Indicate Mr., Mrs., Ms)
Helen D. Martin

HOME TELEPHONE NO. (Include Area Code)
(302) 888-0236

STREET ADDRESS                    CITY, STATE AND ZIP CODE
616 West 8th Street    Wilmington DE 19801    NCC

COUNTY

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)

NAME
Pachulski, Stang, Ziehl, Young & Jones

NO. OF EMPLOYEES OR MEMBERS 200+

TELEPHONE NUMBER (Incl. Area Code)
(302) 778-6400

STREET ADDRESS                    CITY, STATE AND ZIP CODE
919 Market Street, Wilmington DE 19801

NAME

TELEPHONE NUMBER (Include Area Code)

STREET ADDRESS                    CITY, STATE AND ZIP CODE

☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE

☐ RETALIATION    ☐ DISABILITY    ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST  9/11/2001
LATEST    1/13/03
☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

I was first hired by Respondent on January 10, 2000. In or about September 2001 Jim Stang (white) appeared in my office ...'d me he was "in charge" while I conducting company business. I was told that MaryRitchie Johnson (white), my direct 'ervisor, would negatively describe me to prospective employees that I would supervise before I met them. I was never timely told information that involved me or my department. I worked in a hostile environment. On January 13, 2003 , I was forced to tenure my resignation (constructively discharged) because of intolerable working conditions effective January 27, 2003.

Management never gave an explanation for these working conditions.

I believe I have discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Delaware Discrimination in Employment Act, as amended, because of my race (black): 1. I am Respondent's only black supervisory employee in Delaware. 2. I was promised a "pay raise" for the file room employees but never received it. Also, when I asked for a pay raise for myself, I was denied unlike that of my similarly situated fellow white co-workers.

☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

SIGNATURE OF COMPLAINANT

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

declare under penalty of perjury that the foregoing is true and correct.

01/15/03
te

_Helen D Martin_
Charging Party (Signature)

NOTARY - (When necessary to meet State and Local Requirements)

Subscribed and sworn to before me this date                    (Day, month, and year)

C FORM 5
REV 6/92

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

A300


Δπ EXHIBIT  1
Deponent Martin
Date 6-11 Rptr. 94
WWW.DEPOBOOK.COM

January 13, 2003

Pachulski, Stang, Ziehl, Young & Jones P.C.
919 North Market Street
16th Floor
P.O. Box 8705
Wilmington, DE  19899-8705

Dear Partners,

This letter is to inform management personnel effective today, January 13, 2003, I'm resigning from the Firm.

This written notice will serve as a two (2) week notice.  My last work day will be January 27, 2003.

Due to stress involved in my current DE File Room Supervisor Position, not to mention being passed over for promotions as well as previous and recent management comments.

Thank you,

Helen D. Martin

cc:    Donna Carr (LA)
       Karen Sheeler (LA)
       MaryRitchie Johnson (DE)
       Kathy Wittig (DE)

**A301**

Case 1:06-cv-00303-GMS    Document 26-7    Filed 08/30/2007    Page 51 of 52



STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS
4425 NORTH MARKET STREET
WILMINGTON, DELAWARE 19802

TELEPHONE (302) 761-8200
FAX (302) 761-6601

*Winner, Delaware Quality Award of Merit*

## NOTICE OF DISMISSAL

<u>Martin v. Pachulski, Stang, Zeihl, Young & Jones P.C.</u>              <u>State Case No: 0301839</u>

On 1/15/03 Ms. Helen D. Martin filed a charge of discrimination against her former employer Pachulski, Stang, Zeihl, Young & Jones P.C. (hereafter, Respondent) The Charge of Discrimination is hereby incorporated by reference.

<u>No Cause Finding:</u>
On August 25, 2004 the Department of Labor concluded its investigation and now finds, based on the following facts, that there is no reasonable cause to believe that a violation of the State Discrimination Act has occurred.

I.    <u>Undisputed Facts:</u>
 1. Charging Party began her employment with the Respondent on January 10, 2000 as the head file room clerk of the law firm.
 2. Charging Party resigned her position with the Respondent as of January 27, 2003.
 3. Charging Party filed her Charge of Discrimination on January 15, 2003.

II.   <u>Disputed Facts:</u>
 1. Charging Party alleges that because of a racially hostile work environment, she felt as though she had no other choice than to resign her position.
 2. Charging Party states that her immediate supervisor, Mary Ritchie Jones would describe her negatively to prospective employees she was to supervise before she even met them.
 3. Charging Party states that she was never given timely information that involved her or her department.
 4. Charging Party states that she was the only black supervisory employee in the Respondent's Delaware office.
 5. Charging Party states that she and her staff were promised pay raises that were never received. Further that similarly situated did receive these pay raises.
 6. Respondent denies that the Charging Party was constructively discharged because of her race.
 7. Respondent states that at no time did they withhold information from the Charging Party about the operation of her department and that all related matters were discussed with her. Respondent states that they are unsure what information in particular was kept from the Charging Party.
 8. Respondent states that they did give all of their support staff a pay raise of 5% effective 1/1/03. The Respondent states they executed this pay raise after they conducted a market survey of wages paid to the support staff of other law firms in Wilmington.

III.  <u>Resolution of Material Facts in Dispute:</u>
 1. The Respondent submitted a position statement that included a workforce analysis showing the across the board pay raise to their support staff.
 2. During the course of the investigation into this matter, the DDOL conducted extensive interviews with the Charging Party's witnesses. Further, a request for further information was made to the Respondent for the names of other firm employees who could provide relevant information.

EXHIBIT 3
Deponent _Martin_
Date _6-11_ Rptr. _94_
WWW.DEPOBOOK.COM

**A302**

3. The result of the interviews indicated that the hostile work environment the Charging Party complained of was the product of a contentious relationship between the Charging Party and her supervisor, Mary Ritchie Johnson. (Hereafter, Ms. Ritchie).

4. Another potential cause of the Charging Party's belief that she was being discriminated against was the conservative and risk adverse nature of the Respondent's law firm. It appears from information developed in the record that the Charging Party was one of the Respondent's very first employees. It seems she was hand picked by one of the Firms partners to run their file room when the Wilmington office was opened. Regardless of the fact that the Charging Party was given a title as 'supervisor' it appears that she did not have any actual supervisory authority. In this regard the Charging Party was placed in a situation where she was hired to institute changes and procedures that the Respondent was not actually willing to undertake.

5. There appears to be a confluence of factors that placed the Charging Party in what she would subjectively consider an untenable position. The first factor would be the conservative and risk adverse nature of the Respondent's business as mentioned above. The second is the fact that Ms. Ritchie acted as a clearinghouse for information between the Charging Party and upper management. The end result of this situation seems to be that the Charging Party was thwarted from doing the job she was actually hired to do.

6. It is very significant to note that this perception was echoed by more than one of the individuals interviewed during the investigation. It was further stated by one of them that this would have been the outcome regardless of the Charging Party's race.

IV.    **Resolution:**

Charging Party was given notice of the Respondent's position and was afforded a chance to give answer but has failed to do so. Charging Party has failed to show by a preponderance of the evidence that she was discriminated against because of her race.

The Charge of Discrimination, State Case No. 0301839 is hereby Dismissed pursuant to 19 *Del. C.* § 712(b). There is no statutory right of appeal of the Department's No Cause Dismissal. Since this decision ends the administrative process, you may have a right of judicial review under default principles of law in the Court of Chancery. See Holland v. Zarif, 794 A. 2d 1254 (Ch. Ct. 2002).

8/31/04
_____
DATE

8/31/04
_____
DATE

Thomas J. Smith
LABOR LAW ENFORCEMENT OFFICER

JULIE CUTLER
LABOR LAW ENFORCEMENT SUPERVISOR

**A303**